**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

JOHN MULLINS and THOMAS SUNDERLIN,        Case No.
individually and as representatives of a class of
similarly situated persons, and on behalf of the
401(k) Pension Plan,

          Plaintiffs,

    v.

NATIONAL RURAL ELECTRIC
COOPERATIVE ASSOCIATION and the
INSURANCE AND FINANCIAL SERVICES
COMMITTEE,

          Defendants.

_____/

**CLASS ACTION COMPLAINT**

## INTRODUCTION

1.        Over the past 15 years, Defendants National Rural Electric Cooperative Association ("NRECA") and the Insurance and Financial Services Committee (the "Committee") of the NRECA Board of Directors (collectively "Defendants") have repeatedly breached their fiduciary duties in managing the NRECA 401(k) Pension Plan (the "Plan") and engaged in transactions prohibited by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1101, *et seq.*, harming over 77,000 Plan participants and beneficiaries.

2.        In July 2012, after a multi-year investigation, the U.S. Department of Labor found that NRECA "made payments to itself that exceeded NRECA's direct expenses in providing services to the plans."[1] As a result of the investigation, NRECA agreed to restore $27.3 million to the Plan and two other employee benefit plans it administers and pay $2.7 million in civil penalties.[2] Although the full settlement terms are not public, the Department of Labor's press release quoted Phyllis Borzi, then-Assistant Secretary of Labor for Employee Benefits Security, stating that the "settlement sends a clear message to plan fiduciaries that they cannot profit from selecting themselves to provide services to plans."[3]

3.        Apparently, that message was not as "clear" to Defendants as the Department of Labor intended. Despite the government settlement and its requirement to engage an independent fiduciary, Defendants continued to breach their fiduciary duties to the Plan and found themselves in yet another legal battle in July 2019.

4.        This time, Defendants faced a class action lawsuit. The suit alleged that Defendants: "(1) failed to prudently monitor and control Plan administrative costs in the interests of Plan

---

[1] U.S. Department of Labor, *National Rural Electric Cooperative Association Agrees to Restore $27.3 Million to Benefit Plans, Settling US Labor Department Claims*, DOL.GOV, https://www.dol.gov/newsroom/releases/ebsa/ebsa20120705 (last visited May 1, 2025).
[2] *Id.*
[3] *Id.*

participants; (2) appropriated the extra fees from the Plan for their own benefit; and (3) diverted monies from the Plan to subsidize other expenses of NRECA and its member employers."[4]

5.      After about 18 months of litigation, Defendants settled the case on behalf of "[a]ll participants and beneficiaries of the NRECA 401(k) Pension Plan at any time from July 25, 2013, through July 31, 2020."[5] They agreed to pay $10 million into a fund to be distributed pro rata to current and former Plan participants based on their average account balances.[6]

6.      Remarkably, despite *two* settlement agreements mandating independent fiduciary oversight, Defendants are *still* charging the Plan more for Administrative Costs than ever.[7] Indeed, the Plan's 2020 administrative charge of ***$415 per participant*** and the 2023 charge of ***$410 per participant*** outpace even the "grossly excessive" 2017 charge of $404 per participant flagged by the Plan participants in the prior lawsuit.[8] These increases are indefensible, especially given that the Plan's assets have grown 10% since 2020 alone—which should have enabled significant fee reductions—and trends in the retirement plan marketplace show that administrative fees have generally been *declining* across the market on a per-participant basis.

7.      As fiduciaries, Defendants must act for the exclusive benefit of Plan participants, without self-interest, and ensure fees are reasonable. 29 U.S.C. § 1104(a)(1). Defendants failed to act in the best interests of Plan participants and beneficiaries, ignored their fiduciary duty to control costs, unlawfully appropriated a portion of the Plan's fees for their own benefit, and squandered the Plan's bargaining power, causing participants to bear unreasonably high Administrative Costs.

8.      As a direct result of Defendants' mismanagement and failure to control the Plan's

---

[4] *Intravaia v. NRECA*, No. 1:19-cv-00973-LO-IDD, Dkt. 1 at 2 (E.D. Va. July 25, 2019).
[5] *Intravaia v. NRECA*, 2020 WL 8918378, Dkt. 108, at 5 (E.D. Va. Dec. 3, 2020) (Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement).
[6] *Id.*
[7] The term "Administrative Costs" used throughout the complaint, including in the illustrations below, represents the "Total administrative expenses" reported in the annual Form 5500 (Schedule H – Part II.i.(12)), minus the portion categorized as "Investment advisory and investment management fees" (Schedule H – Part II.i.(5)).
[8] *Intravaia*, Dkt. 1 at 3.

costs, Plan participants have suffered millions of dollars in losses from excessive and improper fees.

9.      Plaintiffs John Mullins and Thomas Sunderlin, individually and on behalf of all Plan participants and beneficiaries, bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a), to hold Defendants liable for all losses to the Plan resulting from the breaches of fiduciary duties alleged herein, and to restore to the Plan any profits made through Defendants' use of the Plan's assets. In addition, Plaintiffs seek to reform the Plan to comply with ERISA and to prevent further breaches of ERISA's fiduciary duties and other such equitable or remedial relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

10.      This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because this is an action under 29 U.S.C. § 1132(a)(2) and (3), for which federal district courts have exclusive jurisdiction under 29 U.S.C. § 1132(e)(1).

11.      This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because the Plan is administered in this district.

## PARTIES

**Plaintiffs**

12.      Plaintiff John Mullins resides in Nixa, Missouri, is a current participant in the Plan, and has been a Plan participant since 2019. Plaintiff Mullins was charged a pro rata share of Plan fees through his Plan account and, therefore, was subject to the excessive fees alleged herein. Plaintiff Mullins's Plan account would be worth more today had Defendants not breached their fiduciary duties as described herein.

13.      Plaintiff Thomas Sunderlin resides in Rockbridge, Ohio, is a current participant in the Plan, and has been a Plan participant since 2015. Plaintiff Sunderlin was charged a pro rata share of Plan fees through his Plan account and, therefore, was subject to the excessive fees alleged

herein. Plaintiff Sunderlin's Plan account would be worth more today had Defendants not breached their fiduciary duties as described herein.

**NRECA**

14.    NRECA "is a nonprofit, nonpartisan service organization of approximately 900 rural electric cooperatives or systems (Member Systems)."[9]

15.    In addition to the Plan, NRECA sponsors two other primary employee benefit plans governed by ERISA:

> a.    The Retirement Security Plan – This is a defined benefit pension plan established to provide lifetime monthly retirement income to eligible employees of participating cooperatives. It is funded through employer contributions.

> b.    The NRECA Group Benefits Program – This program offers a comprehensive suite of health and insurance benefits, including medical, dental, vision, life insurance, accidental death and dismemberment, long-term disability, and other ancillary benefits. These benefits are provided through a combination of self-funded and insured arrangements and are available to both active employees and retirees of participating cooperatives.

16.    The business and affairs of NRECA are managed under the direction of its Board of Directors, which has authority over NRECA's employees, budget, and duties. Member Systems elect the Board of Directors and its officers and must also approve all amendments to the bylaws. Given this governance structure, NRECA serves not only its own financial interests as a national cooperative but also the financial interests of Member Systems, upon whom NRECA and its employees depend for their compensation and continued employment.

---

[9] December 31, 2023, Independent Auditor's Report for the National Rural Electric Cooperative Association 401(k) Pension Plan ("2023 Auditor Report") at 8.

CLASS ACTION COMPLAINT

17.     NRECA is the "plan sponsor" of the Plan within the meaning of 29 U.S.C. § 1002(16)(B). Through its Board of Directors, NRECA organized the Committee and appointed the Committee to be a named fiduciary of the Plan. NRECA has the discretion to appoint individual members of the Committee, is responsible for ongoing oversight of the Committee and its members and has the authority to remove the Committee from its position or to remove individual Committee members from the Committee. Based on these duties, NRECA exercises "discretionary authority or discretionary control respecting the management of [the Plan]," exercises "authority or control respecting management or disposition of [the Plan's] assets," and "has discretionary authority or discretionary responsibility in the administration of [the Plan]," and therefore acts as a functional fiduciary of the Plan under 29 U.S.C. § 1002(21)(A).

**The Committee**

18.     The Committee is the named fiduciary of the Plan, as contemplated by 29 U.S.C. § 1102(a)(2). The Committee exercises overall fiduciary responsibility for selecting and monitoring the Plan's service providers and administering the Plan. *See* 2023 Auditor Report at 8. The Committee also appoints NRECA employees to carry out specific administrative functions and monitor and oversee their work. Pursuant to these duties, the Committee exercises "discretionary authority or discretionary control respecting the management of [the Plan]," exercises "authority or control respecting management or disposition of [the Plan's] assets," and "has discretionary authority or discretionary responsibility in the administration of [the Plan]," and therefore also acts as a fiduciary of the Plan under 29 U.S.C. § 1002(21)(A).

**The Plan**

19.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

20.     The Plan is also a "plan maintained by more than one employer" within the meaning of 26 U.S.C. § 413(c), commonly referred to as a "multiple employer plan."

21.     The Plan covers eligible employees of participating member cooperatives of NRECA. Participants contribute to their accounts through salary deferrals and may also receive

CLASS ACTION COMPLAINT

contributions from their employers.

22.     Each Plan participant's account is credited with the participant's contributions and allocations of (a) the Member System's contributions and (b) Plan earnings (losses) and charged with an allocation of administrative expenses.[10]

23.     Expenses for administrative services provided by NRECA are paid by either the Plan or the Plan's participating Member Systems. All other administrative expenses of the Plan are paid directly from assets of the Plan and are recognized by the Plan during the period in which they are incurred.[11]

24.     As of the end of 2023, the Plan had $14.9 billion in assets and 77,706 participants with account balances, making it one of the largest defined contribution plans in the United States.[12]

## COMMON FACTUAL ALLEGATIONS

### A.     Background of 401(k) MEPs

25.     Defined contribution plans like the 401(k) were never intended to serve as the primary—or sole—source of retirement income for American workers. But with the continued decline of employer-sponsored pensions and growing uncertainty surrounding Social Security, 401(k) plans have become the main retirement savings vehicle for a broad and expanding segment of the workforce.

26.     Most 401(k) plans are sponsored and maintained by a single employer, which must serve as a fiduciary, select a recordkeeper, make plan design decisions, file Form 5500s, and cover the associated administrative costs. These responsibilities can be especially challenging for small employers.[13]

---

[10] *See* 2023 Auditor Report at 9.
[11] *See* 2023 Auditor Report at 8.
[12] National Rural Electric Cooperative Association, Form 5500, 2023 Annual Return/Report of Employee Benefit Plan for 401(k) Pension Plan, at 2 (hereinafter "NRECA Form 5500 (2023)").
[13] Definition of "Employer" Under Section 3(5) of ERISA—Association Retirement Plans and Other Multiple-Employer Plans, 84 Fed. Reg. 37,508, 37,508 (July 2019) (hereinafter Final

27.     In contrast, a multiple employer plan ("MEP") is a retirement plan adopted by two or more employers and administered by a MEP sponsor. Although MEPs can be either defined benefit or defined contribution plans, most are 401(k)-type defined contribution plans. MEPs allow employers to pool resources, offload fiduciary duties to the sponsor (typically a trade or industry group or professional employment organization), and share the administrative burdens, compliance responsibilities, and overall costs of offering a retirement plan.

28.     Due to their pooled assets and the relative sophistication of their sponsors, MEP participants should generally benefit from lower investment management fees than those in small or mid-sized single-employer plans.[14] MEPs are also positioned to leverage their scale and bargaining power to reduce costs from third-party service providers.[15]

29.     Describing the "distinct economic advantages" created by the large scale of MEPs, the Department of Labor recently explained:

> First, as scale increases, marginal costs for MEPs would diminish and MEPs would spread fixed costs over a larger pool of member employers and employee participants, creating direct economic efficiencies. Second, larger scale may increase the negotiating power of MEPs. Negotiating power matters when competition among financial services providers is less than perfect and they can command greater profits than in an environment with perfect competition. Very large plans may sometimes exercise their own market power to negotiate lower prices, translating what would have been higher revenue for financial services providers into savings for member employers and employee participants. . . . [¶] As a result of these two types of scale efficiencies, MEPs operating as a large single plan likely will secure substantially lower prices from financial services companies than such firms would charge separate small employer plans. Asset managers commonly offer

---

Regulation) ("Cost and regulatory complexity discourage employers—especially small businesses—from offering workplace retirement plans for their employees.").

[14] Final Regulation, *supra* note 11, at 37,510 (noting that "investment companies often charge lower fund fees for plans with greater asset accumulations" and suggesting that "because MEPs facilitate the pooling of plan participants and assets in one large plan, rather than many small plans, they enable small businesses to give their employees access to the same low-cost funds as large employers offer").

[15] *Id.* at 37,533.

CLASS ACTION COMPLAINT

proportionately lower prices, relative to assets invested, to larger investors, under so-called tiered pricing practices. For example, investment companies often offer lower-priced mutual fund share classes to customers whose investments in a fund surpass specified break points. These lower prices may reflect scale economies in any or all aspects of administering larger accounts, such as marketing, distribution, asset management, recordkeeping, and transaction processing. Large MEPs likely will qualify for lower pricing compared with separate plans of small employers. MEP participants that benefit from lower asset-based fees would enjoy superior investment returns net of fees.[16]

30.    While MEPs provide economies of scale, they are also particularly vulnerable to abuse. As the U.S. Government Accountability Office explained in its report on MEPs:

There is also concern about whether MEPs are any more or less prone to abuse than other types of pension arrangements. Labor officials said the potential for inadequate employer oversight is greater because employers have passed along so much responsibility to the entity controlling the MEP. Labor officials noted that potential abuses might include layering of fees, misuse of assets, or falsification of benefit statements. One pension expert agreed that there was potential for MEPs to charge excess fees without the enrolled employer being aware of those fees. While Labor officials acknowledged that single-employer plans could be subject to similar abuses, they cautioned that MEPs' structure and operation could make them particularly susceptible to such abuses.[17]

**B.    ERISA's fiduciary standards and cost-conscious management.**

31.    To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence on Defendants as Plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. §1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. §1104(a)(1)(B). These dual fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019).

---

[16] *Id.*

[17] United States Government Accountability Office, *Federal Agencies Should Collect Data and Coordinate Oversight of Multiple Employer Plans*, GAO-12-665 (Sept. 2012), available at https://www.gao.gov/assets/gao-12-665.pdf.

CLASS ACTION COMPLAINT

32.     These general fiduciary duties of loyalty and prudence are strengthened by a list of prohibited transactions, which are considered *per se* ERISA violations because they entail a high potential for abuse. To this end, Section 1106(a) states, in pertinent part: "A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect– (A) sale or exchange, or leasing, of any property between the plan and a party in interest; . . . (C) furnishing of goods, services, or facilities between the plan and party in interest; [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]" 29 U.S.C. § 1106(a)(1). Section 1106(b) further provides that: "A fiduciary with respect to the plan shall not – (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interest of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b).

33.     A critical step in fulfilling these fiduciary duties is conducting rigorous oversight of all service providers to "ensure that the services provided to [the] plan are necessary and that the cost of those services is reasonable."[18]

34.     To meet this obligation, fiduciaries must regularly benchmark a 401(k) plan's fees against those charged by comparable plans.[19] This is not optional—it is an essential element of prudent oversight.[20] Benchmarking exposes excessive charges, identifies cost-saving

---

[18] U.S. Department of Labor, *Understanding Retirement Plan Fees and Expenses*, DOL.Gov, available at https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses (last visited May 16, 2025).
[19] Stephen Miller, *401(k) Sponsors Focus on Benchmarking—and Lowering—Fees*, SHRM.Org (Feb. 22, 2018), https://www.shrm.org/topics-tools/news/benefits-compensation/401k-sponsors-focus-benchmarking-and-lowering-fees.
[20] Ed McCarthy, *The Why, What and How of Plan Benchmarking*, PlanSponsor.Com (Jan. 2, 2025), https://www.plansponsor.com/the-why-what-and-how-of-plan-benchmarking/ (noting that "fiduciaries are responsible for ensuring that the services provided to their plans are necessary and that the cost of those services is reasonable" and that "an annual exercise to put some

opportunities, and ensures 401(k) plans are paying market rates for both investment and administrative services.[21]

35.    The benchmarking process must be grounded in comprehensive data, including peer plan disclosures, industry surveys, and independent benchmarking studies.[22] Just as important, fiduciaries must periodically issue competitive requests for proposals ("RFPs") to test the market, challenge the status quo, and compel service providers to offer more favorable terms.[23] Absent these steps, fiduciaries risk breaching their duty of prudence by allowing unchecked fees to erode participants' retirement savings. Benchmarking and RFPs are not discretionary—they are fiduciary imperatives designed to enforce cost discipline and protect plan participants.

36.    To further strengthen cost oversight, fiduciaries should also establish robust governance procedures. This includes forming a knowledgeable fiduciary committee that meets regularly, maintains detailed meeting minutes, and reviews all plan-related costs and services.

**C.    Defendants' violations of ERISA.**

37.    Defendants violated ERISA by: (1) failing to prudently monitor and control the Plan's Administrative Costs in the best interests of Plan participants; and (2) diverting excess fees from the Plan for their own benefit and unfairly allocating fees and costs to the Plan to subsidize other expenses of NRECA and its member employers.

---

guardrails around reasonableness through comparative benchmarking is a prudent part of the fiduciary process").

[21] McCarthy, *supra* note 22 (noting that 401(k) plans that fail to "benchmark and price the market . . . could end up [paying] anywhere from 50% to 100% over the market for similar plans receiving similar services").

[22] *See* U.S. Department of Labor, *Meeting Your Fiduciary Responsibilities*, DOL.Gov, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities-booklet-2021.pdf (last visited May 22, 2025) (stating that plan fiduciaries are required to evaluate the reasonableness of fees using comparative data from service providers); McCarthy, *supra* note 22 (advising fiduciaries to benchmark using peer group comparisons, industry surveys, and third-party analytics to evaluate both cost and quality of service).

[23] Miller, *supra* note 21 (noting that the "most effective way to meet th[e] fiduciary requirement" to benchmark plan fees "is by engaging in a request for proposals every three to five years").

### i. Defendants failed to prudently monitor and control the Plan's Administrative Costs in the interest of Plan participants.

38.     Administrative services "maintain the framework of a 401(k) plan" and generally include the following:

a.      "Recordkeeping, including maintaining plan records; processing employee enrollment; processing participants' investment elections, contributions, and distributions; and issuing account statements to participants;"

b.      "Transaction processing, including purchases and sales of securities within participant accounts;"

c.      "Plan creation/conversion/termination, including associated administrative services;" and

d.      "Trustee services, providing the safe holding of the plan's assets in a trust, as required by ERISA."[24]

39.     The market for 401(k) administrative services is robust and mature, dominated by established providers and has high barriers to entry. It is generally segmented by plan size: small (up to 100 participants), medium (100 to 1,000 participants), large (1,000 to 10,000 participants), and jumbo (more than 10,000 participants).

40.     During the Class Period, the Plan had between 71,007 (year-end 2020)[25] and 77,166 (year-end 2023)[26] participants with account balances. Based on the number of participants, the Plan easily qualifies as a jumbo plan.

41.     The Plan also held between $13.6 billion (year-end 2020)[27] and $14.9 billion (year-

---

[24] Investment Company Institute, *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2022* (July 2023), available at https://www.ici.org/system/files/2023-07/per29-06.pdf.
[25] National Rural Electric Cooperative Association, Form 5500, 2020 Annual Return/Report of Employee Benefit Plan for 401(k) Pension Plan, at 2 (hereinafter "NRECA Form 5500 (2020)").
[26] NRECA Form 5500 (2023), at 2.
[27] NRECA Form 5500 (2020), Schedule H at 2.

CLASS ACTION COMPLAINT

end 2023)[28] in assets under Defendants' fiduciary care, placing it among the largest defined contribution MEPs in the United States.

42.    ERISA fiduciaries overseeing jumbo MEPs like the Plan have a heightened duty to rein in costs and ensure that participants benefit from the economies of scale these plans are intended to provide. By pooling assets and consolidating administrative functions, MEPs offer fiduciaries the ability—and the obligation—to negotiate reduced fees for investment management, recordkeeping, and other essential services.

43.    Defendants ignored that obligation. Rather than using the Plan's scale to reduce expenses, they allowed Administrative Costs to rise throughout the Class Period. Despite the Plan's significant bargaining power, Plan participants were burdened with steadily increasing fees, both per participant and as a percentage of total assets, as illustrated below.

*Illustration 1: Plan Assets, Participants, and Cooperatives*

|      | Plan Assets (Year End) | Participants with Account Balances (Year End) | Contributing Cooperatives |
|------|------------------------|-----------------------------------------------|---------------------------|
| 2023 | $14,978,676,240        | 77,706                                        | 889                       |
| 2022 | $12,972,737,361        | 76,625                                        | 905                       |
| 2021 | $15,333,884,530        | 73,783                                        | 914                       |
| 2020 | $13,602,217,345        | 71,742                                        | 921                       |

*Illustration 2: The Plan's Exorbitant Administrative Costs*

|      | Administrative Costs | Per Participant[29] | Per Cooperative |
|------|----------------------|---------------------|-----------------|
| 2023 | $31,621,957          | $410                | $35,570         |
| 2022 | $29,590,795          | $393                | $32,697         |

[28] NRECA Form 5500 (2023), Schedule H at 2.

[29] To estimate per-participant cost of administering the Plan over the course of each year, this chart uses the average of the year-start and year-end number of participants with account balances, as reflected on Form 5500s.

| 2021 | $28,812,706 | $396 | $31,524 |
| 2020 | $29,432,432 | $415 | $31,957 |

44.     These Administrative Costs were unreasonably high and out of step with the market for similarly sized defined contribution MEPs. For example, in 2023, the GE Retirement Savings Plan (132,850 active participants on average) reported per participant Administrative Costs that were ***37 times lower*** than the Plan's costs. That same year, the Comcast Corporation Retirement – Investment Plan (128,540 active participants on average) and the Honda 401(k) Savings Plan (37,875 active participants on average) reported Administrative Costs per participant that were ***18 times*** and ***14 times lower*** than the Plan, respectively.

45.     Even compared to other association-sponsored MEPs, the Plan's annual Administrative Costs were excessive. The National Telecommunications Cooperative Association ("NTCA") plan—another large-scale association-sponsored MEP that manages benefit plans for tens of thousands of cooperative employees nationwide and performs in-house administrative services for the those plans through its wholly owned subsidiary—reported Administrative Costs of $102 per participant in 2020 (***4 times lower*** than the Plan), and $157 per participant in 2023 (***2.6 times lower*** than the Plan).

46.     As the following illustrations show, the Plan's Administrative Costs were also excessive when measured as a percentage of the total assets, even among jumbo defined contribution MEPs, throughout the Class Period:

*Illustration 3: Comparison of Administrative Costs as a Percentage of Total Assets, 2023*

| | Total Assets | Average Number of Active Participants | Administrative Costs Per Participant[30] | Administrative Costs as % of Total Assets |
|---|---|---|---|---|
| **GE Retirement Savings Plan** | $19,485,469,047 | 132,850 | $11 | 0.0076% |
| **Comcast Corporation Retirement – Investment Plan** | $17,368,669,862 | 128,540 | $23 | 0.0171% |
| **NRECA 401(k) Pension Plan** | **$14,978,676,240** | **77,166** | **$410** | **0.2111%** |
| **Honda 401(k) Savings Plan** | $5,489,229,765 | 37,875 | $29 | 0.0198% |
| **Savings Plan for Employees of NTCA and Its Members** | $2,998,904,469 | 23,057 | $157 | 0.1204% |

---

[30] To estimate per-participant cost of administering the Plan over the course of each year, this chart uses the average of the year-start and year-end number of participants with account balances, as reflected on Form 5500s.

*Illustration 4: Comparison of Administrative Costs as a Percentage of Total Assets, 2022*

|  | Total Assets | Average Number of Active Participants | Administrative Costs Per Participant[31] | Administrative Costs as % of Total Assets |
|---|---|---|---|---|
| **GE Retirement Savings Plan** | $24,786,830,027 | 163,581 | $14 | 0.0090% |
| **Comcast Corporation Retirement – Investment Plan** | $14,751,564,896 | 130,606 | $39 | 0.0306% |
| **NRECA 401(k) Pension Plan** | **$12,972,737,361** | **75,204** | **$393** | **0.2281%** |
| **Honda 401(k) Savings Plan** | $4,746,332,021 | 36,588 | $41 | 0.0317% |
| **Savings Plan for Employees of NTCA and Its Members** | $2,623,829,127 | 22,475 | $136 | 0.1161% |

47.    The Plans' Administrative Costs are equally egregious compared to broader retirement industry trends. To better understand those trends, Brightscope, a financial information company focused on the retirement market, and the Investment Company Institute ("ICI"), a trade association representing regulated investment funds, "analyze[d] plan-level data gathered from audited Form 5500 filings of private sector defined contribution (DC) plans[.]"[32] Their

---

[31] To estimate per-participant cost of administering the Plan over the course of each year, this chart uses the average of the year-start and year-end number of participants with account balances, as reflected on Form 5500s.

[32] BrightScope and Investment Company Institute, *The Brightscope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2021*, at II (Aug. 2024), available at https://www.ici.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf (hereinafter "BrightScope/ICI Study (2024)").

collaboration produced "a total plan cost measure that includes all fees on the audited Form 5500 reports as well as fees paid through investment expense ratios."[33] In effect, the total plan cost permits a straight "apples-to-apples" comparison of the total fees incurred by different plans.

48.    The most recent BrightScope/ICI Study, published in August 2024, examined data from "about 58,000 large 401(k) plans (with between four and 100 investment options and typically 100 participants or more) with total plan cost information, 50,000 large 401(k) plans with mutual fund investments, and a sample of more than 16,500 consistent large 401(k) plans with mutual funds present from 2009 to 2021."[34] The study confirmed that "larger plans tend to have a lower total plan cost when measured as a percentage of plan assets" and "[s]ince 2009, total plan cost has decreased whether measured on a plan-, participant-, or asset-weighted basis."[35]

49.    Specifically, for plans with more than $1 billion in assets, the average total plan cost dropped from 0.36% of total assets in 2009 to 0.26% of total assets in 2021.[36] Of those amounts, only 18% can be attributed to Administrative Costs,[37] or approximately 0.06% of total assets in 2009 and 0.04% of total assets in 2021.

50.    The Plan's Administrative Costs, by contrast, were nearly *4.7 times larger* in 2021 than the average for similarly sized plans. From 2020 to 2023, the Plan's Administrative Costs alone ranged from 0.19% to 0.23%—approaching the average *total plan cost* incurred by other large plans, which includes both administrative and investment management fees.

51.    Defendants' failure to control rising Administrative Costs demonstrates a fundamental failure to capitalize on the MEP's significant advantages over smaller plans. More egregiously, rather than using the Plan's economies of scale to drive down fees, Defendants exploited the centralized control and reduced oversight typical of MEPs to layer fees, conceal

---

[33] BrightScope/ICI Study (2024), at 47.
[34] *Id.*
[35] *Id.* at 48.
[36] *Id.* at 49.
[37] *Id.* at 49, n.47.

excessive charges, and divert Plan assets for their own benefit. In doing so, Defendants abandoned their core fiduciary duties of prudence and loyalty, and violated ERISA.

### ii. Defendants used the extra fees from the Plan for their own benefit.

52.    Defendants neglected their fiduciary duties while benefitting from the very costs they failed to control. Rather than using their authority to reduce Administrative Costs, they allowed those costs to rise—ensuring that a significant portion flowed back to NRECA. As the next illustration shows, NRECA's compensation increased steadily, year after year.

***Illustration 5: NRECA's Rising Compensation from the Plan, 2020-2023***

|      | NRECA's Compensation | Per Participant[38] | Per Cooperative |
|------|----------------------|---------------------|-----------------|
| **2023** | $24,447,849 | $317 | $27,500 |
| **2022** | $23,200,318 | $308 | $25,636 |
| **2021** | $23,144,204 | $318 | $25,322 |
| **2020** | $23,133,032 | $326 | $25,117 |

53.    But Defendants did more than just increase NRECA's compensation from the Plan. Over the past decade, Defendants also shifted a disproportionate share of NRECA's total compensation onto the Plan, compared to the other two benefit plans NRECA sponsors.

54.    In 2013, NRECA's total compensation of $39,162,880 was roughly evenly divided across the three plans: $14,157,880 (36%) came from the Plan; $13,253,000 (34%) from the Retirement Security Plan; and $11,752,000 (30%) from the Group Benefits Program.

*55.*    By 2023, Defendants had shifted a significantly greater burden onto Plan participants. Compensation from the Plan surged to over $24.4 million, representing ***more than 52%*** of NRECA's total compensation. Meanwhile, compensation from the Retirement Security

---

[38] To estimate per-participant compensation over the course of each year, this chart uses the average of the year-start and year-end number of participants with account balances, as reflected on Form 5500s.

Plan fell to $12,662,000—nearly $600,000 less than in 2013—and the Group Benefits Program dropped to $9,383,000, down $2.37 million from 2013. Together, those two programs accounted for just 47% of NRECA's compensation in 2013.

56.     In effect, Defendants exploited their fiduciary control over the Plan to subsidize NRECA's other benefit programs—diverting participant-paid fees to underwrite unrelated expenses. This blatant misuse of Plan assets violated ERISA's core fiduciary duties, including the duty of loyalty and the obligation to act exclusively in participants' interests.

## CLASS ACTION ALLEGATIONS

57.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually and on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

58.     In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class (the "Class"):

> All participants and beneficiaries of the NRECA 401(k) Pension Plan who were charged Plan fees from August 1, 2020, through the date of judgment.

Excluded from the Class are members of the Insurance and Financial Services Committee, the NRECA's Board of Directors, and any other NRECA employees with discretionary responsibility for the Plan's administrative functions or costs.

59.     **Numerosity:** The Class is so numerous that joinder of all Class members is impracticable. The Plan averaged more than 70,000 participants during the Class Period.

60.     **Predominate Common Questions:** Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

a.     whether Defendants breached their fiduciary duties by engaging in the conduct alleged herein;

b.     whether Defendants engaged in prohibited transactions;

c.     whether NRECA breached its duty to monitor the Committee;

d.     the proper form of Plan-wide equitable and injunctive relief; and

e.     the proper measure of monetary relief.

61.     **Typicality:** Plaintiffs' claims are typical of the claims of the Class because Plaintiffs are participants in the Plan and suffered injuries as a result of Defendants' breaches of fiduciary duty and other unlawful conduct as alleged herein. Defendants' imprudent and disloyal actions affected Plaintiffs and all Class members similarly.

62.     **Adequate Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs and Plaintiffs' counsel have no interest that is antagonistic to the interests of the Class, and Defendants have no defense unique to any Plaintiff or Class member. Plaintiffs and Plaintiffs' counsel are committed to vigorously prosecuting this action on behalf of the Class, and they have the resources to do so.

63.     A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all class members, and their pursuit of individual actions, is impracticable, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, Plaintiffs are unaware of any difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3).

## COUNT I

### Breach of Duties of Loyalty and Prudence

### 29 U.S.C. §§ 1104 and 1109

64.     Plaintiffs incorporate and reallege the foregoing factual allegations by reference.

65.     Defendants are fiduciaries under ERISA because they exercise discretionary authority or control regarding management of the Plan and exercise authority or discretionary control as regards to the management or disposition of the Plan's assets including, but not limited to, the payment of fees and other compensation associated with the Plan's operation.

66.     ERISA imposes strict fiduciary duties upon Defendants in their administration of the Plan and required them to closely monitor and control Plan expenses to ensure that such expenses were reasonable and appropriate and were not used to benefit Defendants' interests.

67.     The scope of Defendants' fiduciary duties and responsibilities under ERISA includes discharging their duties with respect to the Plan solely in the interest of Plan participants and beneficiaries and for the exclusive purpose of providing benefits to Plan participants and their beneficiaries and defraying reasonable expenses of administering the Plan. *See* 29 U.S.C. § 1104(a)(1)(A)(i)-(ii). Additionally, Defendants are required to act with the care, skill, prudence, and diligence required by ERISA. *See id.* at § 1104(a)(1)(B).

68.     Defendants have breached these duties, and continue to breach these duties, by engaging in the conduct described herein.

69.     Defendants did not manage the Plan as a prudent investor would, especially regarding Defendants' vast experience and knowledge in retirement plan management, in part acquired as a result of investigations, litigation, and settlements reached with the Department of Labor and then with Plan participant-plaintiffs in an ERISA action similar to this Class Action.

70.     Defendants engaged in imprudent and disloyal conduct in violation of ERISA by failing to take appropriate steps to manage and control the Plan's administrative expenses solely in the interest of Plan participants, and by using charges to the Plan's participants to benefit NRECA and its member employers. Among other things, Defendants caused the Plan to pay

excessive fees for administrative services, failed to restrain escalating fees, and used the extra fees for NRECA's benefit in various ways, including increasing NRECA's compensation and decreasing the amount NRECA's member employers had to contribute to other benefits programs' costs.

71.    As a consequence of Defendants' breaches of fiduciary duty, the putative Class has suffered millions of dollars in losses due to excessive, unreasonable, imprudent, and inappropriate fees.

72.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to the Plan's participants for any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT II

### Prohibited Transactions with a Party in Interest

### 29  U.S.C. § 1106(a)

73.    Plaintiffs incorporate and reallege the foregoing factual allegations by reference.

74.    NRECA is a fiduciary of the Plan, a service provider to the Plan, the sponsor of the Plan, and an employer whose employees are covered by the Plan. NRECA is therefore a party in interest with respect to the Plan under 29 U.S.C. § 1002(14)(A)-(D).

75.    Defendants have caused the Plan to engage in transactions with NRECA for the benefit of NRECA and at the expense of Plaintiffs and the Class. Defendants executed these unlawful transactions on a frequent periodic basis (at least as frequently as quarterly) throughout the statutory period as Defendants withdrew and retained fees from the Plan.

76.    These transactions constituted a direct or indirect transfer of assets from the Plan's participants to a party in interest, a transfer of assets of the Plan for use by a party in interest, and a transfer of assets of the Plan for the benefit of a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(D). Defendants knew or should have known that the Plan was transacting with a party in interest.

77.    In addition, these transactions also involved the furnishing of services between the

21
CLASS ACTION COMPLAINT

Plan and a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(D).

78.     These transactions were unlawful under ERISA, and the amounts paid to NRECA from the Plan were excessive and unreasonable.

79.     As a direct and proximate result of these prohibited transactions, the Class membership directly or indirectly paid millions of dollars in improper fees to NRECA.

80.     Under 29 U.S.C. § 1109(a), Defendants are liable to the Plan for all losses suffered as a result of these prohibited transactions, and to disgorge all profits associated with their unlawful conduct. In addition, the Plan and Plan participants and beneficiaries are entitled to further equitable and injunctive relief on account of these prohibited transactions.

## COUNT III

### Prohibited Transactions with a Fiduciary

### 29 U.S.C. § 1106(b)

81.     Plaintiffs incorporate and reallege the foregoing factual allegations by reference.

82.     Acting in a fiduciary capacity, Defendants improperly directed assets of the Plan to NRECA for its own benefit. These transactions occurred on a periodic basis throughout the class period (at least as frequently as quarterly) as Defendants withdrew Plan assets and placed them in NRECA's own accounts.

83.     These transactions were prohibited under ERISA, and the amounts paid to NRECA were excessive and unreasonable. NRECA dealt with the Plan's assets in its own interest and for its own accounts, in violation of 29 U.S.C. § 1106(b)(1), and received consideration for its personal accounts in connection with transactions involving assets of the Plan, in violation of 29 U.S.C. § 1106(b)(3).

84.     As a direct and proximate result of these prohibited transactions, the Plan directly or indirectly paid millions of dollars in improper fees to NRECA.

85.     Under 29 U.S.C. § 1109(a), Defendants are liable to the Plan for all losses suffered as a result of these prohibited transactions, and to disgorge all profits associated with their unlawful conduct. In addition, the Plan and Plan participants are entitled to further equitable and injunctive

relief on account of these prohibited transactions.

## COUNT IV

### Failure to Monitor Fiduciaries

### 29 U.S.C. § 1132(a)(3)

86.    Plaintiffs incorporate and reallege the foregoing factual allegations by reference.

87.    In its fiduciary capacity, NRECA organized the Committee, delegated discretionary control of Plan administrative functions to the Committee, and appointed Committee members.

88.    NRECA had a duty to monitor the performance of the Committee under ERISA, and to ensure that its appointed fiduciaries were performing their fiduciary obligations in compliance with ERISA. *See* 29 C.F.R. § 2509.75-8, FR-17.

89.    NRECA breached its fiduciary monitoring duties by, among other things:

    a.    Failing to monitor and evaluate the performance of the Committee and its members, or have a system in place for doing so, passively standing by as the Plan suffered enormous losses as a result of the imprudent actions and omissions of the Committee;

    b.    Failing to monitor the Committee's fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein;

    c.    Failing to ensure that the Committee had a prudent process in place for periodically evaluating the Plan's administrative fees and ensuring that the fees were competitive;

    d.    Failing to implement a system to avoid, discover, report, and sanction conflicts of interest that tainted the decisions made by the Committee; and

    e.    Failing to remove fiduciaries who did not perform their duties under ERISA.

90.    As a consequence of the foregoing breaches of Defendants' duty to monitor, the Class suffered millions of dollars in losses per year due to excessive, unreasonable, and

inappropriate fees.

91.     Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), NRECA is liable to restore to the Plan all losses suffered as a result of NRECA's failure to properly monitor the Committee and its members, and must disgorge all profits resulting from its failure to monitor. In addition, the Plan and Plan participants are entitled to further equitable and injunctive relief.

## COUNT V

### Co-Fiduciary Liability

### 29 U.S.C. § 1105(a)

92.     Plaintiffs incorporate and reallege the foregoing factual allegations by reference.

93.     Defendants worked closely together on matters relating to the Plan. Senior NRECA officials served on the Committee, and the Committee appointed NRECA employees to carry out administrative functions.

94.     During the relevant time, each Defendant knew of the actions and omissions of the other Defendant that gave rise to the breaches of fiduciary duty alleged in this Complaint.

95.     As a consequence of each Defendant's wrongful acts and failures to act, the Plan's participants have suffered millions of dollars in losses due to excessive, unreasonable, and inappropriate fees.

96.     Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## PRAYER FOR RELIEF

97.     Wherefore, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

     a.     certify the Class, appoint Plaintiffs as the class representatives, and appoint Plaintiffs' Counsel as Class Counsel;

b.      find and declare that Defendants breached their fiduciary duties under ERISA as described herein;

c.      find and declare that Defendants committed prohibited transactions as described herein;

d.      find and adjudge that Defendants are personally liable to the Plan's participants for all losses to the Plan over the Class Period resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

e.      order Defendants to provide all accountings necessary to determine the amounts Defendants must pay to the Plan's participants under § 1109(a);

f.      enjoin the Defendants from future ERISA violations;

g.      surcharge against Defendants and in favor of the Plan's participants all amounts involved in any transactions which was improper, excessive or otherwise violated ERISA;

h.      award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

i.      order the payment of interest to the extent allowed by law; and

j.      grant other equitable or remedial relief as the Court deems appropriate.

Dated: June 11, 2025                    Respectfully submitted,

                                        */s/ Noah Rich*
                                        Noah Rich, VA Bar No. 87947
                                        noah.rich@baronbudd.com
                                        **BARON & BUDD, P.C.**
                                        2600 Virginia Avenue NW Suite 201
                                        Washington, DC 20037
                                        Telephone: 202.333.4562

Kelsey Elling, VA Bar No. 94739
kelling@baronbudd.com
Roland Tellis (CA Bar No. 186269)
rtellis@baronbudd.com
David Fernandes (CA Bar No. 280944)
dfernandes@baronbudd.com
Adam Tamburelli (CA Bar No. 301902)
atamburelli@baronbudd.com
Isaac Miller (CA Bar No. 266459)
imiller@baronbudd.com
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: 818.839.2333

Don Bivens
**DON BIVENS PLLC**
don@donbivens.com
15169 N. Scottsdale Road
Scottsdale, AZ 85254
Telephone: 602.708.1450

*Attorneys for Plaintiffs and the Proposed Class*