# Exhibit 2

# Part 1

Redacted Version

*Confidential*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| JOHN MULLINS AND THOMAS SUNDERLIN, individually and as representatives of a class of similarly situated persons, and on behalf of the 401(k) Pension Plan,<br><br>        Plaintiffs,<br><br>v.<br><br>NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION AND THE INSURANCE AND FINANCIAL SERVICES COMMITTEE,<br><br>        Defendants. | Case No. 1:25-cv-00994 |

**EXPERT DECLARATION OF STEVEN K. GISSINER**

**February 5, 2026**

*Confidential*

# TABLE OF CONTENTS

I.     **Introduction** .................................................................................................. **1**

    A.    Qualifications ............................................................................................ 1

    B.    Scope of Assignment ................................................................................ 7

II.   **Summary of Opinions** ...................................................................................... **9**

III.  **Background** ...................................................................................................... **11**

    A.    Overview of Defined Contribution Plans ............................................... 11

    B.    Overview of Multiple Employer Plans .................................................. 13

    C.    The NRECA 401(k) Pension Plan .......................................................... 17

    D.    Administrative and Recordkeeping Services .......................................... 22

    E.    NRECA and the Administrative and Recordkeeping Services It Provided to the Plan and Its Cooperatives and Subgroups ................................... 33

    F.    Named Plaintiffs .................................................................................... 44

IV.  **Cooperatives and Subgroups Differ Across Many Important Aspects That Directly Affect the Administrative and Recordkeeping Services Required** .............. **45**

    A.    Participating Cooperatives and Subgroups Differ in Terms of Size and Complexity ............................................................................................. 47

    B.    Participating Cooperatives and Subgroups Differ in Terms of Plan Design and Service Needs .................................................................................. 50

    C.    Participating Cooperatives and Subgroups Differ in Terms of Investment Options Utilized .................................................................................... 56

    D.    Participating Cooperatives and Subgroups Differ in Terms of the Level of "White-Glove" and Ancillary Services ................................................ 57

    E.    Differences in Account Balances and Participant Behavior and Characteristics Lead to Wide Variation in Administrative and Recordkeeping Fees Paid by Plan Participants and Subgroups Over the Proposed Class Period. ................................................................................ 62

V.   **Cooperative- and Subgroup-Specific Individualized Inquiries Would Be Necessary to Ascertain Whether There Is Any Harm Associated with the Alleged Misconduct** ................................................................................ **71**

    A.    Different Cooperatives and Subgroups Would Incur Different Fees and Levels of Services If They Moved to Another Administrative and Recordkeeping Vendor Instead of NRECA ........................................... 74

    B.    The Recent RFP That Resulted in the Plan Moving Its Recordkeeping Services to      Demonstrates Variation in Plan Participant Outcomes in a But-For World ......................................................................................... 84

*Confidential*

C.      Potential Conflicts Within the Proposed Class ...................................................... 92

**VI.    Named Plaintiffs Are Not Representative of the Proposed Class.............................. 96**

*Confidential*

# I.    INTRODUCTION

## A.    Qualifications

1.    I have worked in the retirement plan services industry for approximately 44 years, in a variety of roles encompassing a wide range of responsibilities.  Over the course of my career, I have managed teams that provided retirement plan administrative services, including recordkeeping, for plans with up to 50,000 participants.[1]  I have also directly consulted with hundreds of retirement plan sponsors with varying retirement plan arrangements, including 401(k), 403(b), 401(a), defined benefit pension plans, multiple employer plans ("MEPs"),[2] and various forms of non-qualified plans, ranging in size from less than $5 million in assets to more than $9 billion in assets.  In these engagements, I have undertaken both recurring and non-recurring projects related to retirement plan design, compliance, administrative procedures, employee communications, investment education services, ongoing investment fund monitoring, fee benchmarking, and fiduciary responsibilities, among other initiatives.  My prior and current clients include multiple Fortune 500 companies, banks and financial services companies, mutual fund companies, insurance companies, healthcare and higher education entities, and consulting firms, all of which provide and administer retirement plans for their employees.

---

[1] In general terms, defined contribution plan recordkeeping services performed on behalf of a 401(k) plan involve tracking or accounting for assets held by individual participants and assets held by the entire plan.  Depending on the provider, additional and oftentimes substantial supplementary services are performed on behalf of individual participants and the retirement plan sponsor.  *See, e.g.*, Ramirez, David, "401(k) Recordkeeper: What They Do for Your Retirement Plan," *ForUsAll*, January 25, 2024, available at https://www.forusall.com/401k-blog/401k-recordkeeper-what-they-do-and-what-to-look-for.  I describe the various administrative and recordkeeping services provided to plans in more detail below.

[2] Specific companies that sponsored Multiple Employer Plans that I have consulted with during my career include Ambrose Employer Group (acquired by TriNet in 2013; *see* "TriNet Acquires Ambrose," *TriNet*, July 2, 2013, available at https://www.trinet.com/about-us/news-press/press-releases/trinet-acquires-ambrose), and Oasis Outsourcing (acquired by Paychex in 2018; *see* "Paychex to Acquire Oasis Outsourcing," *Stone Point Capital*, November 16, 2018, available at https://www.stonepoint.com/news/paychex-to-acquire-oasis-outsourcing/).

*Confidential*

2.      I continue to support approximately 30 retirement plan clients on a recurring basis (combined assets of approximately $10 billion) and approximately ten additional clients on a periodic or non-recurring basis.  The services provided in support of these clients include performing retirement plan cost determination and fee benchmarking, including fees for recordkeeping; assisting plan sponsors and retirement plan committees in understanding and implementing administrative fee arrangements, including for recordkeeping; developing and distributing Requests for Proposals ("RFPs") and Requests for Information ("RFIs") for retirement plan administrative services, including for recordkeeping; consulting with client personnel and plan committees regarding plan design issues and, if appropriate, modifications to existing plan features and provisions; and reviewing and presenting quarterly or semi-annual fund monitoring reports to client personnel and plan committees that are responsible for selecting and examining the performance of plan investment funds.  Over the course of a typical year, I attend approximately 50 committee and client meetings that address a variety of topics, such as plan investment fund options, legal and regulatory updates, plan demographics updates and communications initiatives, and service provider enhancements.

3.      I first began working in retirement plan management in 1981, when I was employed by two different banks that provided investment management and administrative services for retirement plan clients.  In 1985, I joined Coopers & Lybrand as a Consultant in the Retirement Plans Practice.  At that time, my responsibilities were specific to the administration of defined contribution plans.  I advanced through the firm and became a Partner in 1995, ultimately assuming responsibility for managing the Western Region Administrative Outsourcing Practice, which included defined contribution and defined benefit plan administration.

*Confidential*

4.    During the 1985–2001 period, Coopers & Lybrand was a significant provider of administrative, consulting, employee communications, and total benefits (defined contribution, defined benefit, and health and welfare plan administration) outsourcing services.[3]  While at first a stand-alone organization, Coopers & Lybrand substantially expanded its administrative and retirement plans consulting practice following the acquisition of the benefits consulting firm Kwasha Lipton in 1997, then expanded even further following the merger with Price Waterhouse in 1998.[4]  The merged entity was renamed PricewaterhouseCoopers, a multinational company considered one of the Big Four accounting firms.[5]  Many plans managed by PricewaterhouseCoopers during this period were complex, featuring legacy account balances from mergers, participant loans (with more than one outstanding), various in-service withdrawal options, and alternatives for benefit payments upon employment termination or retirement, along with multiple payroll locations and custom reporting requirements.  My experience providing participant recordkeeping and retirement plan consulting services for multiple clients maintaining various types of defined contribution plans, including those with the degree of complexity described above, informs my opinion that every retirement plan differs in terms of plan provisions, features, and participant and plan sponsor servicing requirements.

---

[3] In its fiscal year ending June 2001, PricewaterhouseCoopers' administrative servicing business, branded as Unifi, had revenues of $351 million and approximately 2,100 employees.  *See* Klein, Camilla, "Mellon Completes Unifi Acquisition," *PlanSponsor*, January 4, 2002, available at https://www.plansponsor.com/mellon-completes-unifi-acquisition/; Wheelan, Hugh, "Mellon Buys Out PwC HR Consulting Subsidiary," *Investment & Pensions Europe*, November 28, 2001, available at https://www.ipe.com/mellon-buys-out-pwc-hr-consulting-subsidiary/4745.article. Clients of the firm included, but were not limited to, Northrop Grumman, Bank of America, Charles Schwab, Allergan, Zale Corporation, Ace Hardware, and Pacific Life.

[4] "Coopers & Lybrand Has Agreed to Acquire Kwasha Lipton, a Leading…," *Pensions & Investments*, January 13, 1997, available at https://web.archive.org/web/20210308123850/https://www.pionline.com/article/19970113/ONLINE/701130707/coopers-lybrand-has-agreed-to-acquire-kwasha-lipton-a-leading.

[5] "History and Milestones," *PricewaterhouseCoopers*, available at https://www.pwc.com/us/en/about-us/pwc-corporate-history.html.

5.      In March of 2001, I elected to leave PricewaterhouseCoopers and became a Partner in the Human Capital Practice of Arthur Andersen.  Although Arthur Andersen did not offer retirement plan administrative services, the firm provided retirement plan consulting, compliance, and investment advisory services to a wide range of clients, including Tenet Healthcare, Domino's Pizza, Ford Motor Company, and Daimler Chrysler.

6.      In May of 2002, Clark/Bardes, Inc. (d/b/a Clark Consulting) acquired Arthur Andersen's Human Capital Practice.[6]  Clark Consulting provided retirement plan, investment advisor, and compensation consulting services, in addition to services relating to the administration of non-qualified retirement plans.  As a Senior Vice President at Clark Consulting, I established the firm's retirement plan cost benchmarking services and, with the assistance of others at the firm, marketed those services to current and prospective clients throughout the country.  During this period, in addition to performing a substantial number of retirement plan cost benchmarking projects, I was involved in various RFP projects performed on behalf of clients with defined contribution retirement plans and consulted with plan sponsors on issues related to plan design, administration, employee communications, compliance, and investment education.

7.      In December 2003, I established an independent contractor arrangement with Clark Consulting, pursuant to which I continued to provide consulting services to new and existing clients.  These services were performed within the structure of my own limited liability company, Orchard Hills Consulting ("OHC").  At the end of 2006, the independent contractor arrangement established with Clark Consulting expired, and I continued to perform services on behalf of clients (consistent with what has been described in Paragraphs 1 and 2 above) within

---

[6] Clark/Bardes, Inc., Form 10-K, for the Fiscal Year Ended December 31, 2003 at p. 5.

*Confidential*

the structure of my own limited liability company and through independent contractor consulting arrangements with two different investment advisory firms.[7]

8.     Throughout my approximate 44-year career, I have served as a relationship manager for more than 1,000 separate defined contribution plan servicing arrangements; completed more than 600 retirement plan cost and fee benchmarking studies for clients; met with, in either individual or group settings, thousands of participants in defined contribution plans for the purpose of guiding retirement plan savings and investment decisions; performed nearly 170 RFP projects specific to the provision of defined contribution plan administrative services, including participant recordkeeping; and managed teams of individuals (at one point, as many as 60) providing participant recordkeeping, administrative (*e.g.*, processing individual participant transactions), compliance, and consulting services to a variety of clients and plans.

9.     My current and prior experience in performing participant recordkeeping services, managing defined contribution plan engagements, consulting with plan sponsors and committees regarding plan features, provisions, and administrative issues, meeting with retirement plan participants, structuring recordkeeping fee and revenue sharing payment arrangements, performing fee benchmarking studies, consulting on the selection and monitoring of plan investments, and completing RFP and RFI projects has provided me with comprehensive knowledge with respect to how defined contribution plans are administered and serviced from

---

[7] The two firms are (current registration) Capital Research + Consulting and (prior registration) BKS Retirement Services (reorganized into The Baldwin Group). *See* "Why We're Different," *Capital Research + Consulting LLC*, available at https://capitalresearchandconsulting.com/why-crc/; "Retirement Plan Consulting," *The Baldwin Group*, available at https://baldwin.com/wealth-retirement/retirement-plan-consulting/.   The Baldwin Group (previously Fiduciary Partners Retirement Group) provides consulting services to several Multiple Employer Plans, including the JustWorks Retirement Savings Plan and the Oasis Outsourcing Retirement Savings Plan, among others. *See, e.g.*, Justworks Retirement Savings Plan, Form 5500 Filing, 2020, Schedule C; Oasis Retirement Savings Plan, Form 5500 Filing, 2020, Schedule C.

*Confidential*

the perspective of a service provider *and* as a consultant to hundreds of retirement plan sponsors. This level of knowledge extends to how plan sponsors, consultants, and recordkeepers collaborate to structure fee and service arrangements that align with the unique demographics, requirements, and expectations of each plan sponsor and, by extension, each plan participant. This level of experience informs my view that each defined contribution plan is unique in terms of plan provisions, features, investment options, administrative complexity, participant demographics, participant and plan sponsor servicing requirements, and service and compensation arrangements for recordkeepers and third-party plan providers, such as investment consultants or plan counsel.

10.    In addition to offering consulting services to my recurring clients, I also provide specialized consulting and expert witness services related to retirement plan fee litigation, covering topics, such as administrative and recordkeeping fees, total plan costs, managed account services, investment management fees, recordkeeping fee arrangements and revenue sharing considerations, and the assessment of processes adopted by plan sponsors specific to monitoring plan fees and services. My resume, attached as **Appendix A**, provides additional details on my education, qualifications, and professional affiliations, as well as a list of publications I have authored over the last 10 years and the testimony I have given at trial or in deposition over the last 4 years.

11.    I am being compensated at the rate of $925 per hour for my time. Personnel of Analysis Group, Inc., under my direction and guidance, have assisted me in performing research and analysis for this report. I also receive compensation based on the professional fees Analysis Group earns in connection with its support for this report. Neither my compensation nor that of

*Confidential*

Analysis Group is contingent upon my findings, the testimony I may give, or the outcome of this litigation.

### B.    Scope of Assignment

12.    I have been engaged by Goodwin Procter, LLP ("Counsel"), counsel for National Rural Electric Cooperative Association ("NRECA") and the Insurance and Financial Services Committee ("Committee") (collectively referred to as "Defendants") in connection with the matter *John Mullins and Thomas Sunderlin, et al. v. National Rural Electric Cooperative Association and the Insurance and Financial Services Committee*.[8]

13.    I understand that Plaintiffs seek to certify a class in this matter that is defined as: "All participants and beneficiaries of the NRECA 401(k) Pension Plan [(the "Plan")] who were charged administrative fees from August 1, 2020, through the date of judgment [(the "Proposed Class")]."[9]

14.    Plaintiffs allege that Defendants mismanaged and failed to "prudently monitor and control the Plan's administrative costs in the best interests of Plan participants," and as a result, "Plan participants have suffered millions of dollars in losses from excessive and improper fees."[10] Plaintiffs further allege that these losses "were incurred at the Plan level and affected all Plan participants and beneficiaries in the same manner" and "no individualized inquiries are

---

[8] Class Action Complaint, *John Mullins and Thomas Sunderlin, et al. v. National Rural Electric Cooperative Association and the Insurance and Financial Services Committee,* Civil Action No. 1:25-cv-00994 MSN/IDD, June 11, 2025 ("Complaint").

[9] Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, *John Mullins and Thomas Sunderlin, et al. v. National Rural Electric Cooperative Association and the Insurance and Financial Services Committee,* January 29, 2026. *See also* Complaint, ¶ 58. For the remainder of this Declaration, I refer to the August 1, 2020 to present period as the "Proposed Class Period."

[10] Complaint, ¶¶ 8, 37.

*Confidential*

required to measure losses," and thus claim that "the Court should certify this action as a class action."[11]

15.    Counsel has asked me to assess whether Plaintiffs' allegations that Plan participants paid "excessive" administrative and recordkeeping fees during the Proposed Class Period can be evaluated on a common, class-wide basis for the Proposed Class.  Specifically, I have been asked to evaluate whether the alleged misconduct, if any, affected all Plan participants and beneficiaries in the same manner and whether any resulting losses can be determined on a common, class-wide basis, as Plaintiffs contend.[12]  As part of this evaluation, I have been asked to comment on the opinions offered in the expert report of Mr. James Scheinberg,[13] specifically to opine on whether the damages methodology put forth by Mr. Scheinberg can be used to calculate damages, to the extent such damages exist and are attributable to Defendants' alleged misconduct, on a class-wide basis using evidence common to Proposed Class.

16.    The documents, materials, and other information I considered when conducting my analysis and forming my opinions are listed in this report or in **Appendix B**.

---

[11] Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, *John Mullins and Thomas Sunderlin, et al. v. National Rural Electric Cooperative Association and the Insurance and Financial Services Committee,* January 29, 2026, pp. 15, 17, 30.

[12] Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, *John Mullins and Thomas Sunderlin, et al. v. National Rural Electric Cooperative Association and the Insurance and Financial Services Committee,* January 29, 2026, pp. 15, 17.

[13] Expert Report of North Pier Fiduciary Management, LLC, January 6, 2026, authored by James Scheinberg, founder and Managing Partner of North Pier Fiduciary Management, LLC (the "Scheinberg Report").

## II.    SUMMARY OF OPINIONS

17.    Below is a summary of the opinions I have reached as a result of my review and

analysis to date.  A full description of my opinions is contained throughout this report and the

associated exhibits.



- o    Plaintiffs' expert, James Scheinberg, puts forth 10 comparator plans that he
    claims have "similar scale, structural characteristics, and drivers of administrative
    complexity" as the Plan and therefore can be used to assess the reasonableness of
    the Plan's administrative and recordkeeping fees on a class-wide basis.  These
    purported comparators substantially differ from the Plan in several ways,
    including scale and fee structure, and as a result they are not appropriate
    comparators.  Even assuming—incorrectly so—that Mr. Scheinberg's purported
    comparators are appropriate, data put forth by Mr. Scheinberg and publicly

---

[14] I understand that the Plan includes certain participating members that are not technically cooperatives, such as
public utility districts and other entities.  For simplicity, I refer to all participating members collectively as
"cooperatives" in this report and its exhibits.  The terms "participating employers" and "cooperatives" are used
interchangeably.

available documents for these comparator plans show that a significant number of cooperatives and subgroups in the Plan paid administrative and recordkeeping fees during the Proposed Class Period that were **_significantly lower_** than fees charged by Mr. Scheinberg's comparator plans. Mr. Scheinberg's report is supportive of the assertion that the reasonableness of the Plan's administrative and recordkeeping fees cannot be assessed on a class-wide basis and would instead require individualized inquiry.

- Because individualized inquiry is required to evaluate the reasonableness of the Plan's administrative and recordkeeping fees, any determination of harm from the alleged misconduct likewise requires individualized inquiry. This inquiry would need to consider factors specific to each participating employer, as well as individual participants within each participating employer, and would therefore yield substantially different conclusions across different participating employers and participants. Accordingly, any harm from the alleged misconduct cannot be assessed on a class-wide basis. (*See* **Section V**.)

  o Participating employers within the Plan would face substantially different outcomes if they sought comparable administrative and recordkeeping services from another administrative and recordkeeping vendor, including those offered by Mr. Scheinberg as purported comparators. Some employers, such as those with relatively few participants or low levels of plan assets, would likely face significantly higher costs, lower levels of service, or both. In contrast, larger employers could be more likely to experience cost savings and comparable service levels from another vendor. Individualized inquiry into the specific costs and services available to each participating employer would be required to assess the harm, if any, each employer experienced from the alleged misconduct.

  o The Plan's recent decision to move recordkeeping services to 

  o More generally, the varying outcomes that participating employers and participants would experience from switching to another vendor demonstrate significant conflicts of interest within the Proposed Class. While some might benefit, others would likely be harmed, and therefore it is not appropriate to treat all participating employers or participants as a single class.

- Named Plaintiffs John Mullins and Thomas Sunderlin are not representative of the Proposed Class Members. For example, both Named Plaintiffs' employers rank among the largest participating employers in the Plan, and their account balances and administrative and recordkeeping fees are substantially below the average account balance and administrative and recordkeeping fees for Plan participants. Both Named Plaintiffs also exhibited a level of investment sophistication substantially beyond that of

*Confidential*

the typical Plan participant.  Furthermore, not only were the administrative and recordkeeping fees paid by the Named Plaintiffs during the Proposed Class Period significantly lower than the Plan's average fee per participant, but they were also lower than those of many of the comparator plans that Mr. Scheinberg proffers.  Collectively, both Named Plaintiffs differ materially from the typical participant across several important dimensions, and, as a result, they are not representative of the Proposed Class. (*See* **Section VI**.)

18.    My analysis and opinions are based on the information available to me at the present time.  If additional information or materials become available, I reserve the right to update my analysis and opinions as appropriate.

## III.    BACKGROUND

### A.    Overview of Defined Contribution Plans

19.    Defined contribution plans, and more specifically 401(k) plans, are employer-sponsored benefit plans that allow eligible employees to accumulate tax-advantaged savings that can be used to generate income during retirement.[15]  Unlike defined benefit pension plans, defined contribution plans do not guarantee a specific benefit at retirement, but rather define the methodology used to determine employee and employer contributions (hence the term "defined contribution").  In a participant-directed defined contribution plan, eligible employees who choose to participate in the plan contribute a fixed amount or a percentage of their compensation to the plan (within limits set by the IRS and/or the provisions of the plan) and allocate their contributions among the investment options available in the plan.[16]  The employers who sponsor defined contribution plans may also contribute to employees' accounts, often by matching a

---

[15] *See* "Retirement Plans Definition," *IRS*, August 26, 2025, available at https://www.irs.gov/retirement-plans/plan-participant-employee/retirement-plans-definitions.  *See also* "What's a 401(k)?" *Fidelity,* December 11, 2025, available at https://www.fidelity.com/learning-center/smart-money/what-is-a-401k.

[16] Participants typically direct their accounts' investment in defined contribution retirement accounts and choose from the lineup of options offered in the plan.  *See* "The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2022," *Investment Company Institute,* March 2025, p. 5, available at https://www.ici.org/system/files/2025-03/25-rpt-dcplan-profile22-401k.pdf.

*Confidential*

fixed percentage of the employee's contribution or by contributing a fixed or variable percentage of eligible compensation.[17]  The contributions are invested at the direction of the employee, who will ultimately receive the vested balance of his account, which reflects contributions made, net investment gains, in-service withdrawals, loan balances, and any fees charged against the account.

20.    Defined contribution plans, like the Plan, have been integral to the retirement landscape in the United States for several decades.  According to the 2025 *PlanSponsor* Recordkeeping Survey, defined contribution plans held approximately $13 trillion in assets for 140 million participants as of December 31, 2024, with 401(k) plan assets amounting to $8.5 trillion.[18]

21.    Defined contribution plans are subject to a vast number of federal statutes, including Section 401(a) of the Internal Revenue Code ("IRC") (setting forth requirements to qualify for federal income tax deferral) and ERISA (codified at 29 U.S.C. § 1001 et seq.) (setting forth additional statutory requirements), as well as the related rules and regulations issued by the IRS and the DOL, entities that also act to enforce those requirements.[19]  As a result, defined

---

[17] In 2022, according to BrightScope/ICI, 88% of "large" 401(k) plans (defined by BrightScope/ICI as plans with more than 100 participants) had employer contributions, and nearly 94% of large 401(k) plans with 10,000 or more participants had employer contributions.  *See* "The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2022," *Investment Company Institute*, March 2025, pp. 15-16, available at https://www.ici.org/system/files/2025-03/25-rpt-dcplan-profile22-401k.pdf.

[18] "2025 Recordkeeping Survey: State of the Industry," *PlanSponsor*, June 10, 2025, available at https://www.plansponsor.com/surveys/2025-recordkeeping-survey/?pagesec=1#Introduction.  There are multiple types of defined contribution plans including 401(k) plans, 403(b) plans, employee stock ownership plans, profit sharing plans, money purchase plans, and 457 plans.  *See* "Types of Retirement Plans," *U.S. Department of Labor*, available at https://www.dol.gov/general/topic/retirement/typesofplans; "2025 Recordkeeping Survey: Industry Snapshot," *PlanSponsor*, June 10, 2025, available at https://www.plansponsor.com/surveys/2025-recordkeeping-survey/?pagesec=3#Industry%20Snapshot.

[19] "The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2023," *Investment Company Institute*, July 2024, p. 3, available at https://www.ici.org/system/files/2024-07/per30-06.pdf.

*Confidential*

contribution plans require various services to ensure compliance with applicable law, regulations, and plan provisions.

### B.    Overview of Multiple Employer Plans

22.    A Multiple Employer Plan ("MEP") is a type of retirement plan, most commonly a 401(k) defined contribution plan, that is adopted by two or more unrelated employers and administered by a MEP sponsor.[20]  MEPs allow participating employers to pool plan assets to pay benefits and cover administrative and recordkeeping costs through a centralized plan structure.[21]  This pooling of resources can help reduce costs for individual employers by spreading fixed administrative and recordkeeping expenses and leveraging the group's combined purchasing power to obtain lower costs when compared to a single, stand-alone plan.[22]  Unlike a single-employer 401(k) plan, where each employer is solely responsible for plan administration, fiduciary oversight, and regulatory compliance, a MEP consolidates many of these

---

[20] "Multiple Employer Plans," *Internal Revenue Service*, August 25, 2025, available at https://www.irs.gov/irm/part7/irm_07-011-007; Morse, David E. and Angela M. Antonelli, "Multiple Employer Plans (MEPs) An Overview of Legal, Regulatory and Plan Design Considerations for States," *Georgetown University,* 2017, at p. 4; "Multiple Employer Plans," *Internal Revenue Service*, July 3, 2019, available at https://www.regulations.gov/document/IRS-2019-0032-0001. More specifically, MEPs are "retirement savings plans adopted by two or more employers that are unrelated for income tax purposes but share some common business element or are part of the same professional employer organization."  There are several different types of MEPs, including Association MEPs, such as the NRECA Plan, which are limited to association members, Professional Employer Organization ("PEO") MEPs, which are limited to clients of the PEO, and corporate MEPs, which cover entities that have some common ownership but are classified as unrelated for regulatory purposes.  They differ from Pooled Employer Plans, which were established by the Secure Act of 2019 and "provide benefits to the employees of at least two employers that do not have a common interest other than adopting the plan."  *See* "2025 Pooled Employer Plan Bulletin," *U.S. Department of Labor*, available at https://www.dol.gov/sites/dolgov/files/ebsa/researchers/statistics/retirement-bulletins/pooled-employer-plan-bulletin/2025.pdf; "MEP, PEP, or Stand Alone Plan, Which Is the Best Fit for Your Company?" *DWC*, February 18, 2021, available at https://www.dwc401k.com/blog/mep-pep-standalone-plan-best-fit-for-you.

[21] Morse, David E. and Angela M. Antonelli, "Multiple Employer Plans (MEPs) An Overview of Legal, Regulatory and Plan Design Considerations for States," *Georgetown University,* 2017, p. 4.

[22] "Exploring the pros and cons of multiple-employer plans," *Mercer*, March 26, 2025, available at https://www.mercer.com/insights/investments/market-outlook-and-trends/exploring-the-pros-and-cons-of-multiple-employer-plans/.

*Confidential*

responsibilities at the plan sponsor level and can therefore reduce the administrative burden, as well as potential liability and fiduciary responsibility, at the participating employer level.[23]

23.    MEPs can be particularly beneficial for small employers, who often face barriers to offering retirement plans due to limited administrative resources, lack of internal compliance expertise, and higher per-participant costs on a standalone basis.[24, 25]  These challenges are further compounded by the burden of fiduciary liability, as employers that sponsor their own plans are solely responsible for plan oversight and compliance with ERISA obligations.[26]  MEPs shift key fiduciary responsibilities to the centralized administrator and offer "a simplified turnkey process for obtaining a plan document, selecting and monitoring the investment platform and the recordkeeper, IRS reporting, [and] obtaining an independent audit," thereby reducing cost,

---

[23] Morse, David E. and Angela M. Antonelli, "Multiple Employer Plans (MEPs) An Overview of Legal, Regulatory and Plan Design Considerations for States," *Georgetown University,* 2017, p. 1.  *See also* "Exploring the pros and cons of multiple-employer plans," *Mercer,* March 26, 2025, available at https://www.mercer.com/insights/investments/market-outlook-and-trends/exploring-the-pros-and-cons-of-multiple-employer-plans/; "MEPS and PEPs – Legal and Regulatory Developments," *Trucker Huss, APC,* p. 13, available at https://www.truckerhuss.com/wp-content/uploads/2019/11/Multiple-Employer-Plans-%E2%80%94-The-Lastest-Word-on-MEPs-and-PEPs_2019-12-12.pdf.

[24] "Unlocking the Benefits of Multiple Employer Plans (MEPs) for Organizations," *The Waterwheel*, September 19, 2024, available at https://www.alescoadvisors.com/the-waterwheel/unlocking-the-benefits-of-multiple-employer-plans-meps-for-organizations.

[25] For example, the IRS Notice of Proposed Rulemaking regarding MEPs posted July 3, 2019 indicates that only 45% of employers with 1–49 employees offer a retirement plan, whereas 94% of employers with 500 or more employees do so.  By expanding access to MEPs, employees of small employers, particularly those who do not have employer-sponsored retirement benefits, gain an opportunity to participate in an institutional-level retirement plan. *See* "Multiple Employer Plans," *Internal Revenue Service*, July 3, 2019, Table 1, available at https://www.regulations.gov/document/IRS-2019-0032-0001.

[26] Single employers would also incur additional costs associated with maintaining their own stand-alone plan, including expenses for an independent audit (if the plan has more than 100 active participants), investment advisory fees, and legal or consulting fees. *See* "Unlocking the Benefits of Multiple Employer Plans (MEPs) for Organizations," *The Waterwheel*, September 19, 2024, available at https://www.alescoadvisors.com/the-waterwheel/unlocking-the-benefits-of-multiple-employer-plans-meps-for-organizations. *See also* "MEP, PEP, or Stand Alone Plan, Which Is the Best Fit for Your Company?" *DWC*, February 18, 2021, available at https://www.dwc401k.com/blog/mep-pep-standalone-plan-best-fit-for-you.

*Confidential*

administrative burden, and fiduciary responsibility.[27]  By offering payroll, HR support, and other

ancillary services to participating employers, MEPs can further benefit small firms by reducing

costs and allowing for more seamless integration between payroll processing and 401(k) plan

administration.[28]  These reduced costs and administrative requirements can also encourage these

employers to offer retirement plans for their employees and, therefore, potentially help address

the retirement "coverage gap" (*i.e.*, the lack of employer-sponsored retirement plan coverage for

many workers, particularly those at smaller employers).[29]

24.    For larger employers, the value proposition of MEPs is more nuanced.  These

organizations often have the capacity to sponsor and administer their own retirement plans,

including the presence of internal benefits staff, finance,  and compliance professionals that

provide the level of support necessary to select service providers, negotiate fees, establish

investment fund lineups, hire audit and investment advisory firms, and maintain fiduciary

committees responsible for the management of the plan.  For such employers, joining a MEP

may offer relief from day-to-day fiduciary obligations and regulatory maintenance, as those

responsibilities are largely centralized within the MEP framework, thereby allowing the

---

[27] "Private Sector Pensions: Federal Agencies Should Collect Data and Coordinate Oversight of Multiple Employer Plans," *United States Government Accountability Office,* September 2012, p. 19 available at https://www.gao.gov/assets/gao-12-665.pdf; "Definition of 'Employer' Under Section 3(5) of ERISA—Association Retirement Plans and Other Multiple-Employer Plans," *Employee Benefits Security Administration, Department of Labor,* July 31, 2019, p. 35 available at https://www.govinfo.gov/content/pkg/FR-2019-07-31/pdf/2019-16074.pdf; Morse, David E. and Angela M. Antonelli, "Multiple Employer Plans (MEPs) An Overview of Legal, Regulatory and Plan Design Considerations for States," *Georgetown University,* 2017, p. 1.

[28] "Definition of 'Employer' Under Section 3(5) of ERISA—Association Retirement Plans and Other Multiple-Employer Plans," *Employee Benefits Security Administration, Department of Labor,* July 31, 2019, p. 25, available at https://www.govinfo.gov/content/pkg/FR-2019-07-31/pdf/2019-16074.pdf.

[29] *See, e.g.*, "Will Multiple Employer Plans Help Close the Coverage Gap?" *Center for Retirement Research at Boston College,* July 16, 2024, available at https://crr.bc.edu/will-multiple-employer-plans-help-close-the-coverage-gap/.

*Confidential*

employer to focus on managing their respective business.[30]  However, the tradeoff for large

employers may include some reduction in control and flexibility with respect to plan design and

investment fund selection.[31]  In addition, MEP fee structures may not provide meaningful cost

savings for larger employers, as the scale efficiencies achieved through pooling are less relevant

for firms that can negotiate administrative and investment fees independently.[32]  Ancillary

services bundled into MEP participation, such as payroll or HR support, may also offer limited

value to larger employers that already maintain those functions in-house.  However, MEP

participation is just one of many considerations that an employer may make in evaluating

whether to join an association such as NRECA, and, in fact, associations must have a meaningful

business purpose outside of sponsoring the MEP.[33]  For example, in addition to sponsoring the

Plan and administering other employee benefit plans, NRECA also assists participating

cooperatives through several other channels, including organizing public relations and advocacy

campaigns, conducting leadership and staff training, suggesting standards for power-grid

---

[30] "The Benefits Of Multiple Employer Plans (Meps)," *Transamerica*, p. 3 available at https://sfchamber.com/wp-content/uploads/2023/06/SF-Chamber_Benefits_of_MEP.pdf; Morse, David E. and Angela M. Antonelli, "Multiple Employer Plans (MEPs) An Overview of Legal, Regulatory and Plan Design Considerations for States," *Georgetown University,* 2017, p. 18.

[31] "Exploring the pros and cons of multiple-employer plans," *Mercer*, March 26, 2025, available at https://www.mercer.com/insights/investments/market-outlook-and-trends/exploring-the-pros-and-cons-of-multiple-employer-plans/.  *See also* Morse, David E. and Angela M. Antonelli, "Multiple Employer Plans (MEPs) An Overview of Legal, Regulatory and Plan Design Considerations for States," *Georgetown University,* 2017, p. 15.

[32] "Request for Information Regarding Prohibited Transactions Involving Pooled Employer Plans Under the SECURE Act and Other Multiple Employer Plans," *American Retirement Association,* July 20, 2020, pp. 16-17, available at https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/rules-and-regulations/public-comments/1210-ZA28/00028.pdf.

[33] "MEPS and PEPs – Legal and Regulatory Developments," *Trucker Huss, APC,* p. 15 available at https://www.truckerhuss.com/wp-content/uploads/2019/11/Multiple-Employer-Plans-%E2%80%94-The-Lastest-Word-on-MEPs-and-PEPs_2019-12-12.pdf.

*Confidential*

operations, and performing economic and technical research to educate participating

cooperatives on important regulatory and operational issues.[34]

### C.    The NRECA 401(k) Pension Plan

25.    NRECA is a nonprofit, nonpartisan service organization of approximately 900

rural electric cooperatives or systems.[35]  The cooperatives are further divided into over 1,500

subgroups, based on factors such as geographic location, union representation (*e.g.*, union vs.

non-union), or employee hire dates.[36]

26.    The Plan is a defined contribution multiple employer pension plan that serves

employees, former employees, and beneficiaries of those cooperatives or specific subgroups

within a cooperative that elect to participate in the Plan by executing an adoption agreement.[37]

**Exhibit 1** provides a summary of the Plan's key characteristics over the 2020–2024 period,

---

[34] "Our Organization," *NRECA,* available at https://www.electric.coop/our-organization; Deposition of Thomas Sunderlin, *John Mullins and Thomas Sunderlin, et al. v. National Rural Electric Cooperative Association and the Insurance and Financial Services Committee,* Civil Action No. 1:25-cv-00994 MSN/IDD, December 16, 2025 ("Sunderlin Deposition"), 15:4-19.

[35] NRECA 401(k) Pension Plan, Form 5500 Filing, 2023, NRECA-MULLINS-00023307-3607 at 3458.

[36] NRECA 401(k) Pension Plan, Plan Setup by Co-op, December 2023, NRECA-MULLINS-00030653; NRECA 401(k) Pension Plan, Adoption Agreement, Associated Electric Co-Op, subgroup 26073-001, NRECA-MULLINS-00025960-5968 at 5960; NRECA 401(k) Pension Plan, Summary Plan Description, Associated Electric Co-Op, subgroup 26073-001, January 1, 2023, NRECA-MULLINS-00025969-6014 at 5978; NRECA 401(k) Pension Plan, Summary Plan Description, Associated Electric Co-Op, subgroup 26073-002, July 1, 2022, NRECA-MULLINS-00025049-5092 at 5056; NRECA 401(k) Pension Plan, Summary Plan Description, Associated Electric Co-Op, subgroup 26073-005, January 1, 2023, NRECA-MULLINS-00024903-4950 at 4912; NRECA 401(k) Pension Plan, Summary Plan Description, Associated Electric Co-Op, subgroup 26073-006, July 1, 2022, NRECA-MULLINS-00024857-4900 at 4864; NRECA 401(k) Pension Plan, Summary Plan Description, Associated Electric Co-Op, subgroup 26073-007, January 1, 2023, NRECA-MULLINS-00024669-4715 at 4678; NRECA 401(k) Pension Plan, Summary Plan Description, Associated Electric Co-Op, subgroup 26073-008, January 1, 2023, NRECA-MULLINS-00024571-4618 at 4580; NRECA 401(k) Pension Plan, Summary Plan Description, Associated Electric Co-Op, subgroup 26073-009, January 1, 2023, NRECA-MULLINS-00024377-4424 at 4386; NRECA 401(k) Pension Plan, Summary Plan Description, Associated Electric Co-Op, subgroup 26073-011, January 1, 2023, NRECA-MULLINS-00024189-4236 at 4198; NRECA 401(k) Pension Plan, Summary Plan Description, Associated Electric Co-Op, subgroup 26073-012, July 1, 2022, NRECA-MULLINS-00024241-4284 at 4248.

[37] NRECA 401(k) Pension Plan, Form 5500 Filing, 2023, NRECA-MULLINS-00023307-3607 at 3458; NRECA 401(k) Pension Plan, Specifications of the 401(k) Pension Plan, July 1, 2022, NRECA-MULLINS-00003733-3839 at 3742.

including total invested assets, participant counts, average invested assets per participant, and the number of participating cooperatives.  As shown in the exhibit, total invested assets increased from approximately $13.3 billion in 2020 to $16.7 billion in 2024, while the number of participants increased from 71,742 to 79,674 over the same period.  Average invested assets per participant increased from approximately $185,244 in 2020 to $209,394 in 2024.  The number of cooperatives participating in the Plan ranged from 925 to 950, and the number of subgroups exceeded 1,500 in each year.  According to the produced data, the participating cooperatives and subgroups operated across 1,259 locations in 48 U.S. states.[38]

27.    **Exhibits 2A and 2B** summarize the Plan's investment options over the 2020–2024 period, including the total assets invested in each option, the percentage of total Plan assets allocated to each option, the investment vehicle type, and the associated expense ratios.  As shown in the exhibit, assets invested in domestic equity investment options increased from approximately $5.4 billion in 2020 to $7.1 billion in 2024, representing roughly 41% to 43% of total Plan assets.  Target date portfolios similarly represented a significant share of Plan assets, ranging from approximately 38% in 2020 to 40% in 2024, with assets increasing from $5.1 billion to $6.7 billion over the period.  Fixed income allocations declined from $1.2 billion in 2020 to $1.0 billion in 2024, representing approximately 9% and 6% of total Plan assets, respectively.

28.    The Committee serves as the named fiduciary for the Plan.[39]  Appointed by the NRECA Board of Directors, the Committee is responsible for the administration of the Plan, as well as the Retirement Security Plan (defined benefit pension plan) and the Group Benefits

---

[38] Plan Data for the NRECA 401(k) Pension Plan, NRECA-MULLINS-00109852.

[39] NRECA Director's Manual, June 2020, NRECA-MULLINS-00000476-0683 at 0544.

*Confidential*

Program (health and welfare plan arrangements).[40]  Its responsibilities include establishing and monitoring policies, rules, and regulations; interpreting and ensuring compliance with Plan terms and ERISA; overseeing Plan assets to prevent misuse by related parties; ensuring assets are valued at fair market value and held in trust; and hiring and monitoring service providers, including administrative and recordkeeping service providers, actuaries, investment managers, and consultants.[41]

29.    The Committee also serves as the audit committee for the Plan, selecting and overseeing the independent Plan auditor and reviewing and approving the audited financial statements of the Plan.[42]  Additional duties include establishing and approving annual budgets funded by plan assets, reviewing and recommending administrative and operational costs paid by NRECA or third parties, monitoring compliance with ERISA and the IRC, overseeing employer eligibility, and providing input to the NRECA Board on amendments that may impact plan design or administration.[43]

30.    During the Proposed Class Period, the Committee has retained multiple independent fiduciaries that are experts in fiduciary processes to oversee key aspects of plan governance and administrative cost monitoring and to report their findings to the Committee.[44] At the start of the Proposed Class Period, Newport Trust ("Newport") served as an independent

---

[40] NRECA 401(k) Pension Plan, Form 5500 Filing, 2024, NRECA-MULLINS-00030331-0651 at 0489; NRECA Director's Manual, June 2020, NRECA-MULLINS-00000476-0683 at 0544.

[41] NRECA Director's Manual, June 2020, NRECA-MULLINS-00000476-0683 at 0544.

[42] NRECA Director's Manual, June 2020, NRECA-MULLINS-00000476-0683 at 0545-0546.

[43] NRECA Director's Manual, June 2020, NRECA-MULLINS-00000476-0683 at 0546-0547.

[44] Master Professional Services Agreement between NRECA and Newport Trust Company, January 1, 2019, NRECA-MULLINS-00085687-5694; Exhibit A-1 (Statement of Work) to Master Professional Services Agreement, January 1, 2019, NRECA-MULLINS-00085680-5685.

fiduciary for the Plan under a contract signed in 2018.[45, 46]



.[47]  Additionally, from May 2020 through February 2021 and in 2023, Newport undertook a comprehensive study performed by an independent consultant, Callan, to assess the cost and quality of administrative and recordkeeping services provided by NRECA to the Plan for the 2018 and 2021 calendar years, respectively, and, based on the study, provided a formal recommendation to the Committee on whether NRECA's continued engagement to provide administrative and recordkeeping services to the Plan remained prudent and reasonable.[48]

---

[45] Insurance & Financial Services Committee Meeting Materials, October 15–16, 2024, NRECA-MULLINS-00019991-021201 at 020021.

[46] Newport Trust Company is a wholly owned subsidiary of Newport Group, Inc., now part of Ascensus.  Newport Trust Company provides independent fiduciary, fiduciary auditor, and trustee services for employee benefit plans. *See* "Explore Newport's New Home with Ascensus," *Ascensus*, available at https://www.ascensus.com/log-in/newport/.

[47] Exhibit A-1 (Statement of Work) to Master Professional Services Agreement, January 1, 2019, NRECA-MULLINS-00085680-5685 at 5681.

[48] Master Professional Services Agreement between NRECA and Newport Trust Company, February 18, 2020, NRECA-MULLINS-00085695-5702; Exhibit A-1 (Statement of Work) to Master Professional Services Agreement, March 6, 2020, NRECA-MULLINS-00085703-5707 at 5703; Insurance & Financial Services Committee Meeting Materials, March 8–9, 2021, NRECA-MULLINS-00007635-7688 at 7657-7659; Insurance & Financial Services Committee Meeting Materials, March 8–9, 2021, NRECA-MULLINS-00009986-010419 at 010008; Insurance & Financial Services Committee Meeting Materials, October 25–26, 2023, NRECA-MULLINS-00017949-18551 at 17977.

*Confidential*



49, 50

31.



_____

[49] Insurance & Financial Services Committee Meeting Materials, October 15–16, 2024, NRECA-MULLINS-00019991-021201 at 020021-020022.



**D.    Administrative and Recordkeeping Services**

32.    Administrative and recordkeeping services are necessary for the operation and management of a defined contribution plan.  In general, administrative and recordkeeping services are typically performed by a combination of the plan's recordkeeper, employees of the plan sponsor who have plan-related responsibilities, and other administrative service providers (such as the plan trustee, custodian, external audit firms, or outside ERISA counsel).  These services may include (1) core recordkeeping services, which involves maintaining participant accounts and processing transactions and database updates directed by the plan sponsor, participant-elected transactions that are specific to individual participants, (2) enhanced or non-core plan administrative services, which typically include custom reporting, compliance testing, Form 5500 preparation and external auditor support, SPD preparation and distribution, QDRO administration, preparing plan amendments, and preparing and distributing participant communications, and (3) third-party administrative and compliance support services, such as accounting, audit, legal, and printing and mailing services.  In practice, large plans or MEPs, like the NRECA Plan, are often distinguished by having these services performed through a combination of internal administrative support and external third-party administrative services.[55]

---

[54] ███████████████████████████████████████████

[55] NRECA 401(k) Pension Plan, Administrative Service Agreement, January 1, 2022, NRECA-MULLINS-00030816-0853 at 0833.  In my experience, NRECA performed substantially more services on behalf of participants and participating employers than a typical third-party provider.

*Confidential*

*1.    Types of Administrative and Recordkeeping Services*

33.    The administrative and recordkeeping services provided by a plan's administrative service providers, which vary by plan and by the needs and requirements of the plan sponsor, may include the following plan-level services.[56]  In a MEP, providing these services is often more complex, and can often be costlier to provide, particularly with respect to those services that must be *independently performed* for each participating employer.

- **Plan-Level Transactions**.  These services involve routine transactions that typically occur for *all* plan participants (in contrast to specific services requested by individual participants, which are discussed below).  These services include maintaining participant records specific to plan balances by fund and contribution type, accepting and editing payroll files, directing contributions to participant-selected investments, tracking vesting amounts, and administering and executing daily and routine transactions directed by participants, such as transfers of investments between funds or changes in contribution percentages.[57]  These services comprise the primary services typically covered by a plan's core recordkeeping fee.[58]

  In a MEP, participant data such as contributions and loan repayments would be independently submitted by each adopting employer, and each employer would be responsible for timely and accurate submission of this data.  This contrasts sharply with a single employer arrangement whereby contribution and loan repayment information is often submitted in a single file by one employer.  Managing this employer-by-employer level data can significantly increase the complexity of performing core recordkeeping services compared to a single-employer plan.[59]

---

[56] In my experience, the types of services differ depending on various factors, including (1) the provisions and related features contained in the plan document; (2) the needs of the plan sponsor (*e.g.,* reporting, communications, and administrative support) and plan participants (*e.g.,* the level of assistance and support required for certain types of participant transactions or access to on-site representatives); (3) the types of investments the plan offers; (4) whether the plan sponsor pays all or a portion of fees on behalf of plan participants (which may impact decisions related to the types of funds and share classes offered to participants); and (5) information and recommendations provided by the plan's recordkeeper, investment consultant and/or financial advisor.

[57] Typical fund and contribution types include employer matching, employer discretionary, employee elective deferral, employee rollover, and legacy accounts resulting from plan mergers.  Vesting amounts refer to the portion of employer contribution accounts that participants are entitled to receive if their employment ends as of a given date.

[58] "What Is a 401(k) Recordkeeper?" *Payroll Integrations*, April 28, 2025, available at https://www.payrollintegrations.com/insights/what-is-a-401k-recordkeeper.

[59] For a single employer plan submitting a bi-weekly payroll file, the recordkeeper or administrative service provider would be required to process, edit, and correct, if necessary, approximately 26 files annually (52 weeks ÷ 2).  By contrast, for a MEP with 900 adopting employers and bi-weekly files submissions, the recordkeeper or administrative service provider would be required to process, edit, and correct, if necessary, approximately 23,400 files annually (26 files per employer × 900 employers).

*Confidential*

- **Data Management**.  These services include maintaining the following information for both active and terminated employees: employee demographic information, employee status, physical address, e-mail address, division code or company location, contribution and investment elections, and hours of service data.[60]  Data management functions also typically include the solicitation and retention of participants' beneficiary elections.

  In a MEP, demographic and other participant-specific data would also be submitted separately by each adopting employer, similarly increasing the complexity of maintaining this information.  Recordkeepers or administrative service providers are also responsible for processing any transfers of employees, including participants with account balances that may move to a separate participating employer with different contribution, vesting, and distribution features, within the MEP.

- **DOL Compliance, Including Notices and Disclosures**.  These services include the preparation and distribution of annually required legal and regulatory notices and disclosures.  While the cost of preparing these materials is sometimes included in the core recordkeeping fee, additional fees may be imposed for services associated with the printing and mailing of these documents to participants.  In contrast to single employer plans, disclosures prepared for MEP adopting employers will vary based on unique plan provisions and features, in addition to the investment options selected by the adopting employer.

- **Plan Amendments and Regulatory Updates**.  These services include periodic updates to plan documents, participant forms, and disclosures to comply with new legal and regulatory requirements or as a result of changes requested by the plan sponsor.  If a recordkeeper or administrative service provider prepares the plan document and related amendments, the provider may also be responsible for implementing any other necessary changes to plan-related documents and procedures, such as making corresponding changes in administrative processes, forms, and required disclosures.  While some service providers may include these services in their core recordkeeping fees, others may charge additional fees for such services.

  While MEPs typically maintain a single plan document for all participating employers, each individual participating employer must execute its own adoption agreement.  These adoption agreements can often introduce employer-specific differences within the MEP that the recordkeeper or administrative service provider must separately track and/or implement.[61]

- **Annual Compliance**.  Recordkeepers or administrative service providers may perform numerous annual tests to ensure that a plan does not discriminate in favor of highly

---

[60] This may include maintaining data regarding the dates of an employee's birth, hire, rehire, plan entry, and termination, and maintaining data regarding whether an employee is active, inactive, on a leave of absence, disabled, and/or terminated.

[61] *See, e.g.*, "MEP, PEP, or Stand Alone Plan, Which Is the Best Fit for Your Company?" *DWC*, February 18, 2021, available at https://www.dwc401k.com/blog/mep-pep-standalone-plan-best-fit-for-you.  The differences in plan provisions and features, such as the amount of employer contributions credited on behalf of employees of a participating employer, can have a material impact on the benefits that participants receive from the plan.

24

compensated employees or provide benefits that exceed legal or regulatory limits.[62]  In addition, recordkeepers or administrative service providers typically assist in preparing a plan's annual Form 5500 filings and accompanying schedules, as well as consulting with external plan auditors responsible for the preparation of audited financial statements for the plan.[63]

In a MEP, participating employers are all treated as separate employers for all nondiscrimination testing, including coverage tests, ADP/ACP tests, general nondiscrimination tests, top-heavy tests, and deduction limits.[64]  As a result, there are limited opportunities for economies of scale with respect to these compliance requirements.  In addition, although the MEP files only one Form 5500, preparing this filing is more complex for MEPs, as it requires, for instance, a separate schedule identifying all adopting employers and the amounts they contribute to the plan.[65]

- **Communications and Investment Education**.  Recordkeepers or administrative service providers periodically, or upon the specific request of the plan sponsor, prepare participant communications and offer retirement planning tools, software, and other

---

[62] Alternatively, some plans may retain a third-party consultant to perform such tests.

[63] While some recordkeepers and administrative service providers may include these services in their core recordkeeping fees, others may charge additional fees.  By contrast, some plan sponsors may elect to have the Form 5500 filing completed by their plan auditor or consultant.  Recordkeepers and administrative service providers vary in their ability to perform comprehensive compliance testing, complete Form 5500 filings (if requested), and produce the reports necessary for an auditor to complete annual plan financial statements.  To ensure that compliance testing services are performed correctly, recordkeepers and administrative service providers need to maintain in their database participant demographic information for eligible, non-contributing employees, including birth date, hire date, and termination date, if applicable.

[64] "A Guide to Multiple Employer Plans," *Ascensus*, p. 3, available at https://mybusiness.ascensus.com/data/uploads/Ascensus_A%20Guide%20to%20Multiple%20Employer%20Plans.pdf.

[65] "MEP, PEP, or Stand Alone Plan, Which Is the Best Fit for Your Company?" *DWC*, February 18, 2021, available at https://www.dwc401k.com/blog/mep-pep-standalone-plan-best-fit-for-you.

*Confidential*

forms of investment education and financial wellness materials to participants.[66]  While some of these services may be included in the core recordkeeping fee, others, such as custom communications, on-site participant education sessions, or asset allocation services, may be subject to additional fees.

With respect to a MEP, participant communications must be customized for each adopting employer, including incorporating any employer-specific provisions or restrictions as well as any preferences in the presentation and formatting of these materials.[67]

- **Data Security and Privacy Requirements**.  Recordkeepers or administrative service providers are also responsible for maintaining the security and integrity of participant data and, more recently, have increased and enhanced their efforts to protect participant accounts.[68]  This increased focus on the security of participant data is, in part, related to cybersecurity guidance for retirement plans initially issued by the DOL on April 14, 2021 and updated on September 6, 2024.[69]  In addition to outlining best practice guidelines

---

[66] At the election of the plan sponsor, recordkeepers or other administrative service providers may also provide participants with asset allocation recommendations or, should the participant elect the service, assume responsibility for managing the participant's account.  These services can be provided to participants in multiple formats, including through dedicated plan websites, mobile phone applications, call centers staffed by licensed personnel, group meetings, and individual participant financial counseling sessions.  Financial wellness initiatives are relatively new for 401(k) providers and are typically provided in collaboration with employers.  Such initiatives are contributing factors to higher contribution rates and improved levels of income during retirement.  Over the past decade, there has been a growing trend toward offering and expanding financial wellness programs.  *See* "Hot Topics in Retirement and Financial Wellbeing," *Alight*, 2025, available at https://www.alight.com/getmedia/15858b5a-b1e0-41e5-970e-6486f39ad715/2025-Hot-Topics-in-Retirement-and-Financial-Wellbeing.pdf.  As discussed in **Section III.E**, NRECA provides a range of financial wellness services, such as investment education and advisory services through, among other methods, delivering seminars, preparing and distributing written materials, conducting meetings with participants, and operating call centers.

[67] *See, e.g.*, 401(k) Pension Plan Summary Plan Description as adopted by South Central Power Company, Subgroup ID 36065-001, July 1, 2022, NRECA-MULLINS-00025713-5761 at 5722-5724; 401(k) Pension Plan Summary Plan Description as adopted by Coastal Elec Cooperative Inc, Subgroup ID 41030-001, July 1, 2022, pp. 5-6; 401(k) Pension Plan Summary Plan Description as adopted by Southern Illinois Power, Subgroup ID 14050-002, pp. 5-6.

[68] "Why Plan Sponsors Need a Strong Cybersecurity Policy for 401(k) Plans," *Watkins Ross*, February 24, 2025, available at https://watkinsross.com/articles/2025-02-24-why-plan-sponsors-need-a-strong-cybersecurity-policy-for-401k-plans/.  *See also* Ortolani, Alex, "PSNC 2023: Cybersecurity Best Practices for Plan Sponsors," *PlanSponsor*, June 27, 2023, available at https://www.plansponsor.com/psnc-2023-cybersecurity-best-practices-for-plan-sponsors/.  In recognition of the importance of securing participant data, the DOL released guidance for plan sponsors, plan fiduciaries, plan participants, and recordkeepers regarding 401(k) plan cybersecurity best practices. *See* "US Department of Labor Announces New Cybersecurity Guidance for Plan Sponsors, Plan Fiduciaries, Record-keepers, Plan Participants," *U.S. Department of Labor*, April 14, 2021, available at https://www.dol.gov/newsroom/releases/ebsa/ebsa20210414.

[69] The guidance contains "best practices for use by recordkeepers and other service providers responsible for plan-related IT systems and data, and for plan fiduciaries making prudent decisions on the service providers they should hire." "Cybersecurity Program Best Practices," *U.S. Department of Labor*, available at https://www.dol.gov/sites/dolgov/files/ebsa/key-topics/retirement-benefits/cybersecurity/best-practices.pdf; "US Department of Labor Announces New Cybersecurity Guidance for Plan Sponsors, Plan Fiduciaries, Record-keepers, Plan Participants," *U.S. Department of Labor*, April 14, 2021, available at https://www.dol.gov/newsroom/releases/ebsa/ebsa20210414; "US Department of Labor Updates Cybersecurity Guidance for Plan Sponsors, Fiduciaries, Recordkeepers, Plan Participants to Protect Info, Assets," *U.S. Department of Labor*, September 6, 2024, available at https://www.dol.gov/newsroom/releases/ebsa/ebsa20240906-0.

*Confidential*

with respect to cybersecurity practices, in this same guidance, the DOL provided suggestions with respect to the selection of service providers that have adopted strong cybersecurity practices.[70]

34.    In addition to the plan-level services discussed above, recordkeepers or administrative service providers also provide services in the processing of participant-elected transactions. These recordkeeping services involve administering specific transactions initiated by individual participants that are elective in nature and generally involve the withdrawal of monies from the plan. Such transactions include loan requests, loan repayments, loan re-amortizations, in-service withdrawal requests, payment requests resulting from the termination of employment or retirement, Qualified Domestic Relations Orders ("QDROs"), and requests to re-administer and re-issue checks that participants have not cashed.[71] Typically, the fees associated with participant-elected services are charged directly to the individual participant who elects the service and are not included as part of the core recordkeeping fee charged to the plan. These fees are sometimes referred to as "à la carte fees."[72] In a MEP, employer-specific adoption agreements can also often introduce differences among participating employers in the MEP in the types of transactions allowed or the terms governing them, and therefore the à la carte fees

---

[70] *See* "Cybersecurity Program Best Practices," *U.S. Department of Labor*, available at https://www.dol.gov/sites/dolgov/files/ebsa/key-topics/retirement-benefits/cybersecurity/best-practices.pdf; "US Department of Labor Announces New Cybersecurity Guidance for Plan Sponsors, Plan Fiduciaries, Record-keepers, Plan Participants," *U.S. Department of Labor*, April 14, 2021, available at https://www.dol.gov/newsroom/releases/ebsa/ebsa20210414.

[71] In-service withdrawals refer to the ability of employees to withdraw funds from their plan account prior to retirement subject to specific rules and restrictions, as well as potential taxes and penalties depending on their circumstances. For instance, participants may make such requests in connection with payments from a rollover account, hardship withdrawals, or age 59½ withdrawals.

[72] Recordkeepers provide varying levels of service related to or resulting from participant-elected transactions. These services include identifying and locating missing participants, administering outstanding checks, and returning excess contributions and invalid loan repayments. Procedures for processing loans, withdrawals, and distribution payments also vary among providers.

*Confidential*

that may be applicable.  These differences create additional complexity for recordkeepers responsible for approving and recording these transactions.

35.     Beyond the services discussed above, recordkeepers or administrative service providers may, and often do, consult with the plan sponsor on the design and administration of the plan, offer recommendations to improve plan participation and retirement income outcomes (for example, automatic enrollments and automatic contribution increases), and assist in the development of administrative processing procedures.  In addition, recordkeepers or administrative service providers often consult on changes to administrative procedures to accommodate plan design modifications, communicate and manage changes to investment options, and correct processing or payroll errors when required.  Certain recordkeepers or administrative service providers have separate consulting units to support these services.  These consulting services are typically subject to additional fees.  However, certain providers may offer these services at no additional cost.  For example, as discussed further in **Section III.E**, NRECA provides customized ancillary services at no additional cost to participating cooperatives and subgroups based on their individual needs, including training and education programs as well as assistance with compliance, legal, investment consulting, and internal audit support as needed or requested by participating employers.[73]

36.     Certain other administrative services required by a plan, such as accounting, audit, legal, and printing and mailing services are, in my experience, typically provided by third-party service providers.  These administrative services support the Plan's overall operations and

---

[73] NRECA 401(k) Pension Plan, Administrative Service Agreement, January 1, 2022, NRECA-MULLINS-00030816-0853 at 0831-0836.

*Confidential*

compliance, but are distinct from the provision of services performed by a recordkeeper or other administrative services provider.

37.    In my experience, and consistent with industry research, administrative and recordkeeping services are not a commodity and fees for administrative and recordkeeping services are not determined simply based on the number of plan participants or the amount of assets held by the plan.[74]  The administrative and recordkeeping services required to support a 401(k) plan vary substantially based on the needs and circumstances of the plan and plan participants, in addition to the specific servicing preferences of the plan sponsor.  The asset size of a plan, number of participants, number of non-contributing employees, and the nature of the investment lineup can substantially affect administrative complexity, as can the underlying provisions and features of the plan, as set forth in the plan document.  As discussed above, MEPs introduce several additional layers of complexity beyond a single-employer plan, including managing and administering many services that require distinguishing between, and incorporating, individual differences between participating employers despite operating under the provisions of one governing plan document.  This additional complexity is an important factor to consider in evaluating the value of the services that the MEP administrative provider offers.

38.    Additionally, every dollar must be accounted for in a 401(k) plan.  Each business day, after all transactions are processed and investment gains or losses are determined, the sum

---

[74] A report published in August 2024 by CEM Benchmarking indicated that plan size (*i.e.*, number of participants), average account balance, the presence of managed accounts, and the presence of investment options that are proprietary to the recordkeeper account for approximately "25% of the variance in recordkeeping costs across the plans in CEM's database."  The report also noted that the dispersion in costs "suggests that record keeping today is not 'commodity' service."  *See* Weeda, Janjaap et al., "An Empirical Analysis of the Drivers of Record Keeping Cost in U.S. Defined Contribution Plans," *CEM Benchmarking*, August 2024 at pp. 3, 6-7, available at https://20903941.fs1.hubspotusercontent-na1.net/hubfs/20903941/PDFs/Research%20Downloads/45.1-CEM_Drivers_of_RK_Costs_in_US_DC_Plans.pdf.

*Confidential*

of the account balances of individual plan participants must equal the plan's total assets. Contributions and loan repayments must be posted each pay period (by participant account, contribution type, and investment fund) without error, and contributions and loan repayments must also be reconciled with control totals reported on the payroll file. The greater the plan assets and number of transactions, the greater the potential liability assumed by the service provider if such transactions are processed incorrectly.[75] Again, MEPs face heightened complexity compared to single-employer plans in processing these transactions, as they must maintain participant information separately for up to hundreds or thousands of participating employers within the MEP.

39.     It has been my experience throughout my career that not all recordkeepers and administrative service providers are able to provide the same level of service relating to plan-level transactions nor do they have the same abilities when reacting to industry changes.[76] For instance, recordkeepers vary in their ability to accommodate multiple account types (also referred to as "contribution sources") with various rules for eligibility, withdrawal, vesting, and distribution. Some recordkeepers and administrative service providers, in my experience, are also unable to handle a large number of account types due to system limitations. Recordkeepers and administrative service providers also vary in their ability to accommodate different investment options and the frequency with which they edit and correct submitted payroll files. The additional complexity required for MEPs magnifies the effect of these differences in the

---

[75] By way of illustration, Fidelity Investments, which administers 401(k) plans, as well as other types of plans, processed approximately 1.1 billion defined contributions transactions in 2024 with more than 39 million customers visiting Fidelity's NetBenefits site and mobile application. *See* "Annual Report 2024," *Fidelity*, 2025 at pp. 1, 5, available at https://www.fidelity.com/bin-public/060_www_fidelity_com/documents/about-fidelity/2024-Fidelity-Investments-Annual-Report.pdf.

[76] For examples of recent industry changes, *see* "Key Trends Shaping the 401(k) Recordkeeping in 2025," *Congruent*, January 13, 2025, available at https://www.congruentsolutions.com/blogposts/key-trends-shaping-the-401k-recordkeeping-in-2025/.

*Confidential*

levels of service that recordkeepers provide and are, in my experience, a significant contributing

factor to certain recordkeepers and administrative service providers, which may have a

significant market presence with respect to the administration of single employer plans,

administering relatively few MEPs.[77]

> ### 2.    *Arrangements to Pay for Plan Recordkeeping, Participant-Elected Services, and Other Administrative Services*

40.    The compensation paid to recordkeepers and administrative service providers for

plan-level services, participant-elected transactions, and other important services is generally

determined through negotiation between the plan sponsor and the service provider and is

typically set forth in the recordkeeping or administrative services agreement.  The two most

common compensation approaches are (1) an asset-based fee arrangement or (2) a fixed dollar,

per participant fee arrangement.[78]

- **Asset-based fee arrangements** compensate the service providers through fees determined as a percentage of the plan's aggregate assets.  With an asset-based fee for administrative and recordkeeping services, the compensation paid to the provider, expressed in dollars, fluctuates depending on the amount of plan assets.  For example, assume two participants, one with an $80,000 balance and the other with a $10,000 balance, in a plan with an annual asset-based fee of 0.20% of plan assets.  The participant with the larger account balance pays $160 ($80,000 times 0.20%) annually, and the participant with the smaller balance pays $20 ($10,000 times 0.20%) annually.  With respect to asset-based fee arrangements, when fees are expressed as annual dollar amounts, newly eligible and typically smaller balance employees benefit by experiencing lower annual fee debits.

- **Fixed dollar, per-participant fee arrangements** compensate service providers through a fixed dollar amount for each plan participant in each invoicing period.  Under a fixed-dollar, per-participant contractual fee arrangement, total administrative and

---

[77] For example, Fidelity Investments, which is by a substantial margin the largest provider of defined contribution plan recordkeeping services when measured by assets under management and numbers of participants serviced, is not ranked as one of the ten largest providers that provide services to MEPs.  *See* "2025 Recordkeeping Survey," *PlanSponsor*, June 10, 2025, available at https://www.plansponsor.com/surveys/2025-recordkeeping-survey/?pagesec=7#Provider%20Rankings.

[78] In addition to using asset-based or fixed dollar fee arrangements to compensate recordkeepers, this approach may also be used to compensate other service providers, including fees associated with investment advisory services, legal and consulting services, audit fees, and the costs of staff with plan administrative responsibilities.

*Confidential*

recordkeeping fees fluctuate with each invoice period based on the number of participants. For instance, if a plan has an annual administrative and recordkeeping fee of $50 per participant and the participant count of this plan increased from 10,000 to 11,000, the total fee would increase from $500,000 to $550,000 per year, despite no change in the per-participant fee. Under fixed dollar arrangements, when fees are expressed as a percentage of assets, smaller balance participants incur higher fees than larger balance participants.

41.    In my experience, under either arrangement, the funds used to compensate the recordkeeper and administrative service providers can be collected through different methods, including (1) revenue sharing derived from the fund investment fees paid by participants, (2) a direct fee charged either to plan participants or the plan sponsor, or (3) a combination of both of these two methods. Where the direct fee is charged to plan participants, it will generally take the form of either an asset-based account fee (where each participant pays a fee based on their individual account balance) or a uniform periodic fee (where each participant pays an identical periodic fee, typically quarterly, regardless of account balance).

42.    In addition to fees for plan-level recordkeeping and other administrative services (that are typically charged to the plan as a whole), recordkeepers and administrative providers may also receive additional compensation for participant-elected services ("transaction fees") and employer-elected services. Participant-elected services include transactions (such as loans, withdrawals, and QDROs) on a per-occurrence basis. Fees for these transactions are deducted from the plan account of the individual participant who elected that service. Employer-elected services may include annual compliance testing and the preparation and distribution of required legal and regulatory notices, which may involve a separate flat fee charged to the plan or plan sponsor. In my experience, fees for such elected services differ across plans, as the cost for initiating a new loan may vary by plan and service provider, while the fees for employer-elected services will similarly vary based on the plan sponsor's specific requirements.

E.    **NRECA and the Administrative and Recordkeeping Services It Provided to the Plan and Its Cooperatives and Subgroups**

43.    

44.    Under the Administrative Services Agreements, NRECA also provides the services needed to assist the Plan and each participating cooperative or subgroup in complying with applicable guidance under ERISA and the IRC.  These services include ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  NRECA also assists with ▮▮▮▮l,

---

[79] NRECA 401(k) Pension Plan, Administrative Service Agreement, January 1, 2022, NRECA-MULLINS-00030816-0853.  While NRECA serves as the designated central plan administrator for the Plan, the Benefits Administrator ("BA") at each participating cooperative often acts as a "limited plan administrator" with respect to that participating employer's population and data.  (Insurance & Financial Services Committee New Member Orientation, May 18, 2020, NRECA-MULLI NS-00006283-6695 at 6296.)

[80] NRECA 401(k) Pension Plan, Administrative Service Agreement, January 1, 2022, NRECA-MULLINS-00030816-0853 at 0834.

[81] NRECA 401(k) Pension Plan, Administrative Service Agreement, January 1, 2022, NRECA-MULLINS-00030816-0853 at 0834.

[82] NRECA 401(k) Pension Plan, Administrative Service Agreement, January 1, 2022, NRECA-MULLINS-00030816-0853 at 0834.



45.

46.

---

[83] NRECA 401(k) Pension Plan, Administrative Service Agreement, January 1, 2022, NRECA-MULLINS-00030816-0853 at 0835.

[84] NRECA 401(k) Pension Plan, Administrative Service Agreement, January 1, 2022, NRECA-MULLINS-00030816-0853 at 0833.

[85] NRECA 401(k) Pension Plan, Administrative Service Agreement, January 1, 2022, NRECA-MULLINS-00030816-0853 at 0833.

[86] NRECA 401(k) Pension Plan, Administrative Service Agreement, January 1, 2022, NRECA-MULLINS-00030816-0853 at 0835-0836.

*Confidential*



47.

s.[89]

48.

---

[87] NRECA 401(k) Pension Plan, Administrative Service Agreement, January 1, 2022, NRECA-MULLINS-00030816-0853 at 0835-0836.

[88] Letter from Newport Trust Company Re: 401(k) Pension Plan, Retirement Security Plan and Group Benefits Program Consultant Studies, December 20, 2023, NRECA-MULLINS-00031317-1731 at 1323, 1352.

[89] NRECA 401(k) Pension Plan, Administrative Service Agreement, January 1, 2022, NRECA-MULLINS-00030816-0853 at 0833, 0835.  Insurance & Financial Services Committee Meeting Materials, June 28–29, 2022, NRECA-MULLINS-00013747-14637 at 14361.

[90] NRECA 401(k) Pension Plan, Specifications of the 401(k) Pension Plan, July 1, 2017, NRECA-MULLINS-00000248-0345; Morse, David E. and Angela M. Antonelli, "Multiple Employer Plans (MEPs) An Overview of Legal, Regulatory and Plan Design Considerations for States," *Georgetown University,* 2017, at p. 6; NRECA 401(k) Pension Plan, Adoption Agreement, Associated Electric Co-Op, subgroup 26073-001, January 1, 2023, NRECA-MULLINS-00025960-5968; NRECA 401(k) Pension Plan, Adoption Agreement, South Central Power Company, subgroup 36065-001, August 1, 2024, NRECA-MULLINS-00025933-5941.

[91]

Confidential



██████████████████████████████████████████

████████████████████

49.  ██████████████████████████████████

██████████████  ███████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████

█████████  █████████████████████████████



██  ████  Data for the NRECA 401(k) Pension Plan, NRECA-MULLINS-00109852, COOP-ID 03028.

[97] Plan Data for the NRECA 401(k) Pension Plan, NRECA-MULLINS-00109852, COOP-ID 03028.

Confidential





*Confidential*

50.



[101] NRECA 401k Fee Disclosure, October 2020, NRECA-MULLINS-00031736-1739 at 1737; NRECA 401k Fee Disclosure, October 2021, NRECA-MULLINS-00031740-1743 at 1741; NRECA 401k Fee Disclosure, October 2022, NRECA-MULLINS-00031744-1747 at 1745; NRECA 401k Fee Disclosure, October 2023, NRECA-MULLINS-00031748-1751 at 1749; NRECA 401k Fee Disclosure, September 2024, NRECA-MULLINS-00031752-1755 at 1753.

[102] NRECA 401k Fee Disclosure, October 2020, NRECA-MULLINS-00031736-1739 at 1737; NRECA 401k Fee Disclosure, October 2021, NRECA-MULLINS-00031740-1743 at 1741; NRECA 401k Fee Disclosure, October 2022, NRECA-MULLINS-00031744-1747 at 1745; NRECA 401k Fee Disclosure, October 2023, NRECA-MULLINS-00031748-1751 at 1749; NRECA 401k Fee Disclosure, September 2024, NRECA-MULLINS-00031752-1755 at 1753.

*Confidential*



51.

---

[103] NRECA 401k Fee Disclosure, October 2020, NRECA-MULLINS-00031736-1739 at 1737; NRECA 401k Fee Disclosure, October 2021, NRECA-MULLINS-00031740-1743 at 1741; NRECA 401k Fee Disclosure, October 2022, NRECA-MULLINS-00031744-1747 at 1745; NRECA 401k Fee Disclosure, October 2023, NRECA-MULLINS-00031748-1751 at 1749; NRECA 401k Fee Disclosure, September 2024, NRECA-MULLINS-00031752-1755 at 1753.

[104] NRECA 401k Fee Disclosure, October 2020, NRECA-MULLINS-00031736-1739 at 1737; NRECA 401k Fee Disclosure, October 2021, NRECA-MULLINS-00031740-1743 at 1741; NRECA 401k Fee Disclosure, October 2022, NRECA-MULLINS-00031744-1747 at 1745; NRECA 401k Fee Disclosure, October 2023, NRECA-MULLINS-00031748-1751 at 1749; NRECA 401k Fee Disclosure, September 2024, NRECA-MULLINS-00031752-1755 at 1753; KATS Program, Swimlane Recommendations - PSC Meeting 8/30, NRECA-MULLINS-00050492-0503 at 0493.

[105] NRECA 401k Fee Disclosure, October 2020, NRECA-MULLINS-00031736-1739 at 1737; NRECA 401k Fee Disclosure, October 2021, NRECA-MULLINS-00031740-1743 at 1741; NRECA 401k Fee Disclosure, October 2022, NRECA-MULLINS-00031744-1747 at 1745; NRECA 401k Fee Disclosure, October 2023, NRECA-MULLINS-00031748-1751 at 1749; NRECA 401k Fee Disclosure, September 2024, NRECA-MULLINS-00031752-1755 at 1753.

*Confidential*

*Confidential*



52.     The administrative and recordkeeping services required under the NRECA

cooperative structure differ substantially from those associated with administering a single-

---

[106] For plan years 2020 through 2023, the annual administrative and recordkeeping fees were obtained from the Pension Plan Expense Ratio Workbooks. In these workbooks, annual administrative and recordkeeping fees net of investment fees are calculated by deducting external and internal investment management fees from total administrative expenses. For 2024, the annual administrative and recordkeeping fees were obtained from the Plan's Form 5500 and Permissible Expense Allocation Workbook because the Pension Plan Expense Ratio Workbook for that year was not available. The 2024 administrative and recordkeeping fees net of investment fees were calculated by deducting the external investment management fees reported on the line 2i(5) of Schedule H of Form 5500 and internal investment management fees reported in the 2024 Permissible Expense Allocation Workbook from the from the total administrative expenses reported on the line 2i(12) of Schedule H of Form 5500. I note that these amounts are smaller than the purported administrative and recordkeeping fees for the Plan that Mr. Scheinberg includes in his report, as Mr. Scheinberg fails to deduct any internal investment management fees that are included in the Form 5500 data upon which he relies. Therefore, Mr. Scheinberg overstates the Plan's administrative and recordkeeping fees by approximately $2 million annually. *See* NRECA 401(k) Pension Plan Expense Ratios, 2016–2020, September 16, 2021, NRECA-MULLINS-00002394; NRECA 401(k) Pension Plan Expense Ratios, 2017–2021, September 17, 2022, NRECA-MULLINS-00026432; NRECA 401(k) Pension Plan Expense Ratios, 2018–2022, September 13, 2023, NRECA-MULLINS-00000078; NRECA 401(k) Pension Plan Expense Ratios, 2019–2023, September 19, 2024, NRECA-MULLINS-00005459; NRECA 401(k) Pension Plan, Form 5500 Filing, 2024, NRECA-MULLINS-00030331-0651 at 0368; NRECA 401(k) Pension Plan Permissible Expense Allocation, 2023–2024, August 7, 2025, NRECA-MULLINS-00028531; Scheinberg Report, p. 9.

[107] Number of Participants with account balances is from Line 6g of the Form 5500 filing for 2020–2022 and from Line 6g(2) of the Form 5500 filing for 2023–2024. *See* NRECA 401(k) Pension Plan, Form 5500 Filing, 2020, NRECA-MULLINS-00011400-1547 at 1401; NRECA 401(k) Pension Plan, Form 5500 Filing, 2021, NRECA-MULLINS-00011548-1786 at 1549; NRECA 401(k) Pension Plan, Form 5500 Filing, 2022, NRECA-MULLINS-00023608-3830 at 3609; NRECA 401(k) Pension Plan, Form 5500 Filing, 2023, NRECA-MULLINS-00023307-3607 at 3308; NRECA 401(k) Pension Plan, Form 5500 Filing, 2024, NRECA-MULLINS-00030331-0651 at 0332.

employer 401(k) plan. Because the Plan serves numerous independent participating cooperatives and subgroups—each with its own eligibility rules, contribution structure, withdrawal options, payroll systems, and demographic characteristics—NRECA must accommodate a wide range of employer-specific variations and █████████████████████████.[112] These responsibilities include

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[108] For plan years 2020 through 2023, the average plan assets were obtained from the Pension Plan Expense Ratio Workbooks. For 2024, the average plan assets were calculated using the beginning of the year and end of the year balances reported on line 1l(a) and line 1l(b), respectively, of Schedule H of Plan's 2024 Form 5500 filing. *See* NRECA 401(k) Pension Plan Expense Ratios, 2016–2020, September 16, 2021, NRECA-MULLINS-00002394; NRECA 401(k) Pension Plan Expense Ratios, 2017–2021, September 17, 2022, NRECA-MULLINS-00026432; NRECA 401(k) Pension Plan Expense Ratios, 2018–2022, September 13, 2023, NRECA-MULLINS-00000078; NRECA 401(k) Pension Plan Expense Ratios, 2019–2023, September 19, 2024, NRECA-MULLINS-00005459; NRECA 401(k) Pension Plan, Form 5500 Filing, 2024, NRECA-MULLINS-00030331-0651 at 0367.

[109] For 2021, the administrative and recordkeeping fee as a percentage of plan assets shown in **Table 1** (0.19%) differs from the estimate reported in Callan's 2021 benchmarking study. Callan reports administrative expenses net of investment management fees of approximately $25.2 million and total plan assets of approximately $15,318 million, resulting in an administrative fee ratio of approximately 0.16%. I understand that this difference between 0.19% in **Table 1** and 0.16% in Callan's study reflects methodological differences between the two calculations. Specifically, the estimate in **Table 1** is based on administrative expenses reported on Schedule H of the Form 5500 and uses average plan assets, whereas Callan's estimate is based on expenses reported on Schedule C of the Form 5500 and uses year-end plan assets. Because Callan's reported administrative expenses are lower and its reported asset base is larger, Callan's administrative fee ratio is correspondingly lower than the ratio calculated in **Table 1** for 2021. Furthermore, Callan classifies approximately $0.5 million of costs recorded in the Investments Strategy & Performance cost center, which I understand reflects work done to monitor investment management, as an investment management fee rather than an administrative fee. While these costs could reasonably be considered investment management fees, to be conservative, the calculations in **Table 1** include them as administrative fees. *See* NRECA 401(k) Pension Plan Expense Ratios, 2021, NRECA-MULLINS-00026432; Letter from Newport Trust Company Re: 401(k) Pension Plan, Retirement Security Plan and Group Benefits Program Consultant Studies, December 20, 2023, NRECA-MULLINS-00031317-1731 at 1324, 1342; NRECA 401(k) Pension Plan Form 5500 Filings, 2021, NRECA-MULLINS-00011548-1786 at 1551-1579, 1584-1585.

[110] *See* **Exhibit 12.A**.

[111] *See* **Exhibit 12.A**.

[112] For example, Associated Electric and South Central Power Company have multiple subgroups, and subgroup 26073-001 and 36065-001 have executed adoption agreements applicable to their respective subgroups, in which unique plan rules can be observed. NRECA 401(k) Pension Plan, Plan Setup by Co-op, December 2023, NRECA-MULLINS-00030653; NRECA 401(k) Pension Plan, Adoption Agreement, Associated Electric Co-Op, subgroup 26073-001, January 1, 2023, NRECA-MULLINS-00025960-5968; NRECA 401(k) Pension Plan, Adoption Agreement, South Central Power Company, subgroup 36065-001, August 1, 2024, NRECA-MULLINS-00025933-5941.

█████████████████████████████████████████.[113]  In addition, the NRECA Plan, as an

Association MEP serving independent participating employers, provides a different level and

mix of services than other types of plans that may file as MEPs, such as corporate MEPs

covering legally related controlled groups.[114]  For example, because the NRECA Plan serves

unrelated and independent participating cooperatives and subgroups, it must provide employer-

and subgroup-specific administrative, compliance, and advisory services, unlike corporate

MEPs, which operate under "a single, overriding plan document," and "typically do not allow

any plan design flexibility among participating employers."[115]

### F.    Named Plaintiffs

53.    Mr. John Mullins, Named Plaintiff, is currently employed by Associated Electric

Cooperative Inc.[116] and has participated in the Plan since 2019.[117]  Associated Electric

Cooperative Inc. is one of the five largest participating cooperatives in the Plan by participant

---



[114] "Meet the MEPs: Association Retirement Plans," *DWC*, August 7, 2019, available at
https://www.dwc401k.com/blog/meet-the-meps-association-retirement-plans; "Meet the MEPs: Corporate MEPs,"
*DWC*, August 28, 2019, available at https://www.dwc401k.com/blog/meet-the-meps-corporate-meps.

[115] *See, e.g.*, "MEP, PEP, or Stand Alone Plan, Which Is the Best Fit for Your Company?" *DWC*, February 18, 2021,
available at https://www.dwc401k.com/blog/mep-pep-standalone-plan-best-fit-for-you; "Multiple Employer Plans,
An Opportunity for Expanding Retirement Plan Coverage," *Transamerica*, p. 4, available at https://www.ta-
retirement.com/resources/5913-1010_final.pdf; "A primer on multiple employer solutions: MEPs vs. PEPs vs.
Defined Contribution Groups," *Voya*, April 11, 2024, available at https://www.voya.com/voya-insights/primer-
multiple-employer-solutions-meps-vs-peps-vs-defined-contribution-groups.

[116] Resume of Mr. John Mullins, PLTF-MULLINS-0001623-1624.

[117] NRECA 401(k) Pension Plan Statement for John P. Mullins, December 31, 2019, NRECA-MULLINS-
00026166-6167; Deposition of John Mullins, *John Mullins and Thomas Sunderlin, et al. v. National Rural Electric
Cooperative Association and the Insurance and Financial Services Committee,* Civil Action No. 1:25-cv-00994
MSN/IDD, December 19, 2025 ("Mullins Deposition"), 68:10-13.

*Confidential*

count and has had more than 800 participants throughout the Proposed Class Period.[118]

Mr. Mullins had an account balance of $100,124.99 in the Plan as of December 31, 2024.[119]

54.    Mr. Thomas Sunderlin, Named Plaintiff, was employed by South Central Power Company[120] and participated in the Plan from 2015 through June 19, 2025.[121]  South Central Power Company is also one of the larger participating cooperatives in the Plan by participant count, ranking within the top 40 out of the approximately 900 cooperatives participating in the Plan, and has had more than 290 participants throughout the Proposed Class Period.[122]

Mr. Sunderlin had an account balance of $75,478.18 in the Plan as of December 31, 2024.[123]

## IV.    COOPERATIVES AND SUBGROUPS DIFFER ACROSS MANY IMPORTANT ASPECTS THAT DIRECTLY AFFECT THE ADMINISTRATIVE AND RECORDKEEPING SERVICES REQUIRED

55.    Plaintiffs argue that the alleged misconduct affected all Plan participants and beneficiaries in the same way and that losses can be determined on a common, class-wide basis.[124]  As discussed in **Section III.D**, the administrative and recordkeeping services that 401(k) plans require depend on the specific needs and circumstances of the plan and its participants.  For example, larger plans typically require different levels of services compared to

---

[118] Plan Data for the NRECA 401(k) Pension Plan, NRECA-MULLINS-00109852

[119] NRECA 401(k) Pension Plan Statement for John P. Mullins, December 31, 2024, NRECA-MULLINS-00026164.

[120] Resume of Mr. Thomas Sunderlin, PLTF-SUNDERLIN-0001961-1962; Sunderlin Deposition; 99:13-24, 189:2-3.

[121] NRECA 401(k) Pension Plan Statement for Thomas J. Sunderlin, December 31, 2015, NRECA-MULLINS-00026140; Sunderlin Deposition, 99:13-24, 189:2-3.

[122] Plan Data for the NRECA 401(k) Pension Plan, NRECA-MULLINS-00109852.

[123] NRECA 401(k) Pension Plan Statement for Thomas J. Sunderlin, December 31, 2024, NRECA-MULLINS-00026148.

[124] Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, *John Mullins and Thomas Sunderlin, et al. v. National Rural Electric Cooperative Association and the Insurance and Financial Services Committee,* January 29, 2026, pp. 15, 17.

*Confidential*

smaller plans.  In the case of MEPs, differences between individual participating employers create further variation in the amount of administrative work required, as many services must be performed on an employer-by-employer basis or tailored to each employer's preferences or specifications.  These differences directly influence the administrative effort required to deliver the Plan's services to each individual cooperative and subgroup.

56.



---

[125] Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, *John Mullins and Thomas Sunderlin, et al. v. National Rural Electric Cooperative Association and the Insurance and Financial Services Committee,* January 29, 2026, pp. 12-14.



**A.    Participating Cooperatives and Subgroups Differ in Terms of Size and Complexity**

57.

58.

---

[126] Insurance & Financial Services Committee Meeting Materials, March 8–9, 2021, NRECA-MULLINS-00007635-7688 at 7668.

*Confidential*



59. 

60. 

---

[127] Plan Data for the NRECA 401(k) Pension Plan, NRECA-MULLINS-00109852, Plan ID 180590 and 187090.

[128] *See* **Exhibit 3**.

[129]

[130]

[131] Plan Data for the NRECA 401(k) Pension Plan, NRECA-MULLINS-00109852, Plan ID 350340 and 357140.

[132]

*Confidential*

███████████████████████████████████████████████████████████████

████████████████████

61.    ███████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████

62.    ███████████████████████████████████████████████████████

███████████████████████████████████



███████████████████████████████████████████████████████████

██████████████████████████████████████████████

63.    ██████████████████████████████████████████

███████████████████████████████████████████████████

───────────────────

[133] Letter from Newport Trust Company Re: 401(k) Pension Plan, Retirement Security Plan and Group Benefits Program Consultant Studies, December 20, 2023, NRECA-MULLINS-00031317-1731 at 1323. (Emphasis added.)

*Confidential*



**B.**    **Participating Cooperatives and Subgroups Differ in Terms of Plan Design and Service Needs**

64.    As

65.



---

[135] National Rural Electric Cooperative Association (NRECA) 2018 Plan Year: Fee Benchmarking Study and Investment Structure Evaluation, Callan, January 22, 2021, NRECA-MULLINS-00030905-31100 at 31051.

[136] National Rural Electric Cooperative Association (NRECA) 2018 Plan Year: Fee Benchmarking Study and Investment Structure Evaluation, Callan, January 22, 2021, NRECA-MULLINS-00030905-31100 at 31051.

[137] Cooperative Design for the NRECA 401(k) Pension Plan, 2020, NRECA-MULLINS-00086014.

[138] *See, e.g.*, Cooperative Design for the NRECA 401(k) Pension Plan, 2020, NRECA-MULLINS-00086014, BAS Subgroup Id 0111096001; Cooperative Design for the NRECA 401(k) Pension Plan, 2020, NRECA-MULLINS-00086014, BAS Subgroup Id 0138025002.

[139] *See, e.g.*, Cooperative Design for the NRECA 401(k) Pension Plan, 2020, NRECA-MULLINS-00086014, BAS Subgroup Id 0125020001; Cooperative Design for the NRECA 401(k) Pension Plan, 2020, NRECA-MULLINS-00086014, BAS Subgroup Id 0125034001.

[140] Cooperative Design for the NRECA 401(k) Pension Plan, 2020, NRECA-MULLINS-00086014, BAS Subgroup Id 0101032002.

[141] Cooperative Design for the NRECA 401(k) Pension Plan, 2020, NRECA-MULLINS-00086014; **Exhibit 3.A**.



t.

142 ██████████████████████████████████████████████████ For example, 52% of plans surveyed by Vanguard allow just one loan to be outstanding at any time, with 40% permitting two outstanding loans and just 8% permitting three or more loans to be outstanding at any time. *See* "How America Saves 2025," *Vanguard*, p. 96, available at https://workplace.vanguard.com/content/dam/inst/iig-transformation/insights/pdf/2025/has/2025_How_America_Saves.pdf





66. ██████████████████████████████████

██████ ████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

████████████████████



Confidential





*Confidential*

67.



*Confidential*

C.    ████████████████████████████████████
      ██████████

68.   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

69.   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████

70.   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

_____

[155] ████████████████████████████████████
████████████████████

████████████████████████████████████████████
████████████████████████████

*Confidential*



71.

D.

72.

---

[157]

[158] *See* **Section III.E.**



73.

---

[159] Letter from Newport Trust Company Re: 401(k) Pension Plan, Retirement Security Plan and Group Benefits Program Consultant Studies, December 20, 2023, NRECA-MULLINS-00031317-1731 at 1352.

[160] Letter from Newport Trust Company Re: 401(k) Pension Plan, Retirement Security Plan and Group Benefits Program Consultant Studies, December 20, 2023, NRECA-MULLINS-00031317-1731 at 1323.

[161] Letter from Newport Trust Company Re: 401(k) Pension Plan, Retirement Security Plan and Group Benefits Program Consultant Studies, December 20, 2023, NRECA-MULLINS-00031317-1731 at 1323.

[162] 401(k) Pension Plan Summary Plan Description as adopted by Associated Elec Co-op Inc, 26-073-010, July 1, 2022, NRECA-MULLINS-00024331-4374 at 4351; 401(k) Pension Plan Summary Plan Description as adopted by South Central Power Company, 36-065-001, July 1, 2022, NRECA-MULLINS-00025713-5761 at 5736.

[163]

*Confidential*



[165] *See* PIRC Financial Services Seminar Data for the NRECA 401(k) Pension Plan, 2024, NRECA-MULLINS-00085983.

[166] *See* PIRC Financial Services Seminar Data for the NRECA 401(k) Pension Plan, 2024, NRECA-MULLINS-00085983.

[167] *See* PIRC Financial Services Seminar Data for the NRECA 401(k) Pension Plan, 2024, NRECA-MULLINS-00085983.

[168] *See* PIRC Financial Services Seminar Data for the NRECA 401(k) Pension Plan, 2024, NRECA-MULLINS-00085983.

*Confidential*

74. ██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████ █ █████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████ █ █████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

75. ███████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

---

[169] *See* PIRC Financial Services Seminar Data for the NRECA 401(k) Pension Plan, 2024, NRECA-MULLINS-00085983.

[170] *See* PIRC Financial Services Seminar Data for the NRECA 401(k) Pension Plan, 2024, NRECA-MULLINS-00085983.

[171] *See* PIRC Financial Services Seminar Data for the NRECA 401(k) Pension Plan, 2024, NRECA-MULLINS-00085983.

[172] *See* Plan Data for the NRECA 401(k) Pension Plan, NRECA-MULLINS-00109852; PIRC Financial Services Seminar Data for the NRECA 401(k) Pension Plan, 2020–2025, NRECA-MULLINS-00085981-5986.

*Confidential*



76.

---

[173] There are 30 seminars held that are indicated as "statewide" without mentioning a specific cooperative. I excluded these general statewide seminars from the analysis as a conservative approach. *See* **Exhibit 6.B.**

[174] *See* PIRC Financial Services Seminar Data for the NRECA 401(k) Pension Plan, 2020–2025, NRECA-MULLINS-00085981-5986.

[175] NRECA Service Representative Travel Tracker, 2020–2025, NRECA-MULLINS-00086032. The set of 49 states identified is based solely on the approximately 97 percent of nonvirtual visits that included a "State" entry. Location information is unavailable for the remaining approximately 3 percent of non-virtual visits.

[176] Insurance & Financial Services Committee Meeting Materials, June 28–29, 2022, NRECA-MULLINS-00013747-14637 at 14361.



**E.    Differences in Account Balances and Participant Behavior and Characteristics Led to Wide Variation in Administrative and Recordkeeping Fees Paid by Plan Participants and Subgroups Over the Proposed Class Period**

78.    **Exhibits 9, 10, and 11** show the variation in annual administrative and recordkeeping fees paid by Plan participants and by participating subgroups between 2020 and 2024 and demonstrate that the differences in account balances shown in **Exhibit 8** led to significant variation in the administrative and recordkeeping costs borne by individual participants. **Exhibit 9.A** shows that the annual administrative and recordkeeping fees participants pay are highly correlated with their account balances. As shown in **Exhibit 10**, over

---

[177] *See* **Section III.E.**

*Confidential*

40% of Plan participants in each year paid less than $100 in administrative and recordkeeping fees, while approximately 20% paid over $500. **Exhibit 12.A** shows that the 25th to 75th percentile range of participant fees was approximately $30 to $400.

79.



80.    In his report, Mr. James Scheinberg compares the Plan's administrative and recordkeeping fees to fees paid by participants in ten other MEPs that he identifies as "plans with similar scale, structural characteristics, and drivers of administrative complexity" (the "Scheinberg Comparators").[179] Mr. Scheinberg claims that fees on a fixed dollar per-participant basis are the appropriate measure to use when comparing fees across these plans, as asset-based fees "can distort the true administrative cost burdens in plans with larger average balances."[180] However, and for a number of reasons, the Scheinberg Comparators do not provide a reliable basis for evaluating the Plan's administrative and recordkeeping fees on a common and class-

---

[178] **Exhibit 11**.

[179] Expert Report of North Pier Fiduciary Management, LLC, January 6, 2026, authored by James Scheinberg, founder and Managing Partner of North Pier Fiduciary Management, LLC (the "Scheinberg Report"), p. 12.

[180] Scheinberg Report, pp. 10-11.

*Confidential*

wide basis. As discussed below, these plans differ from the NRECA Plan in ways that undermine comparability, and many of them employ one or multiple asset-based fee arrangements that result in varying administrative and recordkeeping costs across participants. It is therefore not possible to reliably measure alleged harm on a common and class-wide basis using the Scheinberg Comparators.

81. In my opinion, the Scheinberg Comparators are not appropriate comparators for the Plan. For example, none of the Scheinberg Comparators are comparable to the Plan in size (*e.g.*, plan assets or the number of participants). Mr. Scheinberg appears to acknowledge that, among other characteristics, it is important to compare plans with similar asset levels and number of participants, as his initial screen to identify potential comparators imposes restrictions on both of these aspects.[181] However, none of the Scheinberg Comparators are comparable to the Plan either with respect to plan assets or numbers of participants. As shown in **Exhibit 1**, the Plan had approximately $15 billion in assets and 80,000 participants during the Proposed Class Period. In contrast, the largest of the Scheinberg Comparators, the Savings Plan for Employees of NTCA and its Members, had assets of just $3.4 billion as of the end of 2024, less than one-quarter of the NRECA Plan's assets.[182] The NTCA plan also had only approximately 24,000 participants at the end of 2024, less than one-third of the NRECA Plan's participants. The other Scheinberg Comparators are even further below the scale of the NRECA Plan, despite Mr. Scheinberg's claim that the Scheinberg Comparators have similar scale and complexity to the NRECA Plan.[183] For instance, as of the end of 2024, the median plan assets of the

---

[181] Scheinberg Report, pp. 10-11.

[182] *See* Scheinberg Report, Exhibit C.

[183] For example, the Questco Companies Retirement Plan is included as a Scheinberg Comparator, despite having only $442 million in total assets as of December 31, 2024 and an average account balance of just $37,393, figures that differ substantially from those of the NRECA Plan. *See* Scheinberg Report, Exhibit C.

*Confidential*

Scheinberg Comparators were only approximately $1.0 billion, or less than 7% of the NRECA

Plan.[184]  Similarly, the median participant count among the Scheinberg Comparators as of the

end of 2024 was approximately 24,000, or approximately 30% of the NRECA Plan's

approximately 80,000 participants.[185]  **Exhibits 13.A-D** illustrate the substantial differences in

plan characteristics between the NRECA Plan and all of the Scheinberg Comparators.

- **Exhibit 13.A** shows that the NRECA Plan's assets were substantially greater than all of the Scheinberg Comparators.

- **Exhibit 13.B** shows that the NRECA Plan had a greater number of participating employers than the majority of the Scheinberg Comparators.

- **Exhibit 13.C** shows that the NRECA Plan had more participants with account balances than all of the Scheinberg Comparators, and all but one of these comparators had less than one-half of the NRECA Plan's number of participants.

- **Exhibit 13.D** shows that the NRECA Plan had higher average account balances than all of the Scheinberg Comparators, in most cases by a substantial margin.

82.    Taken together, these exhibits illustrate that the Scheinberg Comparators differ

materially from the NRECA Plan, and therefore do not provide a reliable basis for benchmarking

the Plan's administrative and recordkeeping fees on a common, class-wide basis.

83.    In addition to these differences in scale, the Scheinberg Comparators also impose

fee structures that differ from the NRECA Plan.  It appears that Mr. Scheinberg performs no

analysis of the fee structure of his purported comparators, and instead simply relies on data

reported in Form 5500 Schedule C to calculate per-participant administrative and recordkeeping

---

[184] *See* Scheinberg Report, Exhibit C.

[185] *See* Scheinberg Report, Exhibit C.

fees.[186]  Had he analyzed the fee structures of these purported comparators, he would have found

that many of the Scheinberg Comparators impose asset-based fees that vary with each

participating employer's plan assets, with several illustrative examples shown in **Table 3**

below.[187]  For example, the Engage PEO Retirement Savings Plan charged asset-based fees

ranging from 0.18% to 0.70% depending on the participating employer's plan assets.  This

variable fee arrangement is inconsistent with the NRECA Plan, which imposes the same asset-

based fee across all participating employers and further demonstrates that participants would

have incurred varying administrative and recordkeeping fees (expressed in dollars) had the

NRECA Plan adopted the fee arrangements of the Scheinberg Comparators, as I discuss in more

detail in **Section V.A**.  Moreover, Mr. Scheinberg's claim that these plans with asset-based fees

"provide[] a reasonable basis for evaluating the reasonableness of the Plan's administrative and

recordkeeping costs" directly contradicts his claim that fixed dollar per participant fees are the

---

[186] As discussed further in **Section V.A**, Form 5500 Schedule C data is generally viewed as being unreliable for determining plan fees.  For example, the data excludes certain forms of unreported indirect compensation, such as revenue sharing amounts received from certain investment options, and therefore often understates total administrative and recordkeeping fees.  Mr. Scheinberg has previously recognized this limitation.  For example, he has opined that plan expenses reported on Form 5500 "may be understated, as many indicate 'indirect compensation' was paid in amounts that are not specified."  *See* Expert Report of James Scheinberg, CIMA®, PRP, Managing Partner of North Pier Fiduciary Management, LLC in the Ronda A. Pledger, et al. v. Reliance Trust Company, et al., March 1, 2018, N.D. Ga., Case No. 1:15-cv-04444-MHC, ("Scheinberg Initial Report in Pledger v. Reliance") ¶ 80.  He has also opined that, for plans with unspecified indirect compensation, "it is not possible to assess" participant fees.  *See* Rebuttal Expert Report of James Scheinberg, CIMA®, PRP, Managing Partner of North Pier Fiduciary Management, LLC to the Expert Reports of Michael Geist and Jania Stout, April 2, 2018, N.D. Ga., Case No. 1:15-cv-04444-MHC, ("Scheinberg Rebuttal Report in Pledger v. Reliance") ¶ 29.]]

[187] In addition to the examples shown in **Table 3**, other Scheinberg Comparators, such as the Credit Union Retirement Plan Association 401(K) Plan, the Extensis Group Retirement Savings Plan, and the G&A Partners Multiple Employer 401(K) Plan also charge asset-based fees, with the fee percentages often depending on the asset balance of each participating employer.  However, detailed fee schedules for these comparators are not publicly available.  *See* Declaration of Mark Werner, *Lucero, et al. v. Credit Union Retirement Plan Association, et al.*, Case No. 3:22-cv-00208-jdp, ECF 70, September 6, 2023, p. 2; "Disclosure & Comparative Chart for Retirement Plan Participants," *Extensis Group Retirement Savings Plan*, July 29, 2025, p. 3; "401(k) & Retirement Plans Available from G&A Partners," SHRM, available at https://web.archive.org/web/20250908024840/https://vendordirectory.shrm.org/company/828528/products/234209/401-k-retirement-plans.

*Confidential*

only appropriate way to assess or measure these fees.[188]  These facts indicate that the Scheinberg

Comparators are unreliable in establishing class-wide damages that are uniform across

participants without individualized inquiries.

**Table 3**
**Illustrative Asset-Based Fee Schedules for**
**Scheinberg Comparators Charging Fees Based on Plan Assets**

| Participating Employer Plan Size | Engage PEO[189] | Questco Companies[190] | Vensure Employer Services[191] |
|---|---|---|---|
| $0 - $500,000 | 0.70% | 0.80% | 0.60% |
| $500,000 - $600,000 | 0.70% | 0.70% | 0.60% |
| $600,000 - $1M | 0.60% | 0.70% | 0.50% |
| $1M - $2M | 0.35% | 0.55% | 0.40% |
| $2M - $3M | 0.26% | 0.45% | 0.30% |
| $3M - $4M | 0.26% | 0.35% | 0.25% |
| $4M - $5M | 0.18% | 0.30% | 0.20% |
| $5M - $7M | 0.18% | 0.25% | 0.20% |
| $7M+ | 0.18% | 0.25% | 0.13% |

---

[188] Scheinberg Report, p. 12.  Mr. Scheinberg himself appears to recognize that it is appropriate to measure fees as a percentage of assets, rather than in fixed dollar terms.  For example, he has previously opined that while flat per-participant fees (as opposed to asset-based fees) are "one way that plans can price or allocate their administrative expenses, [they are] in no way the only appropriate way."  He further opined that "U.S. DOL has never mandated the per participant fee approach. Nor, to my knowledge, has the DOL ever suggested that flat-fee pricing is more preferable than asset-based pricing," citing a "highly referenced" DOL fact sheet stating that "[w]hen paid directly by the plan, administrative fees are either allocated among participant's individual accounts in proportion to each account balance (i.e., participants with larger account balances pay more of the allocated expenses) or passed through as a flat fee against each participant's account."  *See* Scheinberg Initial Report in Pledger v. Reliance, ¶ 73.  Consistent with this view that asset-based pricing is appropriate for comparative benchmarking, Mr. Scheinberg has previously opined that another plan's administrative and recordkeeping fees "are low, and extremely reasonable" based solely on a comparison of these fees as a percentage of assets.  *See* Scheinberg Initial Report in Pledger v. Reliance, ¶ 82; Table 5.

[189] "The Engage PEO 401(k) Retirement Savings Plan," *Engage PEO*, 2020, available at https://www.engagepeo.com/sites/default/files/2020-04/401k%202020.pdf.

[190] "Benefits Guide," *Questco*, 2023, p. 17, available at https://5826396.fs1.hubspotusercontent-na1.net/hubfs/5826396/2023-Questco-BenefitsGuide-1.pdf.

[191] "401(k) Plan Features," *Vensure*, 2022, available at https://www.protradenet.com/documents/Vensure-401k-Plan-Features-Form-20221214.pdf.

*Confidential*

84.     Nevertheless, even if one were to assume that the Scheinberg Comparators are appropriate comparators and that fixed dollar fees are the appropriate measure for comparison—both of which are invalid assumptions in my opinion, as discussed above—Mr. Scheinberg's analysis demonstrates the need for individualized inquiry to assess the reasonableness of the Plan's fees.  Specifically, on a per-participant-fixed-dollar basis, **Exhibit 14.A** indicates that, between 2020 and 2024, approximately 50% of participants paid administrative and recordkeeping fees that were lower than the median fee reported for the Scheinberg Comparators in each year and across all years observed.[192]  Moreover, as shown in **Exhibit 14.B**, across the 2020-2024 period, for each of the Scheinberg Comparators, approximately 40% to 75% of Plan participants in each year paid lower fees than the fees reported for the Scheinberg Comparators.[193]  The wide dispersion in administrative and recordkeeping fees paid—with a significant number of participants paying substantially lower than Mr. Scheinberg's asserted figures—further underscores the unreliability of a class-wide damages theory.

85.     At the subgroup level, **Exhibit 14.C** shows that approximately 20% of subgroups paid average annual per-participant fees below the median annual per-participant administrative and recordkeeping fees reported by Mr. Scheinberg for the Scheinberg Comparators.[194]  **Exhibit 14.D** shows that across 2020–2024 period, approximately 10% to 60% of subgroups had average

---

[192] *See* Scheinberg Report, p. 12.  As discussed above, Form 5500 Schedule C data is unreliable for determining plan fees because, among other things, it does not report certain forms of indirect compensation, such as revenue sharing. This comparison is therefore highly conservative, and the actual percentage of Plan participants paying lower than the median fee for the Scheinberg Comparators is likely even larger than 50%.  Specifically, the NRECA Plan has no revenue sharing, while many of the Scheinberg Comparators use revenue sharing to compensate the plan recordkeeper or other service providers.  *See, e.g.,* Pacific Dental Services, LLC 401(K) Plan, Form 5500 Filing, 2024, Notes to Financial Statements, p. 16; Savings Plan for Employees of NTCA and Its Members, Form 5500 Filing, 2024, Schedule C.  Accordingly, including revenue sharing would likely increase the median fees of the Scheinberg Comparators but would have no effect on the NRECA Plan's fees.

[193] *See* Scheinberg Report, p. 12.

[194] *See* Scheinberg Report, p. 12.

*Confidential*

annual per-participant fees below the median annual per-participant administrative and recordkeeping fees reported by Mr. Scheinberg for the Scheinberg Comparators.[195]  These substantial differences in costs across subgroups further demonstrate that the reasonableness of the Plan's administrative and recordkeeping fees cannot be evaluated on a class-wide basis.

86.    As discussed in **Section III.D.2**, both asset-based and fixed dollar fee arrangements are common practices.  In my view, assessing asset-based fees is also a reasonable allocation method, which as I discussed above, is consistent with both the DOL guidance and Mr. Scheinberg's prior opinion.[196]  On an asset-based basis, **Exhibit 15.A** shows that, between 2020 and 2024, ***more than 99%*** of participants paid administrative and recordkeeping fees, expressed as a percentage of assets, that were lower than the median asset-based fee across the Scheinberg Comparators, both within each year and across all years observed.  Specifically, as shown in **Exhibit 15.B**, more than 99% of participants paid lower administrative and recordkeeping fees, as a percentage of assets, than the fees of at least seven of the 10 individual Scheinberg Comparators each year.  The three Scheinberg Comparators that occasionally reported lower asset-based fees all had undisclosed indirect compensation to their administrative and recordkeeping services providers that were not reported in their Form 5500s, which, as

---

[195] *See* Scheinberg Report, p. 12.

[196] In particular, the DOL states: "In some instances, administrative service costs are covered by investment fees that are deducted directly from investment returns.  Otherwise, if administrative costs are separately charged, they will be borne either by your employer or charged directly against the assets of the plan.  When paid directly by the plan, administrative fees are either allocated among participant's individual accounts in proportion to each account balance (i.e., participants with larger account balances pay more of the allocated expenses) or passed through as a flat fee against each participant's account.  Either way, generally the more services provided, the higher the fees." *See* "A Look at 401(k) Plan Fees," *U.S. Department of Labor*, September 2019, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/401k-plan-fees.pdf.  As discussed above, Mr. Scheinberg has previously referenced this discussion to support the reasonableness of asset-based fees.  He has also opined that "[t]he historical standard for pricing in the retirement industry during the vast majority of my 24 year career in ERISA consulting has been wholly or at least partially asset based pricing."  *See* Scheinberg Initial Report in Pledger v. Reliance, ¶ 74

discussed above, are not included in Mr. Scheinberg's fee estimates and therefore render his estimates unreliable and incomplete.[197]

87.    At the subgroup level, **Exhibit 15.C** shows that, across the 2020–2024 period, ***more than 99%*** of subgroups paid average administrative and recordkeeping fees, expressed as a percentage of assets, that were lower than the median fee reported as a percentage of assets for the Scheinberg Comparators.  Similarly, **Exhibit 15.D** shows that more than 99% of subgroups paid administrative and recordkeeping fees that were lower than those reported for at least seven of the 10 Scheinberg Comparators each year.  As discussed above, the three Scheinberg Comparators that occasionally reported lower asset-based fees all paid undisclosed indirect compensation and, as a result, reported fees for these plans are unreliable and likely understated. Together, these exhibits demonstrate that, on an asset-based basis, the Plan's administrative and recordkeeping fees, whether evaluated on a participant level or on a subgroup level, compare favorably to those of the Scheinberg Comparators.

88.    █████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

---

[197] Extensis Group Retirement Savings Plan, Form 5500 Filing, 2024, Schedule C (showing that the plan's recordkeeper, Transamerica Retirement Solutions, received undisclosed indirect compensation); Credit Union Retirement Plan Association 401(K) Plan, Form 5500 Filing, 2024, Schedule C (showing the plan's recordkeeper, CMFG Life Insurance Company, received undisclosed indirect compensation); Savings Plan for Employees of NTCA And Its Members, Form 5500 Filing, 2024, Schedule C (showing the plan's recordkeeper, Fidelity, received $0 direct compensation and received undisclosed indirect compensation).  I note that multiple investment options in the Savings Plan for Employees of NTCA And Its Members plan, including Fidelity Diversified International Fund and Fidelity Puritan Fund, in my experience typically provide 0.20% revenue sharing to offset administrative and recordkeeping fees.  *See* Savings Plan for Employees of NTCA And Its Members, Form 5500 Filing, 2024, Notes to Financial Statements, p. 27.



**V.    COOPERATIVE- AND SUBGROUP-SPECIFIC INDIVIDUALIZED INQUIRIES WOULD BE NECESSARY TO ASCERTAIN WHETHER THERE IS ANY HARM ASSOCIATED WITH THE ALLEGED MISCONDUCT**

89.

90.

---

[198] *See* **Exhibit 3** and **Exhibit 4**.



91.     Although Plaintiffs claim that "losses were incurred at the Plan level and affected all Plan participants and beneficiaries in the same manner,"[200] in light of this high degree of dissimilarity among cooperatives and subgroups, benchmarking the Plan's administrative and recordkeeping fees against other plans or industry averages on a class-wide basis is not meaningful.  Because cooperatives and subgroups differ so substantially in size and services, a "one-size-fits-all" benchmark or a single "reasonable fee" cannot be applied across roughly a thousand cooperatives and subgroups whose service needs, plan designs, and operational profiles differ substantially.

92.     In my opinion, an evaluation of a "reasonable" but-for administrative and recordkeeping fee for the Proposed Class Members must consider the following factors:

- The size and organizational structure of each individual cooperative and subgroup.
- The provisions, features, and specific plan rules of each individual cooperative and subgroup.
- The individualized administrative and recordkeeping service needs for each individual cooperative and subgroup.
- Whether similar fiduciary and compliance support would be available from outside administrative and recordkeeping vendors for each individual cooperative and subgroup,

---

[199] Administrative Services Agreement By and Between National Rural Electric Cooperative Association and the NRECA 401(k) Pension Plan, Dated as of August 17, 2012, as amended 2022, NRECA-MULLINS-00030816-0853 at 0831-0836.

[200] Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, *John Mullins and Thomas Sunderlin, et al. v. National Rural Electric Cooperative Association and the Insurance and Financial Services Committee,* January 29, 2026, p. 15.

*Confidential*

given its individualized size, organizational structure, characteristics, complexity, and administrative and recordkeeping service needs.

- The pricing available from those outside administrative and recordkeeping vendors and how fees would be charged to plan participants.[201]

93.



---

[201] BrightScope/ICI data illustrate that 401(k) plans vary substantially across key plan designs and scope of services required, including whether plans offer loans, use automatic enrollment, and the type of service providers engaged. For example, larger plans are far more likely to automatically enroll participants and to have loans compared with smaller plans. Recordkeeper arrangements also differ by plan size, with insurance companies more common among smaller plans and asset managers more common in larger plans. These structural differences contribute to variation in total plan costs. Collectively, the BrightScope/ICI survey supports that meaningful differences in plan features and service providers across plans exist, warranting individualized analysis rather than broad generalizations. "The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2022," *Investment Company Institute*, March 2025, pp. 14, 22, 43-44, available at https://www.ici.org/system/files/2025-03/25-rpt-dcplan-profile22-401k.pdf.

*Confidential*



**A.    Different Cooperatives and Subgroups Would Incur Different Fees and Levels of Services If They Moved to Another Administrative and Recordkeeping Vendor Instead of NRECA**

95.    The cost that each participating cooperative or subgroup would incur if it sought comparable administrative and recordkeeping services from another vendor, including those offered by Mr. Scheinberg as purported comparators, would depend on numerous factors, including plan size, complexity, service needs, investment options, and the level of support provided by in-house human resources, benefits, and financial staff. Plans with divergent characteristics would experience different administrative and recordkeeping fee levels, and the services available to each plan would likewise depend on a range of plan-specific factors. Therefore, some cooperatives or subgroups may not be able to obtain services comparable to those offered by NRECA. Because of this plan-level variation in both the costs and degree of

---

*Confidential*

services that would be associated with switching vendors, individualized cooperative- and subgroup-level inquiry would be required to determine any potential harm arising from NRECA's alleged misconduct.

96. ███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████

97.     To illustrate the higher administrative and recordkeeping costs commonly incurred by small stand-alone plans in the market, I reviewed total administrative and recordkeeping costs reported in six examples of stand-alone plans with publicly available Participant Fee Disclosures and participant counts and/or asset levels similar to the range observed among most participating cooperatives and subgroups in the NRECA Plan. These Participant Fee Disclosures provide a more reliable representation of the fees incurred by participants in each plan compared to the "Total Administrative Expenses" reported on Form 5500 relied upon by Plaintiffs for their fee estimation.[204] Based on my experience, the "Total Administrative Expenses" reported on Form 5500s do not provide detail on the specific fee structure (*e.g.*, asset-based, fixed dollar, or a combination), do not include payments made by

---

[203] Participant Data for the NRECA 401(k) Pension Plan, 2020–2025, NRECA-MULLINS-00109854-9858.

[204] Complaint, footnote 7.

*Confidential*

plan sponsors (employer-paid fees) directly to service providers, and do not include indirect fees paid to service providers, such as fees paid through revenue sharing and other forms of indirect compensation that impact participant accounts but are opaque in Form 5500 filings.[205]  In my experience, unless specifically stated in the audited financial statements, one cannot reliably determine the annual administrative and recordkeeping fees from a Form 5500 filing.  Fees specific to the six plans I reviewed for illustrative purposes are as follows:

- VECCS 401(k) Plan—10 participants and $549,254 in assets as of the end of the 2024 plan year—paid annual administrative and recordkeeping fees equal to 0.35% of assets plus a $50 flat annual fee per participant, with the flat fee representing approximately 0.09% of assets, for a total annual fee of 0.44% in 2025.[206]

- TASA Retirement Savings Plan—28 participants and $3,623,950 in assets as of the end of 2023—paid 0.60% of assets in administrative and recordkeeping fees in 2025.[207]

- Employer Solutions Group Retirement Savings Plan—217 participants and $2,995,673 in assets—paid approximately 0.50% of assets in 2024.[208]

- Advantage Home Health Care, Inc. 401(k) Plan—117 participants and $1,762,488 in assets—paid approximately 1.05% of assets in 2021.[209]

- Belay, Inc. 401(k) Plan—88 participants and $2,492,219 in assets—paid approximately 0.80% of assets in 2021.[210]

---

[205] Form 5500 filings for smaller plans (those with less than 100 participants) are even less informative, as these filings do not include separate schedules that provide more information regarding fees (Schedule C) and assets (Schedule H), and are not accompanied by audited financial statements.  *See* "Short Form Annual Return/Report of Small Employee Benefit Plan," *U.S. DOL*, 2022, available at https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2022-form-5500-sf.

[206] VECCS 401(k) Plan, 404(a)(5) Participant Fee Disclosure, 2025, p. 12; VECCS 401(k) Plan, Form 5500 Filing, 2024, pp. 1-2.  0.09% = 50 x 10 participants / 549,254.

[207] TASA 401(k) Plan, 404(a)(5) Participant Fee Disclosure, 2025, p. 54; TASA Retirement Savings Plan, Form 5500 Filing, 2023, pp. 1-2.  For the TASA Retirement Savings Plan, the most recent Form 5500 (where number of participants and plan assets were taken) available as of the date of this report is for 2023.

[208] Employer Solutions Group Retirement Savings Plan, 404(a)(5) Participant Fee Disclosure, 2024, p. 3; Employer Solutions Group Retirement Savings Plan, Form 5500 Filing, 2024, pp. 2, 14.

[209] Advantage Home Health Care, Inc. 401(k) Plan, 404(a)(5) Participant Fee Disclosure, July 18, 2021, p. 2; Advantage Home Health Care, Inc. 401(k) Plan, Form 5500 Filing, 2021, p. 2, Schedule H Line 1l.

[210] Belay, Inc. 401(k) Plan, 404(a)(5) Participant Fee Disclosure, July 18, 2021, p. 2; Belay, Inc. 401(k) Plan, Form 5500 Filing, 2021, pp. 1-2.

- <u>Turtle Southeast, Inc. 401(k) Profit Sharing Plan</u>—48 participants and $2,952,234 in assets as of the end of 2017—paid 0.40% of assets in 2018.[211]

98.     Each of these fee levels is considerably higher as a percentage of assets than the 0.19% to 0.23% charged by NRECA during the Proposed Class Period.[212]  These examples are provided solely to illustrate the range of fees that smaller stand-alone plans commonly pay in the market.  To evaluate whether any of these fees compare favorably to the fees paid by the Proposed Class Members to NRECA, however, a detailed plan-specific comparison of the services provided would be required.

99.     This same pattern—lower costs for larger plans—also appears in total plan costs, including investment management fees.  For example, a BrightScope/ICI analysis found that in 2022, total plan costs for 401(k) plans with under $1 million in assets averaged 1.29%, compared to 0.74% for plans with $10–$50 million in assets and 0.42% for plans with $100–$250 million in assets.[213]  Other sources, including the 401(k) Averages Book, similarly report that larger plans tend to incur lower total costs as a percentage of assets.[214]  These differences reflect the ability of larger plans to spread fixed costs across more participants,[215] underscoring the

---

[211] Turtle Southeast, Inc. 401(k) Profit Sharing Plan, Annual Disclosure Statement, March 14, 2018, p. 3; Turtle Southeast, Inc. 401(k) Profit Sharing Plan, Form 5500 Filing, 2017, pp. 1-2.

[212] *See* **Table 1**.

[213] "The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2022," *Investment Company Institute*, March 2025, p. 49, available at https://www.ici.org/system/files/2025-03/25-rpt-dcplan-profile22-401k.pdf.

[214] Letter from Newport Trust Company Re: 401(k) Pension Plan, Retirement Security Plan and Group Benefits Program Consultant Studies, December 20, 2023, NRECA-MULLINS-00031317-1731 at 1347.

[215] "The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2022," *Investment Company Institute*, March 2025, p. 48, available at https://www.ici.org/system/files/2025-03/25-rpt-dcplan-profile22-401k.pdf.

importance of plan-specific considerations when assessing the administrative and recordkeeping costs cooperatives or subgroups would incur with another vendor.[216]

100.    The fee arrangements of the Scheinberg Comparators further illustrate the need for individualized inquiry.  As discussed above in **Section IV.E**, Mr. Scheinberg claims that these comparators "reflect[] plans with similar scale, structural characteristics, and drivers of administrative complexity."[217]  Many of the Scheinberg Comparators explicitly charge fees that differ based on participating employer-specific characteristics, such as the employer's total plan assets.  For example, as of 2023, the Questco Companies Retirement Plan charged asset-based fees ranging from 0.25% to 0.80% depending on the employer's plan assets, with plans holding total assets under $1 million incurring fees of at least 0.70% and plans with total assets of $5 million or more incurring fees of 0.25%.[218]  As shown in **Exhibit 3.B**, during the Proposed Class Period, approximately 20% of participating subgroups in the NRECA Plan had plan assets below $1 million and approximately 40% to 50% had plan assets of $5 million or more.  Accordingly, there would be substantial variation in the fees that the Proposed Class Members would incur under the Questco plan's fee structure.  Several other Scheinberg Comparators similarly impose different fees to participating employers depending on employer-specific characteristics.  For example, the Extensis Group Retirement Savings Plan charges asset-based fees ranging from 0.20% to 1.32%, and as of 2020, the Engage PEO Retirement Savings Plan charged asset-based

---

[216] Besides plan sizes, these factors could include, for example, differences in plan design, level of services, administrative complexity, and investments utilized. As discussed in **Section IV**, participant cooperatives and subgroups vary substantially across each of these dimensions.

[217] Scheinberg Report, p. 12.

[218] "Benefits Guide," *Questco*, 2023, p. 17, available at https://5826396.fs1.hubspotusercontent-na1.net/hubfs/5826396/2023-Questco-BenefitsGuide-1.pdf.

fees ranging from 0.18% to 0.70%.[219]  More generally, Slavic Integrated, which serves as the

recordkeeper for five out of the 10 Scheinberg Comparators (including the Questco and Engage

plans discussed above), states in its 401(k) Sponsor Adoption Guide that it charges asset-based

administrative and recordkeeping fees, which in many cases vary based on employer-level plan

assets.[220]

101.    **Table 4** below shows an illustrative comparison of the asset-based administrative

and recordkeeping fees paid to NRECA by Plan participants in year 2020 with the asset-based

fees those participants would have paid under the fee arrangement of the Engage PEO

Retirement Savings Plan, one of the Scheinberg Comparators that employs a tiered, asset-based

fee schedule based on employer-level plan assets.[221]  This illustrative comparison demonstrates

that whether a participant would experience higher or lower fees under a Scheinberg Comparator

depends on the size of the subgroup and the fee structure of the alternative benchmark.[222]

102.    In particular, smaller subgroups would generally have paid higher fees under the

Engage PEO fee structure.  For example, subgroups with plan assets of $600,000 or less would

have paid approximately 47 basis points more in asset-based fees (relative to what they paid

under the NRECA fee structure in 2020), whereas subgroups with plan assets of more than $7

---

[219] "Disclosure & Comparative Chart for Retirement Plan Participants," *Extensis Group Retirement Savings Plan,* July 29, 2025, p. 3; "The Engage PEO 401(k) Retirement Savings Plan," *Engage PEO*, 2020, p. 2, available at https://www.engagepeo.com/sites/default/files/2020-04/401k%202020.pdf.

[220] Scheinberg Report, Exhibit C; "401(k) Sponsor Adoption Guide," *Slavic*, p. 4, available at https://www.eesipeo.com/media/Slavic-Sponsor-Guide.pdf.  Similarly, the disclosure for the Delmock Technologies, Inc. 401(k) Profit-Sharing Plan, an adopter of the Slavic's administrative platform for multiple-employer plans, similarly indicates an asset-based administrative and recordkeeping fee structure.  *See* "401(k) Compliance Information," *Delmock Technologies, Inc.*, pp. 3, 10, available at https://insuraty.com/wp-content/uploads/2019/02/Slavic-401K-SPD-1.pdf.

[221] "The Engage PEO 401(k) Retirement Savings Plan," *Engage PEO*, 2020, p. 2, available at https://www.engagepeo.com/sites/default/files/2020-04/401k%202020.pdf; "Engage PEO Retirement Savings Plan," April 1, 2024, available at https://mconmgmt.com/wp-content/uploads/2024/09/Plan-Highlight.pdf.

[222] *See* **Table 4.**

million would have paid about 5 basis points less. Approximately 52% of the subgroups would have faced higher asset-based fees under the Engage PEO fee structure than the NRECA fee structure, with the magnitude of the difference varying substantially across different asset levels. This example illustrates that the determination of whether Proposed Class Members were harmed or not cannot be determined on a class-wide basis and instead requires individualized inquiries, taking into account differences in subgroup sizes and fee structures.

**Table 4**
**Illustrative Comparison of Asset-Based Fees for NRECA and Scheinberg Comparator 2020**

| Plan size | Number of Subgroups[223] | Engage PEO Asset Based Fees[224] | NRECA Asset Based Fees[225] |
|---|---|---|---|
| $0 - $500,000 | 251 | 0.70% | 0.23% |
| $500,000 - $600,000 | 34 | 0.70% | 0.23% |
| $600,000 - $1M | 92 | 0.60% | 0.23% |
| $1M - $2M | 188 | 0.35% | 0.23% |
| $2M - $3M | 132 | 0.26% | 0.23% |
| $3M - $4M | 105 | 0.26% | 0.23% |
| $4M - $5M | 102 | 0.18% | 0.23% |
| $5M - $7M | 161 | 0.18% | 0.23% |
| $7M+ | 480 | 0.18% | 0.23% |

103.    Even among plans with comparable asset levels, administrative and total plan costs can vary widely. Differences in average account balances, service requirements, optional features, and available investment options can materially affect plan costs. Smaller average account balances or more extensive service needs may result in higher costs.[226] In addition,

---

[223] Participant Data for the NRECA 401(k) Pension Plan, 2020–2025, NRECA-MULLINS-00109854-9858.

[224] "The Engage PEO 401(k) Retirement Savings Plan," *Engage PEO,* 2020, p. 2, available at https://www.engagepeo.com/sites/default/files/2020-04/401k%202020.pdf; "Engage PEO Retirement Savings Plan," April 1, 2024, available at https://mconmgmt.com/wp-content/uploads/2024/09/Plan-Highlight.pdf.

[225] NRECA 401(k) Pension Plan Expense Ratios, 2016-2020, September 16, 2021, NRECA-MULLINS-00002394; Participant Data for the NRECA 401(k) Pension Plan, 2020–2025, NRECA-MULLINS-00109854-9858.

[226] "The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2024," *Investment Company Institute*, July 2025, p. 12, available at https://www.ici.org/system/files/2025-07/per31-05.pdf.

*Confidential*

variation in the number of participant-elected transactions—such as loans, in-service

withdrawals, and QDRO processing—can create meaningful cost differences among similarly-

sized plans.  As discussed in **Section III.E**, the costs of administering these participant-elected

transactions are included in NRECA's pricing.  Based on my experience, effectively all other

vendors charge separate transaction-based fees, which would cause costs to vary depending on

each plan's participant behavior, account balances, demographics, and plan features.[227]

Consistent with this experience, many of the Scheinberg Comparators impose separate fees for

participant-elected transactions.[228]  As I discuss in **Section V.B** below, even considering only

transaction-based fees on loans and in-service withdrawals, many participants and subgroups in

the Plan would face higher costs if the Plan moved these services from NRECA, where they

incur no costs for such transactions, to another vendor.

104.    Consistent with this significant fee variation across plans with similar asset levels,

the BrightScope/ICI analysis found that among plans with less than $1 million in assets, 10% of

plans had total plan costs of at least 2.63% of plan assets, while another 10% had total costs of

---

[227] Transaction-based fees vary across plans depending on plan characteristics and service providers.  For example, participants in the Rappahannock Westminster Canterbury, Inc. Retirement Plan generally pay $150 per distribution, $150 per loan set up and annually for loan maintenance, and up to $750 per QDRO review.  *See* "401(k) Memo – Annual Notices," *Rappahannock Westminster Canterbury*, February 2025, p. 5, available at https://rw-c.org/wp-content/uploads/2025/02/401k-AnnualNoticeMemo-2025.pdf.  By contrast, participants in the Atrium Staffing 401(k) Plan generally pay $25 per distribution, $100 per loan origination or takeover, and $250 per QDRO validation.  *See* "Atrium Staffing 401(k) Plan Participant Investment and Fee Disclosure Notice," May 19, 2025, p. 6, available at https://www.atriumdocs.com/associates/401k/2025%20Final%20Fee%20Disclosure%20Notice.pdf.

[228] "The Engage PEO 401(k) Retirement Savings Plan," *Engage PEO,* 2020, p. 2, available at https://www.engagepeo.com/sites/default/files/2020-04/401k%202020.pdf; "Benefits Guide," *Questco*, 2023, pp. 16-17, available at https://5826396.fs1.hubspotusercontent-na1.net/hubfs/5826396/2023-Questco-BenefitsGuide-1.pdf; "401(k) Plan Features," *Vensure*, 2022, available at https://www.protradenet.com/documents/Vensure-401k-Plan-Features-Form-20221214.pdf; "Engage PEO Retirement Savings Plan," April 1, 2024, available at https://mconmgmt.com/wp-content/uploads/2024/09/Plan-Highlight.pdf; "Disclosure & Comparative Chart for Retirement Plan Participants," *Extensis Group Retirement Savings Plan*, July 29, 2025, p. 11.

*Confidential*

0.16% or less of plan assets.[229]  Thus, even among similarly sized plans, there is substantial

variation in cost structures, confirming that individualized inquiry would be required to assess

whether any particular cooperative or subgroup was harmed by NRECA's alleged misconduct.

105.    Plans that seek services from an alternative vendor may also be subject to

different administrative requirements compared to participating cooperatives and subgroups in

the NRECA Plan, including requirements that can vary depending on the number of participants.

For example, plans with 100 or more eligible participants are required to obtain an independent

audit, which would create additional administrative costs for participating cooperatives or

subgroups above this threshold.[230]  In my experience, many stand-alone plans would also prefer

to have investment fund monitoring support from an independent investment advisor, which

would create additional costs for these plans.[231]  In contrast, the Plan provides these services at

no additional cost.[232]  Individualized inquiry would be required to determine the participating

---

[229] "The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2022," *Investment Company Institute*, March 2025 p. 50, available at https://www.ici.org/system/files/2025-03/25-rpt-dcplan-profile22-401k.pdf.

[230] *See, e.g.,* "Does Your Company Need a 401(k) Audit? Here's How to Know," *DHJJ*, May 13, 2025, https://dhjj.com/does-your-company-need-a-401k-audit-heres-how-to-know (reporting that a typical audit fee for a plan with 100 to 150 participants is in the range of $10,000 to $15,000 annually).

[231] In my experience, the cost of typical investment advisory services for stand-alone retirement plans generally ranges from approximately $15,000 to more than $100,000 annually, depending on plan size and the service provider.  For illustrative purposes, using information derived from the DOL Form 5500 database for 2022, I identified 506 plans with between 100 and 249 participants that reported investment advisory fees (service code 27) deducted directly from plan assets and reported on Schedule C and investment advisors in the list of the ten largest defined contribution advisors as published by the National Association of Plan Advisors in 2024.  These 506 plans, which had average assets of $15.16 million, paid average annual investment advisory fees of $24,959.  The average annual investment advisory fee for these 506 plans is approximately $150.76 per participant per year.  As discussed above, investment advisory services are included in the administrative and recordkeeping fees charged under the NRECA Plan, such that participants do not pay a separate advisory fee.  Accordingly, if an NRECA cooperative were to exit the NRECA Plan and operate as a stand-alone plan, participants would be expected to incur an additional per-participant fee (e.g., $150.76 per participant) for investment advisory services.  *See* "2024 Top DC Advisor Multi-Office Firms," *National Association of Plan Advisors*, 2024, available at https://www.napa-net.org/industry-content/accolades-home/napa-accolades-topdcadvisor-multioffice/2024/.

[232] *See* "NRECA Permissible Administrative Expense Billing, Comparison 2018 to 2021," row 32, NRECA-MULLINS-00058298.

cooperatives or subgroups subject to these types of additional administrative services and the costs each cooperative or subgroup would incur to obtain them.

106. 

107.

108.    Collectively, these factors demonstrate that there is no common answer to the question of whether Proposed Class Members in the participating cooperatives or subgroups experienced harm or benefit from NRECA's alleged misconduct over the Proposed Class Period.

*Confidential*

Some Proposed Class Members would likely face higher costs or reduced service offerings if their cooperatives or subgroups moved to another vendor; others could potentially realize cost savings or maintain comparable service levels. Determining the potential harm or benefit for any Proposed Class Member therefore requires individualized, cooperative- and subgroup-specific inquiry. Moreover, certain factors also indicate that even within a particular cooperative or subgroup, individualized participant inquiry is required. For example, the use of participant-elected transactions often varies widely among participants within a single employer. As discussed in **Section V.B** below, this variation results in substantial participant-level differences in the effect of shifting responsibility for administering these transactions to another vendor.

B. **The Recent RFP That Resulted in the Plan Moving Its Recordkeeping Services to ▆ Demonstrates Variation in Plan Participant Outcomes in a But-For World**

109. In September 2021,



NRECA would continue to provide several other administrative

---

[233] 401(k) Pension Plan Recordkeeping Solution and 401(k) Pension Plan and Retirement Security Plan Benefit Payment Solution, Request for Proposal (RFP), NRECA-MULLINS-00030656-0670 at 0659, 0661; Bidder Clarification Questions from NRECA to ▆ 8, 2021, NRECA-MULLINS-00029965-9967; Bidder Clarification Questions from NRECA to ▆ November 8, 2021, NRECA-MULLINS-00030080-0081; Bidder Clarification Questions from NRECA to ▆ November 8, 2021, NRECA-MULLINS-00030085-0086; Bidder Clarification Questions from NRECA to S▆, November 8, 2021, NRECA-MULLINS-00030172-0173; Bidder Clarification Questions from NRECA to ▆, November 8, 2021, NRECA-MULLINS-00030082-0083.

[234] 401(k) Pension Plan Recordkeeping Solution and 401(k) Pension Plan and Retirement Security Plan Benefit Payment Solution, Request for Proposal (RFP), NRECA-MULLINS-00030656-0670 at 0659.

*Confidential*

and recordkeeping services, including operating the Plan's Member Contact Center, PIRC

services, and cooperative education, maintaining participant demographic information, and

assisting with complex compliance issues, such as failed compliance tests, QDROs, and Form

5500 filings.[235]

110.    In March 2023,



---

[235] 401(k) Administration Transformation Strategy, NRECA Executive Stakeholder Committee, September 30, 2024, NRECA-MULLINS-00000081, p. 6.

[236] Insurance & Financial Services Committee Meeting Materials, March 21-22, 2023, NRECA-MULLINS-00016612-17369 at 16661, 16663, 16666, 16668.

[237] Insurance & Financial Services Committee Meeting Materials, June 27-28, 2023, NRECA-MULLINS-00016063-6611 at 6105.

[238] Insurance & Financial Services Committee Meeting Materials, June 27-28, 2023, NRECA-MULLINS-00016063-6611 at 6107, 6108.

[239] Insurance & Financial Services Committee Meeting Materials, October 25-26, 2023, NRECA-MULLINS-00017949-18551 at 18066.

[240] Insurance & Financial Services Committee Meeting Materials, June 24-25, 2025, NRECA-MULLINS-00028566-29493 at 28618.

111. The 

112.

[241] 401(k) Administration Transformation Strategy, NRECA Executive Stakeholder Committee, September 30, 2024, NRECA-MULLINS-00000081, pp. 6, 39.

[242] 401(k) Administration Transformation Strategy, NRECA Executive Stakeholder Committee, September 30, 2024, NRECA-MULLINS-00000081, p. 39; NRECA 401(k) Pension Plan, Participant Fees Annual Disclosure Notice, September 2024, NRECA-MULLINS-00031752-1755 at 1753. As I discussed in **Section III.E**, the Plan has waived loan fees for participants since the onset of COVID pandemic in 2020.

[243] 401(k) Administration Transformation Strategy, NRECA Executive Stakeholder Committee, September 30, 2024, NRECA-MULLINS-00000081, pp. 39-40. $26 = $2 million / 78,000 participants.

[244] 401(k) Administration Transformation Strategy, NRECA Executive Stakeholder Committee, September 30, 2024, NRECA-MULLINS-00000081, p. 39.

████████████████████████  As discussed in **Section IV**, the volume of participant-

elected transactions varies substantially across cooperatives and subgroups.  Thus, the financial

impact of transitioning to ████ would differ across participants and subgroups: employers and

participants with higher transaction volumes could face increased total fees, while those with

lower usage may experience lower costs.

113.    **Exhibit 18** illustrates this variation by showing the incremental average per-

participant fees subgroups would have incurred between 2020 and 2024 under ████ 's fee

structure.  Some subgroups would have experienced no incremental costs, while others would

have faced up to $100 per participant in additional fees.[246]  These differences—reflecting only a

narrow subset of services—underscore the need for individualized assessment to determine

potential fees and potential harm under an alternative-vendor scenario during the Proposed Class

Period.

114.    ████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

---

[245] $1,000,000 = $50 x 6,000 loan initiations + $25 x 19,000 loans outstanding + $25 x 9,000 non-recurring
distributions.

[246] Participant Data for the NRECA 401(k) Pension Plan, 2020–2025, NRECA-MULLINS-00109854-9858; 401(k)
Administration Transformation Strategy, NRECA Executive Stakeholder Committee, September, 30, 2024,
NRECA-MULLINS-00000081, p. 39.

*Confidential*



115.

---

[247] Electric Research & Mfg. Coop terminated from the Plan on January 1, 2024. *See* Plan Data for the NRECA 401(k) Pension Plan, NRECA-MULLINS-00109852.

[248] 401(k) Administration Transformation Strategy, NRECA Executive Stakeholder Committee, September 30, 2024, NRECA-MULLINS-00000081, p. 6.

**Table 5[249]**
**Illustrative Comparison of NRECA vs. Hypothetical ▆ Administrative and**
**Recordkeeping Fees**
**Per Participant**
**2020–2024**

| Description | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| ▆▆▆▆ | | | | | |
| Number of Active Participants[250] | 12 | 11 | 11 | 11 | 12 |
| Average NRECA Fees ($) [A] | $15.54 | $17.68 | $21.97 | $30.70 | $30.15 |
| Average Hypothetical ▆ Fees ($) [B] | $50.19 | $58.16 | $53.55 | $56.95 | $55.31 |
| Increase in Fees ($) [C] = [B] – [A] | $34.65 | $40.48 | $31.58 | $26.25 | $25.16 |
| | | | | | |
| ▆▆▆▆ | | | | | |
| Number of Active Participants | 42 | 49 | 75 | 80 | 78 |
| Average NRECA Fees ($) [A] | $43.68 | $42.88 | $32.47 | $43.53 | $60.28 |
| Average Hypothetical ▆ Fees ($) [B] | $63.64 | $67.11 | $60.17 | $62.53 | $66.51 |
| Increase in Fees ($) [C] = [B] – [A] | $19.95 | $24.23 | $27.70 | $19.00 | $6.23 |
| | | | | | |
| ▆▆▆▆ | | | | | |
| Number of Active Participants | 199 | 207 | 274 | 314 | 313 |
| Average NRECA Fees ($) [A] | $33.55 | $33.01 | $32.86 | $40.86 | $45.53 |
| Average Hypothetical ▆ Fees ($) [B] | $50.21 | $53.04 | $52.43 | $52.36 | $53.25 |
| Increase in Fees ($) [C] = [B] – [A] | $16.66 | $20.02 | $19.57 | $11.50 | $7.72 |
| | | | | | |
| ▆▆▆▆ | | | | | |
| Number of Active Participants | 1,217 | 1,400 | 1,563 | 1,741 | |
| Average NRECA Fees ($) [A] | $61.01 | $52.81 | $47.47 | $36.77 | |
| Average Hypothetical ▆ Fees ($) [B] | $70.02 | $66.31 | $63.84 | $76.82 | |
| Increase in Fees ($) [C] = [B] – [A] | $9.01 | $13.50 | $16.37 | $40.05 | |

---

[249] Plan Data for the NRECA 401(k) Pension Plan, NRECA-MULLINS-00109852; Participant Data for the NRECA 401(k) Pension Plan, 2020–2025, NRECA-MULLINS-00109854-9858.

[250] Number of Active Participants in this analysis refers to the number of participants with a positive account balance in the subgroup in each year.

[251] In this analysis, I am referring to ▆▆▆▆▆▆.

[252] In this analysis, I am referring to ▆▆▆▆▆▆ 002.

[253] ▆▆▆▆▆▆▆▆▆▆▆ 2.

116.    As shown in **Appendix C**, at the participant level, ███ fees alone would exceed

the total administrative and recordkeeping costs paid to NRECA for more than 40% of Plan

participants between 2020 and 2024, despite ███'s more limited responsibilities.  In some

cases, participants would incur fees from ███ totaling $100 or more above the total

administrative and recordkeeping fees paid to NRECA.  Thus, even based on this highly

conservative comparison, a substantial proportion of Plan participants would be adversely

affected by the transfer of core recordkeeping services to ███.  Accounting for the narrower

scope of ███ services (*i.e.*, comparing the hypothetical ███ fees to only the NRECA fees

attributable to the services ███ would be responsible for) would increase this proportion of Plan

participants adversely affected.

117.    Named Plaintiff Mr. Sunderlin is one example of a Plan participant whose

hypothetical ███ fees would have exceeded his total administrative and recordkeeping fees paid

to NRECA during this period.  As shown in **Table 6** below, given his investment allocations and

account balances, Mr. Sunderlin's total administrative and recordkeeping fees paid to NRECA

between 2020 and 2024 were approximately $367 (between $52 and $103 per year).  Under

███ Mr. Sunderlin would have paid both $49 per year in core recordkeeping fees and

additional per-transaction fees for certain participant-elected transactions he opted for, such as

taking loans from the Plan.  As shown in **Table 6**, because Mr. Sunderlin not only maintained an

outstanding loan throughout this period but also initiated a new loan in 2023, he would have

incurred $175 in participant-elected transaction fees under ███ between 2020 and 2024 in

addition to the $49 per year core recordkeeping fee, and his total hypothetical fees paid to ███

would have been $420.  Thus, despite the much narrower scope of ███ services compared to

NRECA that makes this comparison highly conservative, as discussed above, Mr. Sunderlin's

*Confidential*

hypothetical fees paid to ██████ would have been approximately $53 more than the amount he

actually paid to NRECA.  A more appropriate comparison of the hypothetical ████ fees to only

the NRECA fees attributable to the services ████ would be responsible for would further widen

the gap between Mr. Sunderlin's hypothetical ████ fees and his actual fees paid to NRECA.

**Table 6**
**Illustrative Comparison of Hypothetical ████ Fees**
**and Approximate NRECA Fees for Mr. Sunderlin**
**2020–2024**

| Description | 2020 | 2021 | 2022 | 2023 | 2024 | Total |
|---|---|---|---|---|---|---|
| **Hypothetical ████ Fees[254]** | | | | | | |
| Core Recordkeeping Fees ($49 Per Year) [A] | $49 | $49 | $49 | $49 | $49 | $245 |
| Number of New Loans [B] | 0 | 0 | 0 | 1 | 0 | 1 |
| Loan Initiation Fees ($50 Per Loan) [C] = [B] X $50 | 0 | 0 | 0 | $50 | 0 | $50 |
| Number of Loans Outstanding [D][255] | 1 | 1 | 1 | 1 | 1 | 5 |
| Loan Maintenance Fees ($25 Per Year) [E] = [D] X 25 | $25 | $25 | $25 | $25 | $25 | $125 |
| Total Hypothetical ████ Fees [F] = [A] + [C] + [E] | $74 | $74 | $74 | $124 | $74 | $420 |
| **Approximate NRECA Fees** | | | | | | |
| Approximate NRECA Administrative and Recordkeeping Fees Paid [G][256] | $52.45 | $66.53 | $80.53 | $65.07 | $102.72 | $367.30 |
| Difference [H] = [F] – [G] | $21.55 | $7.47 | -$6.53 | $58.93 | -$28.72 | $52.70 |

---

[254] Participant Data for the NRECA 401(k) Pension Plan, 2020–2025, NRECA-MULLINS-00109854-9858; 401(k) Administration Transformation Strategy, NRECA Executive Stakeholder Committee, September 30, 2024, NRECA-MULLINS-00000081, p. 39.  Number of new loans taken and number of loans outstanding for Mr. Sunderlin are obtained from Participant Data for the NRECA 401(k) Pension Plan (Unique ID K5tF5aBHX8QhdkzZ32RJRYGsUAHFtYiXLLFgA4e7ltg=).

[255] Any loan balance outstanding during the year is assumed to represent one loan outstanding, as data identifying concurrent loans outstanding are not available; only quarter-end loan balances are available.

[256] *See* **Appendix D.**

*Confidential*

118.    The recordkeeping fee under ███ also represents a partial shift from an asset-based fee to a fixed dollar fee.  As discussed in **Section III.D**, asset-based fees tend to be more beneficial for employees with lower account balances, while fixed dollar fees tend to be more beneficial for higher-balance employees.  For example, assume two participants, one with a $80,000 balance and the other with a $10,000 balance, in a plan with an annual asset-based fee of 0.20% of plan assets.  The participant with the larger account balance pays $160 ($80,000 times 0.20%) annually, and the participant with the smaller balance pays $20 ($10,000 times 0.20%) annually.  If this plan instead charged all participants an annual fixed dollar fee of $49, the participant with the $80,000 balance would experience a decrease in fees compared to the asset-based fee, while the participant with the $10,000 balance would experience an increase in fees.  Thus, participating cooperatives or subgroups with relatively high account balances could benefit from this change in fee structure, while those with relatively low account balances could be harmed by this change.  As discussed in **Section IV.E**, account balances, and therefore administrative and recordkeeping fees, vary widely across participating cooperatives, subgroups, and participants.  Individualized inquiry would be required to determine the effect, and therefore potential harm, for each participating cooperative, subgroup, or participant.

### C.    Potential Conflicts Within the Proposed Class

119.    Plaintiffs claim that there are no intra-class conflicts within the Proposed Class.[257] In my opinion, there are material conflicts of interest within the Proposed Class arising from, among other things, the wide variation in plan assets, number of participants, and service needs across participating cooperatives and subgroups.  These differences mean that participants do not

---

[257] Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, *John Mullins and Thomas Sunderlin, et al. v. National Rural Electric Cooperative Association and the Insurance and Financial Services Committee,* January 29, 2026, p. 25.

*Confidential*

share a common economic interest in either the challenged fee structure or the relief Plaintiffs

seek.  For many participants—particularly those employed by smaller, service-intensive

cooperatives—the alleged "overcharges" under Plaintiffs' theory correspond to access to services

and economies of scale that would be unavailable or substantially more expensive outside the

NRECA Plan.  By contrast, some participants at larger cooperatives and subgroups or with

different service profiles might, in a but-for world, obtain similar recordkeeping services at lower

cost.  As a result, any uniform change to NRECA's pricing or service model would necessarily

help some Proposed Class Members only at the expense of others.

120.    For example, as discussed in **Section III.B and III.D**, plans with fewer

participants generally incur higher administrative and recordkeeping costs per participant in the

standalone market than larger plans, and vendors often unbundle and separately charge fees for

participant-directed transactions and advisory services.  Smaller participating cooperatives and

subgroups therefore may have benefited from NRECA's existing asset-based fee structure and

bundled "white-glove" services, which allowed them to access robust services at prices that

would be difficult or impossible to replicate in a standalone arrangement.  Larger cooperatives,

by contrast, might be better positioned to negotiate lower fees from alternative vendors for a

narrower set of services.  Under Plaintiffs' proposed relief, smaller cooperatives and their

participants could face higher total costs or reduced services, while some larger cooperatives

might experience cost savings and reduced service levels.

121.    ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████



122.

---

[258] Plan Information, 2021, NRECA-MULLINS-00058234, tab "Satisfaction."

[259] 401(k) Calls Data, 2020–2025, NRECA-MULLINS-00085995, tab "PIRC survey data."

[260] █████████████████████████████████████████████████████████.

[261] 2.00% = $20,548 / $1,028,468. Northeast Louisiana Power Cooperative, Inc. 401(k) Plan No. 2, Form 5500 Filing, 2021, Lines 7c, 8g. "Instructions for Form 5500-SF," *U.S. Department of Labor*, 2021, p. 14, available at https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2021-sf-instructions.pdf.



123.    The recent RFP process and the Plan's decision to transition core recordkeeping

services from NRECA to ███ further demonstrate these conflicting interests among Proposed

Class Members.  As discussed in **Section V.B**, the ███ pricing model introduces fixed per-

participant fees and new à-la-carte charges for participant-directed transactions such as loan

initiation, loan maintenance, and non-recurring distributions—services that previously carried no

separate charge under NRECA.  Participants and cooperatives with lower account balances or

higher transaction volumes could therefore experience higher total costs under the ███

structure, while participants with larger account balances or lower transaction activity may

experience cost reductions.  Given that the prevalence of loans, withdrawals, and other

participant-directed transactions varies widely across participating cooperatives and subgroups,

the financial impact of the RFP outcome differs across members of the Proposed Class and, in

---

[262] 401(k) Pension Plan, Form 5500 Filing, 2018, Schedule H, Line 5b.

[263] ████████████████████████████████████████ 5c.

[264] ██████████████████████████████████████████████████

[265] *See* **Table 1**.

[266] This analysis is based on information reported in these stand-alone plans' Form 5500 filings and is provided for illustrative purposes only.  As discussed in **Section V.A**, unless specifically stated in the audited financial statements, Form 5500 filings do not provide sufficient information to reliably estimate administrative and recordkeeping fees.

many cases, is directly adverse to them.  This real-world example demonstrates that even when the Plan pursues changes intended to reduce aggregate administrative and recordkeeping costs, the resulting effects are not uniform: some cooperatives and their participants benefit while others are harmed.  These conflicting economic outcomes confirm that the Proposed Class does not share a common interest and that any alleged harm cannot be established through common evidence.

## VI.    NAMED PLAINTIFFS ARE NOT REPRESENTATIVE OF THE PROPOSED CLASS

124.    The Named Plaintiffs, Mr. Mullins and Mr. Sunderlin, seek to represent a Proposed Class consisting of themselves and "all similarly situated Plan participants."[267] Plaintiffs claim that there are no intra-class conflicts between the Named Plaintiffs and the Proposed Class.[268]  However, based on the characteristics of their employing cooperatives, their individual account profiles, and their level of financial sophistication, neither Plaintiff is representative of the overwhelming majority of Proposed Class Members.

125.    Both Named Plaintiffs work for cooperatives that are substantially larger and better resourced than nearly all cooperatives participating in the Plan.  Mr. Mullins is employed by Associated Electric Cooperative Inc., one of the five largest cooperatives in the Plan, with more than 800 participants during the Proposed Class Period.[269]  Similarly, Mr. Sunderlin was employed by South Central Power Company, a cooperative ranked within the top 40 of the

---

[267] Complaint, ¶ 97.

[268] Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, *John Mullins and Thomas Sunderlin, et al. v. National Rural Electric Cooperative Association and the Insurance and Financial Services Committee,* January 29, 2026, p. 25.

[269] Resume of Mr. John Mullins, PLTF-MULLINS-0001623-1624; Plan Data for the NRECA 401(k) Pension Plan, NRECA-MULLINS-00109852.  The Associated Electric Cooperative Inc. also has multiple levels of executive leadership, including HR and benefits staff.  *See, e.g.*, "Human Resources Business Partner," *LinkedIn*, available at https://www.linkedin.com/jobs/search/?currentJobId=4325339821.

*Confidential*

approximately 900 participating cooperatives in terms of size, with more than 290 participants.[270]

By contrast, the average participating cooperative had between 75 and 85 participants during the

Proposed Class Period; approximately 98% of cooperatives had fewer than 500 participants, and

approximately 90% had fewer than 200 participants.[271]  The Named Plaintiffs therefore fall into

a very small subset of participants whose employers operate at a scale far larger than that of the

typical cooperative in the Proposed Class.

126. 

---

[270] Resume of Mr. Thomas Sunderlin, PLTF-SUNDERLIN-0001961-1962; Plan Data for the NRECA 401(k) Pension Plan, NRECA-MULLINS-00109852.

[271] Plan Data for the NRECA 401(k) Pension Plan, NRECA-MULLINS-00109852; **Exhibit 3.A**.

[272] "Exploring the pros and cons of multiple-employer plans," *Mercer*, March 26, 2025, available at https://www.mercer.com/insights/investments/market-outlook-and-trends/exploring-the-pros-and-cons-of-multiple-employer-plans/.

[273] Letter from Newport Trust Company Re: 401(k) Pension Plan, Retirement Security Plan and Group Benefits Program Consultant Studies, December 20, 2023, NRECA-MULLINS-00031317-1731 at 1323.

[274] Letter from Newport Trust Company Re: 401(k) Pension Plan, Retirement Security Plan and Group Benefits Program Consultant Studies, December 20, 2023, NRECA-MULLINS-00031317-1731 at 1323.



127.   The Named Plaintiffs' individual account characteristics also diverge sharply from those of the average participant.  As shown in **Exhibit 1**, the average Plan participant's assets during the Proposed Class Period ranged from approximately $168,000 to $210,000 and stood at $209,394 as of December 2024.  Mr. Mullins's account balance ranged from approximately $30,000 to $100,000 during the period, and Mr. Sunderlin's ranged from approximately $30,000 to $76,000—both materially below the Plan-wide average.[275]  Because the Plan's administrative and recordkeeping fees are collected on an asset-based basis through investment option expense ratios, participant-level fees vary proportionally with account size.[276]  Participants with larger balances pay materially higher dollar amounts for administrative and recordkeeping services, while participants with smaller balances pay materially less.  Accordingly, the Named Plaintiffs—each of whom held significantly below-average account balances—paid far lower administrative and recordkeeping fees (in dollars) than a participant

---

[275] NRECA 401(k) Pension Plan Statement for John P. Mullins, December 31, 2020, NRECA-MULLINS-00026168-6169; NRECA 401(k) Pension Plan Statement for John P. Mullins, December 31, 2024, NRECA-MULLINS-00026164-6165; NRECA 401(k) Pension Plan Account Summary for John P. Mullins, March 31, 2025, NRECA-MULLINS-00016061-6062; NRECA 401(k) Pension Plan Statement for Thomas J. Sunderlin, December 31, 2020, NRECA-MULLINS-00026158-6159; NRECA 401(k) Pension Plan Statement for Thomas J. Sunderlin, December 31, 2024, NRECA-MULLINS-00026148-6149; NRECA 401(k) Pension Plan Account Summary for Thomas J. Sunderlin, March 31, 2025, NRECA-MULLINS-00022034-2035.

[276] NRECA 401k Fee Disclosure, October 2020, NRECA-MULLINS-00031736-1739 at 1737; NRECA 401k Fee Disclosure, October 2021, NRECA-MULLINS-00031740-1743 at 1741; NRECA 401k Fee Disclosure, October 2022, NRECA-MULLINS-00031744-1747 at 1745; NRECA 401k Fee Disclosure, October 2023, NRECA-MULLINS-00031748-1751 at 1749; NRECA 401k Fee Disclosure, September 2024, NRECA-MULLINS-00031752-1755 at 1753.

*Confidential*

with an average account balance during the Proposed Class Period. Specifically, based on their investment allocations and asset levels, Mr. Mullins's administrative and recordkeeping fee was approximately $56.72 in 2020, $86.86 in 2021, $97.64 in 2022, $134.20 in 2023, and $179.51 in 2024, and Mr. Sunderlin's administrative and recordkeeping fee was approximately $52.45 in 2020, $66.53 in 2021, $80.53 in 2022, $65.07 in 2023, and $102.72 in 2024.[277] By comparison, the average administrative and recordkeeping fee paid by Plan participants was approximately $368 in 2020, $352 in 2021, $336 in 2022, $363 in 2023, and $381 in 2024.[278] Furthermore, the administrative and recordkeeping fees paid by Mr. Mullins and Mr. Sunderlin over the Proposed Class Period were generally lower than the administrative and recordkeeping fees that Mr. Scheinberg calculates for the Scheinberg Comparators over this period, as shown in **Table 7** below. For example, in each year during the Proposed Class Period, both Named Plaintiffs' administrative and recordkeeping fees were lower than or comparable to Mr. Scheinberg's calculated fees for the Engage PEO Retirement Savings Plan, which, according to Mr. Scheinberg's calculations, had fees at approximately the median of the Scheinberg Comparators in each year. Mr. Mullins's administrative and recordkeeping fees were also lower than the median fee that Mr. Scheinberg calculates for the Scheinberg Comparators in all but one year, while Mr. Sunderlin's fees were lower than the median of the Scheinberg Comparators in every year.

---

[277] *See* **Appendix D.**

[278] *See* **Exhibit 12.A.**

*Confidential*

128.    Collectively, fees for at least one of the Named Plaintiffs were lower than Mr. Scheinberg's calculated fees for at least nine of the ten Scheinberg Comparators in every year, and over the course of the Proposed Class Period, both Named Plaintiffs' total administrative and recordkeeping fees paid were substantially lower than the median of the Scheinberg Comparators.  These observations demonstrate that Named Plaintiffs' experiences and incentives are not representative of the Proposed Class as a whole.

**Table 7**
**Comparison of Scheinberg Comparator Fees and Approximate NRECA Administrative and Recordkeeping Fees Paid by the Named Plaintiffs[279, 280]**
**2020–2025**

| Description | 2020 | 2021 | 2022 | 2023 | 2024 | 2025[281] | Total |
|---|---|---|---|---|---|---|---|
| **Scheinberg Comparators[282]** | | | | | | | |
| Credit Union Retirement Plan Association 401(k) Plan | $239 | $310 | $134 | $145 | $160 | $160 | $1,147 |
| Engage PEO Retirement Savings Plan | $140 | $155 | $144 | $139 | $173 | $173 | $924 |
| Extensis Group Retirement Savings Plan | $215 | $249 | $81 | $87 | $141 | $141 | $914 |
| G&A Partners Multiple Employer 401(k) Plan | $264 | $369 | $342 | $209 | $250 | $250 | $1,685 |
| Oasis Retirement Savings Plan | $111 | $119 | $109 | $118 | $131 | $131 | $719 |
| Pacific Dental Services, LLC 401(k) Plan | $107 | $99 | $69 | $73 | $85 | $85 | $517 |
| Questco Companies Retirement Plan | $93 | $155 | $163 | $149 | $248 | $248 | $1,054 |
| Retirement Plan for Michigan Credit Union Employees 401(k) Savings Plan | $156 | $157 | $135 | $137 | $131 | $131 | $848 |
| Savings Plan for Employees of NTCA and Its Members | $147 | $140 | $128 | $144 | $152 | $152 | $863 |
| Vensure Employer Services, INC. 401(k) Profit Sharing Plan | $113 | $132 | $253 | $145 | $173 | $173 | $989 |
| **Median** | **$143** | **$155** | **$135** | **$141** | **$156** | **$156** | **$885** |
| | | | | | | | |
| **Named Plaintiffs[283]** | | | | | | | |
| Mr. John Mullins | $57 | $87 | $98 | $134 | $180 | $180 | $734 |
| Mr. Thomas Sunderlin | $52 | $67 | $81 | $65 | $103 | $103 | $470 |

129.    In addition, Mr. Sunderlin made use of SDBA and requested and received a loan during the Proposed Class Period, plan features that are not widely utilized among plan participants.[284]  Approximately 1% of participants used an SDBA and about 16% took at least

*Confidential*

one loan, and only around 0.3% used both features.[285]  Mr. Sunderlin's use of these plan features

that are used relatively infrequently, particularly in combination with each other, further

differentiates his experience from that of the typical Plan participant, reinforcing that he is not

representative of the vast majority of Proposed Class Members.  As discussed in **Section V.B**,

Mr. Sunderlin paid no loan-related fees under the NRECA fee structure, whereas he would have

paid $175 in such fees between 2020 and 2024 had the ▮▮▮▮ fee structure been active during this

period.[286]

130.    This distinction is also relevant when evaluating Mr. Sunderlin's fees relative to

the Scheinberg Comparators.  Several, if not all Scheinberg Comparators, impose participant-

elected transaction fees, including loan set-up and annual maintenance fees, during the Proposed

---

[279] Amount shown in green indicates that the Scheinberg Comparator's fee was higher than the fees paid by at least one of the named plaintiffs in the corresponding year.  For each row, the annual fees are rounded for presentation, while the Total reflects the sum of the unrounded fees.  As a result, the displayed annual fees may not sum exactly to the Total.  For 2022, the fees for Extensis Group were $81.25, and the approximate administrative and recordkeeping fees paid by Mr. Thomas Sundelin were $80.53.  Accordingly, Extensis Group for 2022 is highlighted in green.

[280] In this table, I estimate the Named Plaintiffs' administrative and recordkeeping fees by applying the administrative expense ratio derived after deducting internal and external investment management fees from total administrative expenses.  In **Appendix F**, I present a sensitivity analysis of **Table** 7 that does not deduct internal investment management fees.  The result of that analysis is consistent with those shown in **Table** 7: under either approach, the total administrative and recordkeeping fees paid by each Named Plaintiff remain below the total median fees reported for the Scheinberg Comparators.

[281] Consistent with the assumption in Scheinberg Report, fees in 2025 are assumed to be the same as those in 2024. *See* Scheinberg Report, p. 14.

[282] Fees for the Scheinberg Comparators are obtained from Exhibit C of the Scheinberg Report and represent Schedule C costs on a per-participant with a balance basis.  Schedule C costs include Code 28 (Investment Management) costs, consistent with the approach in the Scheinberg Report and associated exhibits for estimating damages.  Scheinberg Report, p. 12, p. 14, Exhibit C, Exhibit D.

[283] *See* **Appendix D.**

[284] NRECA 401(k) Pension Plan Statement for Thomas J. Sunderlin, March 31, 2025, NRECA-MULLINS-00022034-2035 at 2035.

[285] *See* **Appendix E.**

[286] As discussed in **Section V.A**, virtually all other vendors charge fees for loans and other participant-elected transactions and, in many cases, these fees exceed the amounts in the ▮▮▮▮ fee structure (*e.g.*, $150 for each loan setup and $150 annually for loan maintenance).

*Confidential*

Class Period.[287]  Because the NRECA Plan waived participant-elected transaction fees other than

the SDBA fee, Mr. Sunderlin would have incurred additional fees had the Plan adopted the fee

structures of those comparator plans.  These additional fees are beyond the fee differences

reflected in **Table 7** between Mr. Sunderlin's fees and the median fees of the Scheinberg

Comparator Plans, because the median fees reflect only a weighted average of fees for

participants with or without the loan transactions, rather than fees for a participant like

Mr. Sunderlin who uses loan services heavily.

    131.    NRECA also provides individualized educational, advisory, and participant-

support services that differ in value depending on a participant's financial literacy and

investment experience.[288]  Mr. Mullins appears to demonstrate a level of investment

sophistication that is atypical for Plan participants.  For example, in a February 17, 2023 email to

NRECA, he inquired about the investment strategies used in the Plan and the extent to which

environmental, social, and governance ("ESG") considerations were incorporated—topics that

typically require a more advanced understanding of investment concepts.[289]  He further indicated

---

[287] For example, participants in the Engage PEO Retirement Savings Plan were charged $100 for loan set-up and $50 for annual loan maintenance.  *See* "The Engage PEO 401(k) Retirement Savings Plan," *Engage PEO*, 2020, available at https://www.engagepeo.com/sites/default/files/2020-04/401k%202020.pdf.  Participants in the Extensis Group Retirement Savings Plan were charged $50 for loan set-up and $50 for annual loan maintenance. *See* "Disclosure & Comparative Chart for Retirement Plan Participants," *Extensis Group Retirement Savings Plan*, July 29, 2025, p. 11.  Participants in the Vensure Employer Services, INC. 401(k) Profit Sharing Plan were charged $150 for loan set-up and $50 for annual loan maintenance.  *See* "401(k) Plan Features," *Vensure*, available at https://www.protradenet.com/documents/Vensure-401k-Plan-Features-Form-20221214.pdf. Participants in the Questco Companies Retirement Plan were charged $150 for loan set-up and $50 for annual loan maintenance.  *See* "Benefits Guide," *Questco*, 2023, p. 16, available at https://5826396.fs1.hubspotusercontent-na1.net/hubfs/5826396/2023-Questco-BenefitsGuide-1.pdf.

[288] Letter from Newport Trust Company, Re: "401(k) Pension Plan, Retirement Security Plan and Group Benefits Program Consultant Studies," December 20, 2023, NRECA-MULLINS-00031317–1731 at 1352; "Benefits Guide: Electric Cooperatives of Arkansas: 04201-001 & 04034-001," *Electric Cooperatives of Arkansas*, 2026, p. 25, available at https://www.aecc.com/wp-content/uploads/ECA-OrientationGuide_26_04034_04201_FINAL-OE-Version.pdf.

[289] Email from John Mullins to NRECA, re "Investment Strategy and ESG," February 17, 2023, NRECA-MULLINS-00026433-6434 at 6434.

*Confidential*

that he might direct contributions to a self-directed brokerage account if ESG considerations influenced Plan investments, reflecting a familiarity with investment strategy and alternative account structures not commonly observed among Plan participants.[290]  Similarly, Mr. Sunderlin also appears to demonstrate a level of investment sophistication that is atypical for Plan participants.  For instance, he testified in his deposition that he created his own financial plan without assistance, exited the Plan following his departure from South Central Power Company, and invested the funds independently, testifying that he believed he could generate higher returns on his own.[291]  He also demonstrated an understanding of core investment concepts such as diversification and risk-return tradeoffs, as well as familiarity with multiple investment options, including treasury bonds, short-term bond funds, and the S&P 500 index, as reflected in his deposition testimony.[292]  It has been my experience, having met with thousands of participants in group and individual settings over the course of my career, that the vast majority of participants have a limited understanding of investment concepts, including the need to diversify investments and to assume risk to increase portfolio returns.  This limited investment knowledge, in large part, accounts for the continuing popularity of target retirement date funds (a single fund option based on age) and the increasing growth in the use of managed account services.[293]

---

[290] Email from John Mullins to NRECA, re "Investment Strategy and ESG," February 17, 2023, NRECA-MULLINS-00026433-6434 at 6434.

[291] Sunderlin Deposition, 93:22-94:2, 99:13-100:1; 96:6-8.

[292] Sunderlin Deposition, 97:14-98:6; 143:6-9; 143:18-23; 144:6-17.

[293] For example, in a 2022 study of 401(k) participants, approximately 38% of workers reported being very confident in their ability to make investment decisions on their own.  That figure increased by 17 percentage points, to approximately 55%, with the assistance of a financial professional, suggesting that a typical participant's confidence in investment decision-making increases substantially with the help of financial professional guidance. *See* "2022 401(k) Participant Study," *Charles Schwab*, June 2022, p. 9, available at https://content.schwab.com/web/retail/public/about-schwab/schwab_2022_401k_participant_survey_deck.pdf.

*Confidential*

132.    By contrast, as shown in **Exhibit 6.A**, NRECA delivered on average approximately 281 PIRC seminars annually during the Proposed Class Period and offered one-on-one meetings designed to help participants understand their retirement planning options.[294] The frequency and scope of these services indicate that many participants rely heavily on NRECA's educational and advisory support—particularly those with limited investment knowledge.  Given Mr. Mullins's and Mr. Sunderlin's comparatively high level of sophistication, their experience with and reliance on NRECA's services differ materially from that of the typical participant.  This further confirms that Mr. Mullins and Mr. Sunderlin are not representative of the Proposed Class.

Respectfully submitted, this 5th day of February 2026,

_____

Steven K. Gissiner

---

[294] Letter from Newport Trust Company Re: 401(k) Pension Plan, Retirement Security Plan and Group Benefits Program Consultant Studies, December 20, 2023, NRECA-MULLINS-00031317-1731 at 1352; "Benefits Guide: Electric Cooperatives of Arkansas: 04201-001 & 04034-001," *Electric Cooperatives of Arkansas*, 2026, p. 25, available at https://www.aecc.com/wp-content/uploads/ECA-OrientationGuide_26_04034_04201_FINAL-OE-Version.pdf.